

Meyer v Gannett

**RECEIVED**
10/4/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court for the Northern District of Illinois

ANN A. MEYER
Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media)

Defendant

1:24-cv-09529
Judge Thomas M. Durkin
Magistrate Judge Sheila M. Finnegan
RANDOM / CAT. 2

Ms. Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (work)
847-271-0177 (cellphone)

Ms. Heather A. Jackson
Partner, Taft Law
111 E. Wacker Dr., Suite 260
Chicago, IL 60601-4208
hjackson@taftlaw.com
Direct dial: 312-836-4172
Tel. 312-527-4000

Mr. Andrew Murphy
Associate, Taft Law
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601-4208
amurphy@taftlaw.com
Direct dial: 312-836-4145
Tel: 312-527-4000

## COMPLAINT

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth a Complaint against DEFENDANT Gannett Company Inc., and in the pursuit of justice states the following:

1    On Dec. 18, 2023, the following occurred, which are obvious violations of the Americans with Disabilities Act (ADA) and the ADA Amended Act of 2008 (ADAAA):

2    The Plaintiff, a professional journalist with disabilities and a former employee in high regard at the company named in this complaint, was coerced and retaliated against when she was told she must sign an unlawful employment agreement after being offered a full-time position. She received the offer for full-time remote work while at her home in Evanston, Illinois, and was at this same location when the job offer was unlawfully rescinded.

3    The Plaintiff was excluded from employment in a discriminatory act.

1

4     The Plaintiff was denied a reasonable accommodation.

5     The Plaintiff was retaliated against for asserting her rights, for pointing out an employment agreement she was being coerced to sign was unlawful, for having worked through her business previously in part because of her disabilities, and for filing an earlier complaint about disability discrimination at this same employer, which she had worked for from June 2018 to March 2020, at which time she was terminated in a discriminatory and retaliatory act. The Plaintiff filed a legal complaint in U.S. District Court for the Northern District of Illinois on in August 2022 after receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC) and revised it in November 2022, when it was dismissed without prejudice in this courthouse. She received another Notice of Right to Sue from the EEOC on July 15, 2024 regarding EEOC case number 470-2024-0436, following these more recent acts of discrimination, described as follows:

6     On Dec. 18, 2023, after accepting a job offer at the South Bend Tribune, owned by Gannett Co. Inc., the offer was rescinded in a discriminatory act, which is a Failure to Rehire, as the Plaintiff believes she had been unlawfully let go in March 2020 from the same employer in a different newsroom.

7     On Dec. 18, 2023, the Plaintiff was discriminated against in a violation of the Equal Pay Act when a job offer for a nonexempt position was described as at an "annualized rate of approximately $50,000" or $24.04 per hour. This is less than the Plaintiff was earning at her last journalism job, which was $60,000 annually in 2023 in an exempt position as a journalist. It also is less than the Plaintiff grossed working full-time through her company in 2013, which was about $77,000 annually.

8     The offer for $24 an hour doesn't fully consider the Plaintiff's experience and training, nor does it take into account wage inflation.

9     The extent of the discrimination and obstruction the Plaintiff has faced from the Defendant she believes amounts to a violation of U.S.C. 241, which prevents any concerted effort involving two or more people from interfering with someone's Constitutional rights, including freedom of speech and freedom of the press.

10     The Plaintiff also believes she was subject to age and gender discrimination, as she is an over-40, single, divorced female with disabilities and receives no government assistance and no alimony. She needs and deserves a wage or salary commensurate with her experience and education, which are considerable. She was interviewed by two males younger than her and with less relevant education and experience, both of whom would have been above her in the company's hierarchy. Further, the HR representative who rescinded the job offer also apparently had less education and certainly less experience in contracts or this complaint would be unnecessary.

11     The Plaintiff, who worked through her own company prior to joining the Defendant employer and continues to own and work through her company, called L3C Chicago L3C LLC and which does

business as Ann Meyer Communications, also was the victim of several antitrust laws, as she also offered to do the role offered by working through her business, but this offer was rejected. The Plaintiff requests the court to consider the historical context of this matter, as it was during the Covid-19 pandemic and during a particularly difficult economic time for the media industry, which is what the Plaintiff's business relates to as does the employer Defendant's. Like many small business owners, the Plaintiff decided due to economic challenges, it was not prudent to relaunch her company in a big way. Instead, it was active as a holding company and was holding her intellectual property. She had relaunched a website in April 2020, just after being terminated from the employer Defendant, only to have her site repeatedly hacked. She doesn't know who hacked the site. With the damages costly to repair, she put the site on hold while pursuing full-time employment and she doesn't not believe she should be punished or retaliated against for this decision, which to a certain extent reduced the financial losses she suffered because of this employer Defendant's discriminatory actions.

12. Upon reading the four-page single-spaced "Confidential Information and Invention Assignment Agreement" employer Defendant said was required for me to sign -- which was a blatantly false statement because several federal laws exist barring this type of coercive document presented with a job offer. It also was symptomatic of the employer Defendant's poor judgment and apparent incompetence in the human resources (HR) department – and this is based on the Plaintiff witnessing not one or two but several serious errors and discriminatory actions on the part of the employer Defendant's HR departments in several locations. Further, the journalists extending the offer also apparently aren't well trained in human resources and employment law or this could have been resolved to mutual satisfaction. The Plaintiff points out she is not trained as a lawyer, but in her journalism training she was taught to stay abreast of new laws, legislation and other rules and regulations that would change the status quo, in part because they are often newsworthy, either in and of themselves or as they are given practical consideration in the the courtroom and in part because it's useful for everyone to know what's consider "against the law" in this country.

13. Most people are aware of the Americans with Disabilities Act to some extent, though not necessarily every aspect of it. The Plaintiff made a point of discussing her physical disabilities during the job interview when she said she would like to be certain her workspace – whether it be the newsroom (which had been closed so wasn't a viable option) or an apartment – was clean and free of allergens, contaminants, and germs.

14. While the Plaintiff's condition has affected her periodically for most of her life, this was still during the Covid-19 pandemic, which exacerbated her likelihood of becoming ill. At a minimum, the Plaintiff needed the employer Defendant to comply with the ADA, which provides for access and

15. The Plaintiff had suffered a health issue when she was last employed by the Defendant, which also failed to provide reasonable accommodations in the form of remote work in March 2020, which was during the Covid shutdown and stay-at-home order in Chicago. The HR representatives at the time instructed her to apply for positions in other newsrooms, as the one she had worked in wasn't clean.

16. Partly because of Covid and quite likely because many newsroom hiring managers don't consider the ADA's provisions for access, the Plaintiff wasn't rehired by employer Defendant until December 2023 – or about 44 months after her wrongful termination -- despite dozens of applications to Gannett positions she was highly qualified for. The Plaintiff incurred a significant financial loss – estimated at well over six figures – and other hardship, including illness and surgery for a life-threatening health issue related to her disability during this period of waiting to be rehired. She might not have experienced this severe health issue at all had she been allowed to work remotely from 2019 through Covid and possibly indefinitely – for does it really matter where she works from? Then, about four years after she suffered a serious health issue from working in the employer Defendant's contaminated newsroom, she was discriminated against again.

17. After spending countless hours diligently applying for dozens of positions at the employer Defendant, she was highly qualified for, on Dec. 18, 2023, she was told she was **hired** for the full-time role of education reporter. To have this job offer rescinded for unlawful reasons was appalling and unlawful.

18. Further, the Plaintiff has every reason to believe the way the offer was rescinded, with the HR representative essentially interrupting her during a phone call, and telling the Plaintiff, "I'll just rescind the offer then," instead of granting the Plaintiff's reasonable request to recuse herself from any discussion of trade secrets or highly sensitive information, was discriminatory and a violation of the ADA. The employer Defendant engaged in this discriminatory act of exclusion and retaliation without fully considering the Plaintiff's valid and lawful reason for wanting to **amend** the Confidential Information agreement to allow the Plaintiff to recuse herself from any discussion of confidential trade secrets, which would be a reasonable request.

19. The employer Defendant could have subsequently offered the Plaintiff another position, any one of several she applied for earlier this year that were fully remote, but the employer Defendant has not done so, further compounding the discrimination and exclusion.

20. It's quite likely other hiring managers have heard an incorrect version of what happened and have decided they won't bother extending an offer if the Plaintiff won't sign the required Confidential Information document, but no one from the employer Defendant company has contacted the Plaintiff

to attempt to hear for themselves what the issue was or why she felt she shouldn't be forced to sign the document.

21. To the extent hearsay travels between news companies, the Plaintiff suspects other hiring managers at other employers also have used this as a reason not to extend an offer to the Plaintiff, instead of attempting to discuss the issue and work out a resolution.

22. Because the Plaintiff also is the owner of a business in good standing in the state of Illinois, which she is now working through, the documents the Defendant asked her to sign violated several federal antitrust laws, including the Clayton Act, which bars tying contracts that essentially amount to a hostile takeover or an interlocking directorate. The discriminatory action also violates the Sherman Antitrust Act of 1890 (26 Stat. 209, 15 U.S.C. §§ 1–7). This is another antitrust law establishing and requiring free competition and prohibiting unfair monopolies, which apparently the employer Defendant was trying to pull off through dishonest and anything-but-transparent means. For a news company, which makes it money and engages in the business of communicating information, to be so deliberately oblique and passive-aggressive is particularly distasteful as well as unlawful. At no time was the Plaintiff informed the employer Defendant was interested in acquiring her company and intellectual property, nor was she offered a fair price for it. Instead, this publicly traded bully of a company, which is considered one of the nation's largest news organizations, resorted to attempting to pull a fast one so it could essentially steal the Plaintiff's business and intellectual property.

23. This development, personally harmful to the Plaintiff, ties back to the Defendant's earlier outrageously unlawful discrimination in 2019 and 2020, when her work was never in question but she was terminated instead of being offered a simple, reasonable accommodation of remote work after having been injured in a contaminated newsroom, when reporters were told to clear out at certain times when the chemicals were particularly strong. An HR director in the fall of 2019 also had approached the Plaintiff at her workstation, asked for her driver's license so she could make a copy of it, then brought it back to the Plaintiff and said: "In six months, you'll be a disabled veteran." A couple of months later, the Plaintiff was seriously injured when the minivan she was driving was hit with such force in relatively quiet neighborhood in Evanston, Illinois, where she is a resident, that it flipped over and rolled. The low-mileage minivan with hardly a scratch on it prior to the accident, was totaled. This type of accident, while unheard of and quite rare in Evanston, occurs much more regularly in Savannah, Georgia, which has a high accident rate and a healthy personal injury law industry, and where the Plaintiff had worked for the employer Defendant from 2018 to the end of 2019, when she took an FLMA leave. She was terminated at the end of March 2020, when the Defendant failed to provide a reasonable accommodation of remote work.

24. The earlier discrimination is described in a legal complaint (122-cv-04299) that was dismissed without prejudice in United States District Court for the Northern District of Illinois in November 2022 as the Plaintiff was without representation. The Plaintiff is requesting legal representation as this matter involves the public interest.

25. This car accident occurred about six weeks after the employer Defendant's CEO Mike Reed and another executive told employees during a virtual meeting the company was launching a small business hub, which sounded a lot like a business concept the Plaintiff had created in 2009 and 2010 and which was still a live site online until 2021, though she wasn't working on it while she was employed by the employer Defendant. Did any one at the employer Defendant speak to the Plaintiff about this directly? No.

26. Besides the Confidential Information part of the document, the Plaintiff also had questions about the intent behind other sections of document, but the HR representative hung up before the Plaintiff could ask them. The Plaintiff has seen quite a few agreements, as she has worked as an independent journalist for over 30 years. She also has written and edited for publications without any agreement, and this is allowed, leading her to suggest this entire document was unnecessary and served a purpose other than welcoming her back to Gannett. She believes it was being used to allow Gannett to take her intellectual company, which her business L3C Chicago L3C LLC holds. It is registered with the State of Illinois. Much of the IP involves copyright, which is in effect for 70 years past the creator's death. The plaintiff also had come up with an original tagline when she was covering small business and trademarked the following: "Informing, inspiring and connecting businesses." She also holds domain names related to content creation.

27. The document also states the employee/Plaintiff agrees to allow the Defendant to **violate** her by taking Moral Rights to her work, as it states, "I hereby ratify and **consent** to any action of the Company that would **violate** such Moral Rights in the absence of such ratification/consent" of assignment of all rights of paternity, integrity, disclosure and withdrawal and any other rights, including Moral Rights.

28. While the document excluded some inventions the Plaintiff develop on her own, the exclusions don't apply to works or inventions that "relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably **anticipated research** or development of the employer." The Plaintiff's business relates to the news business, and while she hadn't worked with or for Gannett previously, what would stop this aggressive and hostile company from claiming any or all of her work related to the same industry as theirs and therefore should be assigned to Gannett? In the Plaintiff's experience and observation, this company has abused its power repeatedly for no reason other than greed and the size of it, but news monopolies are prohibited in this

country. The government often intervenes when a media company is making an acquisition, such as purchasing another radio or TV station, so as to prevent the concentration of power in disseminating the news to the public.

29  The document also prevents the Plaintiff, who was the owner of L3C Chicago L3C LLC while employed with Gannett and who still is the owner of L3C Chicago L3C LLC, from entering into any other agreement that conflicts with the one Gannett intended her to sign in order to work for $24 an hour in a nonexempt position, which albeit was a raise from the $18 an hour she was earning in 2018 and 2019, but still not a whole lot given the rate of inflation and what Gannett had put her through. What was missing was a settlement for the previous harms. What also was missing from this agreement was a financial offer for her business, which must have some value to Gannett. But perhaps she's not interested in selling her company right now. She shouldn't be forced to confront this for an exempt hourly position. She wasn't interfering in Gannett's business, yet it has interfered with hers.

30  This is a worker classification/misclassification issue, and perhaps Gannett should have offered to hire her through her business, as it obviously was aware she had considerable intellectual property, or it wouldn't have asked her to sign this outrageous agreement. But it also could have hired her as an hourly nonexempt education reporter, which is what Gannett offered and what the Plaintiff accepted before this outrageous document was presented for her signature – and this hourly nonexempt arrangement shouldn't have interfered in her business, and it also wouldn't have interfered in Gannett's business.

31  The Plaintiff didn't sign the agreement because Gannett rescinded it. When the Plaintiff attempted to go back to the electronic document, including the offer, an electronic message said it was no longer available.

32  In another disturbing part of the document, it raises the possibility of the Plaintiff's demise –such as because of an incapacitating illness – in which case Gannett would become her agent. It states: "If the company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me."

33  Given the Plaintiff's previous injuries in the Defendant's newsroom and during Covid when she was on an unpaid Family and Medical Leave Act leave, this raises a serious concern for her about whether Gannett might actually try to harm her in an effort to become her agent and take over her business and intellectual property.

34  Further, the Plaintiff is concerns rumors related to this agreement – and the fact she decline to sign it -- has played a role in Gannett's decision to shun her other applications and offers to work for other Gannett newspapers, such as the Milwaukee Journal Sentinel, which she believes is further indication of the company's retaliation for asserting her rights per the ADA and other laws and for questioning Gannett's business practices. The Plaintiff believes the HR director who told her she had to sign the employment agreement doesn't fully understand employment law and why this document is unlawful, while the Plaintiff has spent considerable time, money and energy learning about employment law in graduate school, where she earned a master's degree with a focus in management.  The Plaintiff is aware of what the ADA covers how the law was broadened in 2008 with the ADA Amendments Act. The Plaintiff understands what her rights are, while the HR representative did not. Those on the editorial side she interviewed with apparently didn't know the procedure – or perhaps Gannett doesn't have a procedure – for what to do when the HR representative for your newsroom blocks the hiring process.

35  The Plaintiff is still unemployed because of this company's discriminatory and retaliatory acts against her, though her unemployment compensation ended months ago. While the Plaintiff is freelancing currently, the amount she earns doesn't come close to the level of compensation she deserves commensurate with her years of experience and substantial education.

36  The Plaintiff is freelancing for a newspaper in Wisconsin, working remotely from her townhouse in Evanston, but not earning anywhere near enough to cover her my bills and to get rid of the debt she has accumulated since being terminated in 2020. She has incurred about $34,000 in credit card debt, some of which is coming due in November, and she has had to draw out funds early from 401Ks, including cashing out two small 401K entirely and making a dent in a third to survive during a period of unusually high inflation.

37  The Plaintiff doesn't have sufficient funds to attempt to build out her business at this juncture, especially given the precarious nature of the news industry where Artificial Intelligence and other interference from major technology companies pose a real threat to its future and its financial sustainability.

38  The Plaintiff also doesn't have sufficient funds to hire an attorney, as they charge $500 an hour.

39  The Plaintiff also doesn't have sufficient funds to retire, nor is she of retirement age. She is not eligible for Social Security currently. If she applies for Social Security prior to her full retirement age of 67, it won't be anywhere near enough to cover her expenses.

40  The ADA works in tandem with other laws. It states:

41  "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42  "(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

43  The Act also provides for remedies when Retaliation, Interference, Coercion or Intimidation are factors in the discrimination.

44  The Act states, "(c) Remedies and procedures. - The remedies and procedures available under sections 12117, 12133, and 12188 of this title *[sections 107, 203 and 308]* shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter *[title I, title II and title III, respectively."*

45  The Plaintiff's business collaborates with other news media companies and forms an alliance with the same mission of informing readers. It's not designed to be a competitor. Instead, it works with other news media to help them be more effective, efficient and to reach a broader audience. At no time has the Plaintiff presented herself or her business as a threat to the employer Defendant. Further, the position she held from 2018 to 2020 and the one she was offered in December 2023 were a nonexempt hourly role, where she should have been allowed to write on the side. To fail to do so would be a violation of her Constitutional right to freedom of speech and freedom of the press. To the extent she was discouraged from doing presents an employment misclassification issue. She did not complain about the hourly, nonexempt terms of her employment, but she also could have been hired through her business, which might have been preferable to both parties and might have averted this long, drawn out dispute that has cost her precious time and money and stymied her business. It raises a question of whether the employer Defendant was involved in the hacking of her company's small business website, SmallBizChicago.com, in 2020, causing the Plaintiff further harm.

46  The Plaintiff recalls an HR recruiter told her at a journalism conference in 2019 the Defendant doesn't hire for experience. She doesn't doubt the accuracy of this statement, but asserts it speaks to

the extent of the company's discriminatory employment practices, which led to this dispute. If an HR representative or a hiring manager had more experience or education, this dispute wouldn't have occurred in the first place.

47  For the PLAINTIFF and others with disabilities affecting their ability without assistance to lead a normal life, employment laws are even stronger than they are for other workers. Employees aren't required to announce their disabilities, due to privacy considerations, but they are protected from discriminatory practices in employment, including retaliation, which can take many forms, such as blacklisting the employee from other opportunities.

48  The Americans with Disabilities Act of 1990 is the federal law that bars employers from discriminating against people with disabilities, including discriminatory termination, failure to hire and retaliation. This law also requires employers to provide reasonable accommodations unless they cause undue hardship.

49  The ADA was amended in 2008 to broaden the definition of disability, and the ADA Amended Act of 2008 (ADAAA) affords many of the same protections as the ADA but qualifies more people.

50  The PLAINTIFF's compound medical disability can be fatal. It involves four separate but related conditions affecting respiratory and cardiovascular health: 1) asthma, 2) a chronic sinus condition involving nasal and sinus polyps that constrict her ability to breathe freely through her nasal passages, 3) allergies to many natural and manmade substances, including chemicals and additives found in common products, such as perfume, paint and some foods and alcohols, and 4) a lack of sense of smell. Her symptoms can include wheezing, shortness of breath and difficulty breathing; sneezing, coughing and congestion in her nose, sinuses, chest and throat; difficulty speaking; cardiac issues stemming from lack of oxygen; headaches and other pains; dizziness, lightheadedness, and fatigue; digestive issues related to allergens; and inability to smell odors and scents. Together, these put the PLAINTIFF at extremely high risk when chemical contaminants or other allergens are present in the environment. The plaintiff's lack of smell may delay her from leaving a dangerous environment and her body's reaction to the allergens or chemical contaminants can constrict the bronchial airways and trigger an asthma attack at the same time polyps in her nasal passages and sinuses can constrict breathing through her nose and lead to a cardiac event due to oxygen deprivation. When she suffered a medical illness after exposure to chemicals in the Defendant's workplace in 2019 and injuries from a Dec. 26, 2019 car wreck, another medical issue involving scoliosis, muscular weakness, osteoporosis and skeletal issues also contributed to fatigue and prolonged her recovery.

51  Besides her medical disabilities, the PLAINTIFF has cognitive disabilities affecting language, and her handwriting. She doesn't speak aloud as well as she writes. She has difficulty learning a new or foreign language, particularly speaking it. Even when speaking her native language of English, she

often "trips over her words" and might choose the wrong word or name when speaking aloud, such as saying "Burger King" when she means "McDonald's," "April" when she means "August" or "left" instead of "right." She often corrects herself after a time delay. She also struggles to read her handwriting and typed notes, as her notes often are difficult to decipher. Yet the copy she produces for publication is often flawless, without typos, spelling or grammar errors because with a little extra time, she can compensate for those weaknesses. This might be the reason she loves to write. It's her strength, and she is a highly productive journalist. The PLAINTIFF also is "gifted," with strengths in many areas. This puts her on the so-called "spectrum," with strengths in some areas and weaknesses in others.

52. The plaintiff's strengths in the written word make her a highly capable writer of news articles, while her weaknesses in note taking, in learning a hidden language and occasionally in the spoken word can present challenges. The note taking weakness is easily accommodated with recording devices or a laptop computer, which she often provides so as not to cause an undue burden, while the hidden-language disability can make it difficult for her to defend herself.

53. Without enforcement of the American with Disabilities Act, some companies target people's weaknesses, instead of their strengths, even though this practice is illegal and considered counterproductive to the best interests of the company and society. Individual managers might discriminate against talented people with disabilities to protect their own jobs. As the journalism industry has contracted in recent years and workforces have been reduced, job insecurity in newsrooms has increased, exacerbating discriminatory practices at employers such as Gannett and GateHouse Media. Newsroom managers are expected to put the organizations' interests above their own personal interests of staying employed at whatever cost while others are downsized, but this doesn't always happen. The PLAINTIFF was the victim of these management issues as her disabilities were used as a way to get her out of the workplace.

54. The financial decline of the DEFENDANT Gannett, a publicly traded company is illustrated through its financial results, stock price and market capitalization, and this supports the PLAINTIFF'S allegations of chronic mismanagement. One tiny part of this mismanagement was the acute bullying of the PLAINTIFF when she worked in another newsroom in 2018 and 2019 and then in 2023 during the hiring process, but perhaps it's indicative of larger issues that need to be addressed. The stock was trading near $1.90 when she applied for the education reporter position in December 2023. This compares with a stock price of $11.04 for old Gannett and about $9.89 for New Media Investment Group (an owner of GateHouse Media) in the weeks leading up to the Nov. 19, 2019, acquisition closing, when New Media acquired Gannett for about $1.2 billion.

55  In this case, besides the PLAINTIFF's medical disabilities, her language difficulties made it difficult for her to defend herself in the face of ongoing harassment and bullying. Often, the DEFENDANTS used a hidden language or a form of double-speak also known as "the Conversation" to taunt, provoke or exclude her. It felt like she was being punished and bullied.

56  According to the Equal Employment Opportunity Commission and the Americans with Disability Act of 1990, SEC. 12101. *[Section 2]* (a) Findings, "the Congress finds that: **1.** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination; **2.** historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem. 3. The discrimination often affects the individual not only in the workplace, but also in other areas, such as housing, education, recreation, health services, and legal services.  4. Individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination. ADA 1990, SEC. 12101. *[Section 2a, 4]*

57  The discrimination takes many forms, most often involving exclusion or disadvantage, such as not being considered for promotions or activities. Over time, this results in economic disadvantage. Many people with disabilities don't realize their full potential in the marketplace. 5. Individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. ADA 1990, SEC. 12101. *[Section 2a, 5].*

58  In the case of the PLAINTIFF with both medical disabilities and cognitive, or "mental," disabilities, they affect her everyday life. Not only must she be vigilant in avoiding allergens or contaminants likely to affect her physical health, she also struggles to keep up with the hidden language used in the so-called "Conversation," or "Hearsay," which she recently has discovered drives some people's words and behavior. The more people use a hidden language with more than one meaning, the more the PLAINTIFF is disadvantaged because she generally uses plain English to communicate, not a code or double-speak. Sometimes  so-called Conversationists don't understand what she's saying until they realize she is speaking or writing in plain English. Aside from difficulty understanding this hidden language and her slight spoken-word weakness, she has mastered the English language. Her

ability to communicate and explain complicated topics in writing often is off the charts. Because of this, she is considered "gifted" or "talented" as a writer but having disabilities.

59  The PLAINTIFF's language disability makes her a target for bullying, and her reputation was affected at DEFENDANT Gannett in 2018 and 2019 when administrators poked fun at the PLAINTIFF using the Conversation possibly for their amusement or possibly to encourage her to leave to protect their positions. While bad jokes, teasing, taunting, slander and other forms of passive-aggressive provocation might be humorous on a late-night comedy show, they are offensive in the workplace and create a hostile work environment. They're also counterproductive.

60  The DEFENDANT's discriminatory practices used against the PLAINTIFF restricted her progress, despite the fact she had helped her employer -- and society as a whole -- through the work she was producing as a journalist, specifically as an education reporter. She should have been allowed to continue in her employment. Instead, she was denied the opportunity to continue working, excluded from her position when she was wrongfully terminated, and blacklisted from countless other opportunities at GANNETT in violations of the ADA and ADAAA.

61  With disability discrimination pervasive, people often have more than one disability but are reluctant to speak of them for fear of being discriminated against. Still, they need support because they so often are economically disadvantaged.

62  The ADA was broadened under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), which states: "the limitations from the impairment no longer must be severe or significant for the impairment to be considered substantially limiting, or that the employer perceive the impairment to be substantially limiting." People with disabilities aren't to be retaliated against, harassed or terminated for having one or more disabilities.

63  This complaint describes how the PLAINTIFF has been physically injured, emotionally abused and severely economically disadvantaged by the DEFENDANT's unwillingness to adhere to disability laws and its discrimination, as shown by its decision to terminate employment and blacklist the employee, continued when it rescinded a job offer in 2023 for no reason other than its discriminatory desire to exclude the Plaintiff in violations of the law was continued

64  **NATURE OF THE ACTION**  The PLAINTIFF brings forth this action for injunctive, equitable, compensatory, declaratory and punitive relief from the DEFENDANT'S discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA) and other laws the DEFENDANT allegedly violated that also could have contributed to discrimination and retaliation.

65  Injunctive relief: In so much as the DEFENDANT has continued to exclude the PLAINTIFF from employment for no reason other than the PLAINTIFF'S disabilities and unlawful retaliation and

discrimination, the DEFENDANT seeks injunctive relief in the form of a court order enjoining the DEFENDANT from these unlawful activities, such as blacklisting.

66. Equitable relief: In so much as the DEFENDANT is the nation's largest print and digital news company, the PLAINTIFF seeks equitable relief to determine a fair resolution.

67. Compensatory damages: In so much as the DEFENDANT's failure to adhere to the ADA and ADAAA, the PLAINTIFF seeks compensatory damages and expectation damages from its breach of these employment laws and other losses the PLAINTIFF incurred as a result of this dispute and the DEFENDANT's negligence.

68. The PLAINTIFF also seeks damages in the form of a monetary award for loss and injury

69. ALLEGATIONS AND STATUTES

70. The Equal Employment Opportunity Commission (EEOC) states, "An individual can meet the definition of disability if an employment action was taken because of an actual or perceived impairment (e.g. refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment)."

71. The discriminatory conduct in this complaint involves the following actions: Failure to rehire, Termination of employment, Failure to provide reasonable accommodations, Unequal terms and conditions of employment, Exclusion, Retaliation, Coercion, Interference, Invasion of privacy, Unfair pay.

72. The Plaintiff also had been locked out of Gannett's career portal, where job opportunities are posted, when the system wouldn't take her log-in information and wouldn't allow her to reset her password. This was corrected after the Plaintiff contacted Investor Relations. These are violations of the ADA of 1990 and ADAAA of 2008, which states: ADA of 1990: Discrimination SEC. 12112. *[Section 102]* (a) General rule: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures**, the hiring,** advancement, or discharge of employees, employee compensation**,** job training, and other terms, conditions, and privileges of employment.

73. **Limited and classification violations** The Plaintiff was discriminated against when the Defendant limited her to a classification forced on her through an illegal employment agreement that contradicted the job offer she had received both verbally and in writing, which was for an hourly nonexempt position, and in a way that adversely affected the opportunities and status afforded her when the Defendant failed to allow her to work and failed to hire her for other suitable positions. Considering her extensive experience, education and training, she was highly qualified for most editorial positions in the company and also could have served the company through her business. This

is a violation of the ADA and the ADAA. According to the ADA of 1990 SEC. 12112. *[Section 102]* (b) As used in subsection (a) of this section, the term "discriminate **against a qualified individual on the basis of disability"** includes (1) **limiting**, segregating, or **classifying a job applicant** or employee in a way that **adversely affects the opportunities** or status of such applicant or employee because of the disability of such applicant or employee.

74  **Reasonable accommodations.** The Plaintiff requested an accommodation in December 2023 when she offered to recuse herself from any confidential information the company intended to announce and then forbid employees from discussing. It previously denied a reasonable accommodation the Plaintiff requested in December 2019 and early 2020, which was to resume work remotely while recovering from injuries sustained due to a contaminated work environment. This was at a time when other employees were working remote from the newsroom. The Plaintiff believes she was retaliated against for protected activity, including contacting federal agencies OSHA, and the EEOC, and bringing forth information about laws that weren't adhered to.

75  To fail to provide reasonable accommodations is to discriminate and violate the ADA and ADAAA According to the ADA of 1990 SEC. 12112. *[Section 102]* (5) (A) The term "discriminate **against a qualified individual on the basis of disability"** includes not making **reasonable accommodations** to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

76  The Plaintiff should not have been terminated in 2020, nor should she have had a job offer rescinded, which was in essence a form of termination before she even was given the chance to start her new position. She had made known her disabilities, which she lives with every day, and which limit her from many different kinds of work and take her out of contention from other positions her counterparts can do. She has every reason to believe she was discriminated on this basis. To be denied access, excluded and terminated are violations of the ADA and the ADAAA:  ADA of 1990: Discrimination SEC. 12112. *[Section 102]* (a) General rule: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or **discharge of employees**, employee compensation, job training, and other terms, conditions, and privileges of employment.

77  The ADAAA has broadened the definition of disability to encourage the courts to hear more disability cases. However, the Plaintiff's respiratory condition also is covered by the original ADA.

78  **The Ledbetter Fair Pay Act of 2009.** The Plaintiff was denied fair compensation when the Defendant failed to consider the extent of her experience and training both in 2018 and in 2023. The

    DEFENDANT also denied her employment based on her disabilities, which led to this failure to rehire matter.

79   The "Lilly Ledbetter Fair Pay Act of 2009" extends the amount of time allowed to file for wage and salary discrimination under the ADA Act: (3) With regard to any charge of discrimination under any law, nothing in this Act is intended to preclude or limit an aggrieved person's right to introduce evidence of an unlawful employment practice that has occurred outside the time for filing a charge of discrimination. https://www.govinfo.gov/content/pkg/PLAW-111publ2/html/PLAW-111publ2.htm (a) Americans With Disabilities Act of 1990.--The amendments made by section 3 shall apply to claims of discrimination in compensation brought under title I and section 503 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq., 12203), pursuant to section 107(a) of such Act (42 U.S.C. 12117(a)), which adopts the powers, remedies, and procedures set forth in section 706 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5).

80   **Failure to hire or rehire.** When the Plaintiff had a health issue in 2019 and 2020, the Defendant encouraged her to contact other Gannett offices and apply for other positions, which she did – repeatedly. When she received an offer, it was rescinded for no cause other than discrimination. This is a violation of the ADA of 1990 and the ADAAA of 2008. SEC. 12112. *[Section 102]* (a) General rule: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, **the hiring**, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

81   The ADA also forbids retaliation and coercion under SEC 12203 [Section 503], "Prohibition against Retaliation and Coercion." The ADA of 1990 states: "(a) **Retaliation.** No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. "(b) **Interference, coercion, or intimidation.** It shall be unlawful to **coerce,** intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

82   The Act also provides for remedies when Retaliation, Interference, Coercion or Intimidation are factors in the discrimination. The Act states, "(c) Remedies and procedures. The remedies and procedures available under sections 12117, 12133, and 12188 of this title *[sections 107, 203 and 308]* shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter *[title I, title II*

*and title.* It also provides for reasonable accommodations unless there is undue hardship to the company, and there wasn't undue hardship to Gannett.

83  This case also involves the Plaintiff's Copyright and Intellectual Property held in her business. Copyright laws stem from the U.S. Constitution. In Article 1, Section 8, the U.S. Constitution states, Congress shall "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Sec. 302 of the Copyright Act of 1976 states, "Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death."
https://www.copyright.gov/title17/title17.pdf

84  **Retaliation and Sabotage** Part of the retaliation the Plaintiff has experienced involved the Defendant sabotaging – whether deliberately or without intention -- the Plaintiff's creative work. This has not only caused her financial harm as it has made it more difficult to find work, but it also has limited the public in its right to be informed by the news media. At some point in 2021 or 2022 and to the current day, for reasons the Plaintiff doesn't understand that present as retaliation, Gannett took down photos and videos the Plaintiff produced for the public's information and benefit, depriving the public of this content. After news is published, it continues to have historical value. Libraries keep news archives from local and national publications because they remain of scholarly interest to historians and researchers in a variety of academic disciplines, such as social studies, business and law. It's rare for a legitimate news organization to take down previously published content and replace elements, such as photos and videos, because it violates the public trust.

85  Many of the Plaintiff's videos on YouTube also were tampered with apparent acts of sabotage. Repairing them at this late date would require substantial time and effort. While recovering and on unpaid leave, the Plaintiff updated her own website, SmallBizChicago.com, with a couple of new articles and photos, only to have it hacked with typos inserted into the posts, to the point where she had to take it down because it was damaging her reputation while she pursued other opportunities. The Plaintiff doesn't know who hacked the site, but it's clear her photos and videos were taken down in an act of retaliation, providing fewer work samples for her to show as she looked for work and destroying the public trust.  This is similar to what occurred to the Plaintiff's work on Gannett's website.

86  The use of chemicals in the workplace, as the Plaintiff witnessed in 2019, is a violation of the Occupational Safety and Health Act's General Duty Clause. Public Law 91-596 84 STAT. 1590 of 1970, amended in 2004, SEC 5, Duties (a), which states:  Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that

are causing or likely to cause death or serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this Act. https://www.osha.gov/laws-regs/oshact/completeoshact

87  EPA Clean Air Act. The Plaintiff was injured physically due to her disability when chemicals were allowed in the workplace in 2019, a violation of (a) the Environmental Protection Agency's General Duty Clean Air Act Section 112(r)(1), which "makes the owners/operators of facilities with regulated hazardous substances responsible for managing chemicals safely." https://www.epa.gov/rmp/general-duty-clause-fact-sheet# Other Statutes

88  The Plaintiff also was the victim of the Defendant's alleged violations of other statutes, including

89  Illinois' Eavesdropping Act as the Invasion of Privacy which obviously occurred in 2018, 2019 while she was employed by the Defendant, and subsequently while she was in Evanston,

90  laws regulating Cyber stalking and Cyber Espionage, as her computer was tapped remotely during this same period,

91  sabotage and destruction of creative work related to copyright law, including a website the Plaintiff launched years before that was hacked to such an extent in early 2020 that she couldn't afford to continue to repair it.

92  violations of Sarbanes-Oxley, including the ethics hotline requirement, which did not seem to be working when she originally called it in 2019, and financial duties to shareholders, as the company has been struggling since the merger in 2019.

93  WHEREFORE, PLAINTIFF respectfully requests the court grant immediate relief from exorbitant legal fees preventing the PLAINTIFF from obtaining suitable legal counsel as well as

94  injunctive, equitable, compensatory, declaratory and punitive relief from the Defendant's discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA) and other laws the that also could have contributed to exclusion, discrimination and retaliation that blocked the Plaintiff, who is a member of the Society of Professional Journalists, from pursuing the profession of journalism;

95  the ADA provides immediate relief, and the Complaint asks the court to award this so she might begin to repay the debt she incurred while waiting for these disputes to be resolved; other relief the court deems appropriate.

Respectfully submitted,
Ann Meyer
*Pro Se*
Evanston, IL  847-271-0177
ameyerwrtr@aol.com

Meyer v Gannett

Oct. 2, 2024