BC

FILED
7/16/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAN

Meyer v Gannett

United States District Court for the Northern District of Illinois

ANN MEYER

Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media)

Defendant

Case No. 1-24-cv-09529
Judge Jorge L. Alonso

Ms. Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (work)
847-271-0177 (cellphone)

Ms. Julie C. Ratliff, associate
jratliff@taftlaw.com
Direct dial: 312-537-4011

Mr. Andrew Murphy, associate
hjackson@taftlaw.com
Direct dial: 312-836-4145

Ms. Heather Jackson, partner
hjackson@taftlaw.com
Direct dial: 312-836-4172

Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601-4208
Tel: 312-527-4000

# RESPONSE TO MOTION TO DISMISS, PART I

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth this Response to the DEFENDANT"s motion to dismiss and asserts the DEFENDANT's accusations about defects and untimeliness are false and unwarranted.

1 Contrary to the DEFENDANT attorney's accusation the claims are untimely, the timeliness was addressed last fall during status hearings when the relationship between two employment matters involving the same employer was duly noted, as information obtained in December 2023 revealed new information that may explain some of the discriminatory acts from 2019 and 2020 discussed in the 2022 complaint. The Honorable Jorge Alonso agreed it made the most sense for these cases to be heard together.

2 The PLAINTIFF reminds the Court one of Taft associate lawyers assigned to this matter also was assigned to the case in 2022, as was another partner. The associate lawyer received her Complaints. The PLAINTIFF believes he also was on the status hearing calls in 2022 when the PLAINTIFF was

asked to redo the formatting of her Complaint because it didn't contain numbered paragraphs. She complied and included numbered paragraphs. At the next status the following month, she was asked to redo the formatting again in a different way, which she did -- all while she wasn't being paid and didn't have any income coming in. She requested mediation to come to a resolution. The DEFENDANT declined. In the PLAINTIFF's opinion, the DEFENDANT's lawyers were obstructing justice by focusing on the formatting of a document rather than the substance of her claims. They didn't present a counter claim then and they said they won't have a counter claim in this case. This case should **not** be dismissed.

**3** Where are the numbered paragraphs in the DEFENDANT's Motion to Dismiss entered in March? They're missing. Is the DEFENDANT attorney's behavior fair and just or is it designed to confuse the court and further disadvantage the PLAINTIFF by making her jump through unnecessary hoops when she isn't being paid?

**4** In late 2022, The PLAINTIFF asked the judge if the original case – 1:22-cv-04299 – could be withdrawn for the time being because she needed to spend her time finding a job, not redoing the formatting of Complaints the DEFENDANT wasn't interested in resolving swiftly. She had no income coming in. Judge Sharon Coleman withdrew the case without prejudice so it could be brought back.

**5** Has the court considered the DEFENDANT employer presented the PLAINTIFF with a far-reaching and inappropriate employment agreement with a job offer in December 2023 and, when asked, the hiring manager said it was about "negotiations"? Negotiations that didn't take place in 2022 as they should have, the PLAINTIFF contends. This is a case that needs to be heard and resolved. It's not helping the DEFENDANT corporation's share price for it to go unresolved, and it's not helping the PLAINTIFF's small business either. The PLAINTIFF worked through her business for 30 years before she joined Gatehouse Media, now Gannett in 2018, and as such holds a considerable amount of copyright and intellectual property through her company, L3C Chicago L3C LLC. She went back to working through this business full time in 2024.

**6** The PLAINTIFF's Complaints were timely filed in 2022 and last Oct. 4, yet the DEFENDANT's attorneys contend they weren't. The DEFENDANT's false allegations are defamation. Why is she being asked to show these documents to the DEFENDANT attorneys again? Is the reason to frustrate and harass the PLAINTIFF, which would be a violation of the Americans with Disabilities Act, which makes harassment unlawful? What's the DEFENDANT's problem that its attorneys don't understand this is a case that needs to be settled? Why are they continuing to obstruct justice by creating confusion that's counterproductive?

7 The DEFENDANT was a no-show for the first **three** status hearings on Nov. 14, Jan. 14 and Feb. 13, but the PLAINTIFF was there. When The DEFENDANT's attorneys appeared for the status March 13, one of the attorneys told the court there wouldn't be a counter claim. She said she needed counts. The PLAINTIFF included a number of claims in her Complaints but didn't use the word "counts." Counts are now contained in this document, but the PLAINTIFF asserts going through each count with this particular group of attorneys might be counter productive, because they are so erratic.

8 At the same status hearing, the same attorney said she intended to file a Motion to Dismiss. Why did she do this? Apparently, she wasn't up on this case.

9 Do the DEFENDANT attorneys realize they aren't really representing the DEFENDANT/public corporation's interests by attempting to get this case dismissed before it's been resolved? Are they considering shareholders' interests? The PLAINTIFF alleges the potential liability for the DEFENDANT is growing by the day. Are the attorneys aware of the DEFENDANT's reputation for hurting its own industry by dramatically reducing it in size and by de-emphasizing the core product that served the public well for decades? **As of the company's financial results**, the money was still in print, yet the company has been purposely reducing its interest in print since 2019. Does this make sense? This decision has reduced the amount of news the company has produced and the number of journalists it can sustain. Are the DEFENDANT company's employees – which it once called its most important asset – happy, compensated fairly and treated with respect? No, not based on the PLAINTIFFs research and experience.

10 The DEFENDANT's stock price of $3.70 per share as of July 16. 2025 reflects the market's assessment of the DEFENDANT's diminished value. Are the DEFENDANT attorneys aware the company they're representing has some work to do to improve its reputation and its stock price, which has fallen to a fraction of the $11.04 per share old Gannett was trading at and $9.89 per share New Media Investment Group (an owner of Gatehouse Media) was trading at in the weeks leading up to the Nov. 19, 2019 acquisition closing, when Gatehouse acquired Gannett for about $1.2 billion and took the Gannett name.

11 The DEFENDANT company's unlawful practices – including privacy invasions – resulting in questionable news being published, are the reason many people say they hate the news media. Is this acceptable to the PLAINTIFF as a former employee and current shareholder? Not it's not. Gannett's reputation in many of its markets is as a big, arrogant corporation that doesn't seem to know what it is doing, that has lost its way. Despite this, it thinks it can do whatever it wants and get away with it – including invading people's privacy, injuring its employees, overcharging customers and blocking them from the digital outlets they have subscribed to, in the PLAINTIFF's experience as a customer, former employee and current shareholder.

12 At the March status hearing, Honorable Judge Alonso asked for a Joint Status Report, but the DEFENDANT's associate attorney continued with her plan to have the case dismissed without making a real effort to resolve it. This is an obstruction of justice. To exclude the PLAINTIFF from negotiations is another violation of the ADA. In the PLAINTIFF's opinion, that's at least two new counts because of the DEFENDANT attorneys' discriminatory behavior. Does the DEFENDANT still want to take this route of counting counts of discrimination?

13 In answering the DEFENDANT employer's demand for "counts," the PLAINTIFF wishes to point out she is not an attorney but she has read up on the laws cited in her Complaints. She also has spoken to dozens of attorneys – at least 60 in Chicago -- regarding employment matters related to the DEFENDANT. Aside from those representing the DEFENDANT, the other attorneys haven't used the word "counts" to the best of her recollection. Nor have they said tallying up counts is the only way to settle a matter. Apparently, there are several ways to skin the cat in this matter. **The PLAINTIFF has included a list of counts of discrimination in Part II of this Response.**

14 To make it even more confusing, while one attorney for the DEFENDANT wanted counts, the other attorney sent the PLAINTIFF a low-ball offer in March with a take-it-by-a-certain-date-or-we-won't-provide-another-offer-ever type of coercive approach the PLAINTIFF contends is a violation of the ADA's ban on coercion. That's another count of discrimination, according to the statute.

15 Does the DEFENDANT -- and its attorneys -- understand why the ADA exists? It exists so people with disabilities, such as the PLAINTIFF, won't be disadvantaged, so they won't become impoverished, so they won't be harassed, bullied, coerced and retaliated against. It doesn't help our nation as a whole when people with disabilities are economically disadvantaged and beat up. As the PLAINTIFF's original Complaints explain in detail, people with disabilities are often treated differently and discriminated against in many different ways. Corporations are expected to provide reasonable accommodations, yet the DEFENDANT company has refused to do so over and over. The PLAINTIFF has lost a lot of money – including retirement savings -- because of the DEFENDANT's illegal behaviors. This kind of economic disadvantage is against the law. The PLAINTIFF also was injured and continues to be in several ways, physically and through privacy invasions that have affected her ability to lead a normal life.

16 The U.S. Supreme Court recently renewed it support for the Americans with Disabilities Act in the case of A.J.T. v Osseo Schools, which is described below.

17 The PLAINTIFF contends the DEFENDANT's poor decision making, such as its refusal to continue employing her in a virtual capacity or as an independent journalist without invading her privacy, was illegal. The PLAINTIFF had worked for decades as an independent journalist providing reporting, writing and editing services and serving as an outsourced publications editor, reporter and writer to

media companies over the years, including Meredith, Tribune Publishing, Maxwell Sroge Publishing, Stagnito Media, Prism Media, the National Safety Council's publishing arm and others. She also had launched and managed publications.

**18** For the DEFENDANT to continue to block the PLAINTIFF in her efforts to obtain work also raises an anti-trust issue, per the Sherman and Clayton Acts, as the employment agreement the DEFENDANT presented the PLAINTIFF in a coercive manner made clear its intention to steal the PLAINTIFF's business and her copyright, in an egregious violation of the ADA and the antitrust acts.

**19** The PLAINTIFF asserts when antitrust laws, such as the Clayton Act and RICO, the damages are tripled, and cites 15 U.S.C 15(a) 1982, which states that a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." From historical research, Congress approved this statute to compensate small businesses when larger companies damaged their businesses through unfair competition, such as a contract containing separate issues and hostile takeovers, as the Clayton Act prohibits, and to provide a disincentive for further anti-competitive behavior. The PLAINTIFF wishes to alert the court RICO shouldn't be ruled out in this case, though she doesn't have the means to pursue it. She suggests the FBI should investigate the DEFENDANT for wrong-doing if the agency isn't already.

**20** From Mahler Law's research, which is discussed on the internet, "Generally, the more directly the person was targeted by the antitrust violation, the more likely the courts are to grant that the person has standing to maintain the action for treble damages." The PLAINTIFF asserts she was targeted back in 2018 when she was coerced to sign an Background Investigation that gave the company and a Third Party the right to invade her privacy and again in 2023 when she was presented with a coercive document that would have required her to abide by the company's policies, including Third Party agreements. She also was targeted physically when she worked in a contaminated newsroom, when her car was hit with such force it flipped over in 2023 and when her Evanston townhouse was contaminated.

**21** Both of the PLAINTIFF's businesses are directly related to this case, as she told the hiring manager in Savannah her acceptance of the offer was contingent on finding a tenant to cover her expenses on her townhouse. She said the same to the hiring manager in Indiana. Further, the DEFENDANT's apparent interest in the PLAINTIFF's copyright was made clear in the employment agreement it presented in December 2023. The PLAINTIFF suspects the Background Investigation was related to this as well.

**22** Without sufficient income coming in, the PLAINTIFF wasn't able to find another place to live during Covid in 2020 and 2021, until accepting an offer from another company and relocating to Michigan's Upper Peninsula for a year, at which time she found two other tenants for short-term leasing. Since returning to Illinois in October 2022, she hasn't been able to restart her real-estate rental business nor to make much needed repairs to the property, such as tuckpointing, roofing, landscaping and other updates, or purchase a two-flat as she had intended to if things went well. The Treple Damages clause of the Clayton Act will allow her to make much-needed repairs to this rental business. The PLAINTIFF points out historically news companies relied on real estate as a separate but important part of their businesses. It's only recently that major news organizations have taken to selling their prime real estate, which she views as a mistake. They need the collateral real estate provides, as their core media businesses need shoring up.

**23** Time sometimes casts new light on old issues, and the discriminatory job offer the Plaintiff received in December 2023 to be hired in a similar capacity as the one she was terminated from in a discriminatory act in March 2020 but with many more strings attached provides an explanation and a possible motivation for the Defendant employer's earlier discriminatory behavior.

**24** The 2023 job offer and the DEFENDANT's decision to rescind it in another discriminatory act provides other new "counts." Unfortunately, it also contributed to the PLAINTIFF's economic disadvantage.

**25** The Plaintiff essentially lost money by going to work for the DEFENDANT employer in 2018 especially if the hardship she faced in the subsequent years are considered. Aside from losing her source of income, she also lost hard drives, clips, business information and personal belongings that were stolen, went missing or were significantly damaged. This amount of economic disadvantage shouldn't be allowed to stand. A website she started in 2010 and relaunched in 2020 was hacked so many times she decided not to continue to keep it live. The PLAINTIFF's work on the DEFENDANT's own platform also was damaged with photos and videos taken down and not replaced and with her name taken off of photo credits, at time when she was looking for work.

**26** The PLAINTIFF's health hasn't fully recovered, and she suspects the stabbing-pain headaches she has suffered could be related to invasions of privacy, which the DEFENDANT has benefited from at the PLAINTIFF's expense.

**27** The PLAINTIFF contends the DEFENDANT'S discrimination is ongoing. Has she been offered a job with pay commensurate with her vast experience and one that doesn't include a discriminatory employment agreement? No, she hasn't. Has she been hired through her business to provide reporting, writing, editing, photography, videography, data visualization, fact-checking or media

strategy, which she has offered to media companies and nonprofits over the years? No, she has not. Yet it's illegal for a large company to deliberately block a smaller company from generating revenue. This is where the Sherman and Clayton Acts come in.

**28** The DEFENDANT employer's seemingly apparent lack of knowledge about the profession of journalism and what's involved in being a professional journalist is both appalling and stunning. If you recall reading about the Watergate scandal, and the PLAINTIFF does, it involved audio recordings or tapes of phone calls. It also involved "Deep Throat," a source who wanted to be anonymous out of concern for his safety. How would any journalists be able to reassure Deep Throat today the journalists wouldn't reveal his identity unless the journalists had the ability to also be anonymous? The journalism profession and the news media has enjoyed certain rights not granted to all citizens, as the Supreme Court decided in Richmond Newspapers Inc. v Virginia. This is because journalists provide information in the public interest, as a service to the communities they serve by providing news of public importance. This sometimes puts journalists in dangerous positions, where it's important for them to be anonymous. Yet the DEFENDANT/employer demanded the PLAINTIFF/employee/business owner sign a Background Investigation as a condition of employment that stated a Third Party had the right to interview – or possibly eavesdrop on -- the PLAINTIFF'S friends, relatives, sources, neighbors and others. Why would a serious news organization ever demand this kind of Background Investigation agreement and use it?

**29** The PLAINTIFF/employee/business owner was assured this agreement would only be used to check her driving history and any criminal activity, of which she has a clean record on both. But this turned out to be false. She soon learned the DEFENDANT/employer had been following her for quite some time, based on newsroom conversations and bizarre comments made. She made it clear she wouldn't sign this agreement again because it so violated her right to privacy.

**30** Yet the PLAINTIFF was presented with another agreement that made mention of other Third-Party agreements in December 2023 after she verbally accepted a job offer to be an education reporter. Upon careful reading of the employment agreement, she quickly surmised the DEFENDANT employer very well may have been deliberately seeking to harm her in 2019 in order to take her copyright, which is the basis of the company she owns, L3C Chicago L3C, LLC. The agreement also made a request the PLAINTIFF found ridiculous, which was that she would have to hear confidential information about the DEFENDANT and keep it a secret. She said she would recuse herself from any discussion of the DEFENDANT's confidential information.

**31** The job she was offered was for an hourly, nonexempt position that wouldn't necessarily ever have to be involved with the DEFENDANT's confidential information. She wasn't hired as a supervisor. Was the DEFENDANT going to stop invading the PLAINTIFF's privacy as it obviously did in

Savannah? The agreement made no mention of this. This agreement is another example of the DEFENDANT's unwillingness to grant a reasonable accommodation to allow the PLAINTIFF to be excused from this agreement. These represent more **counts of discrimination.**

**32** However, arguing over counts certainly isn't the only way to reach a settlement, particularly in this case where the PLAINTIFF contends the counts of discriminatory invasion of privacy are ongoing. The PLAINTIFF learned a considerable amount about the DEFENDANT employer while the PLAINTIFF worked for another newspaper company in Wisconsin and Michigan, two states where Gannett has owned major newspapers for years.

**33** The Plaintiff employee/business owner suspects the DEFENDANT public corporation's over-reliance on the "hearsay," as it is referred to in Wisconsin and Michigan, also resulted in distorted news. It also likely is one reasons the DEFENDANT hasn't attempted to cover the Chicago area in any significant way, yet this doesn't serve its shareholders. The "hearsay" many people follow is based on a Chicago Conversation that's often improvisation but is followed like a soap opera. Some people become obsessed with it. It's distributed through a barely audible chatter found in various locations, including public buildings, in Wisconsin and parts of Michigan. It's also in news rooms. Snippets of this Chicago Conversation often can be found in the headlines and news stories of Gannett papers in Green Bay, Appleton and Milwaukee. These were major papers in Wisconsin, where the PLAINTIFF hasn't been offered any work by the DEFENDANT despite many applications and despite the fact she was offered jobs by several other newspaper companies in Wisconsin, including one she is working for as an independent journalist through her small business. This provides an indication of the extent of the discrimination the PLAINTIFF has faced from GANNETT and why the Failure to Rehire claim is a legitimate claim.

**34** The court likely has no idea how much time and effort the PLAINTFF has spent in trying to gain work from DEFENDANT in the Midwest without success. Given how the DEFENDANT has followed the PLAINTIFF and the "hearsay" through its privacy invasions and reliance on unverified information, its discriminatory behavior becomes magnified.

**35** While perhaps the use of "hearsay" helped Gannett's results in the past, it's not working any longer, perhaps because of Illinois new anti-cyberstalking law, which took effect Jan. 1, 2024. In its first-quarter report for the period ending March 31, 2025, the company reported digital revenue of about $250,000 compared with $321,179 for print/commercial.

**36** When just Domestic Gannett Media is considered, which is it core news division, digital revenue totaled $156.1 million compared with $284 million for print, yet the company has been digital-first since 2019, when it began de-emphasizing it core newspaper products. As a shareholder and a journalist, the PLAINTIFF is angry the company's Board of Directors has allowed the mistake to

continue uncorrected. When the PLAINTIFF first became aware of this issue in 2018 or 2019, when she heard from readers about the company's tactic of jacking up the subscription price of the newspaper in an effort to push readers to digital, she talked to the Publisher about what readers were saying and what she knew from her experience in Chicago. When print subscriber leave, they don't always convert to digital. Some stop reading altogether. In Savannah, people told the PLAINTIFF they were canceling their print subscription without converting to digital. They simply stopped reading the news on a daily basis. This has occurred all over the country, including in Wisconsin, where the DEFENDANT owns the Green Bay Press Gazette, the major newspaper in a papermill city, where print circulation has plummeted because of the DEFENDANT's decision to focus on digital, where it is much harder to make money. This is an age discrimination example, because the PLAINTIFF had more years of industry experience and also more years of life experience, and the company's financial results have borne out what she predicted.

37 In the interest of settling at least part of this case sooner rather than later, as the PLAINTIFF needs the funds to pay her bills, the PLAINTIFF believes a more expeditious approach to settling at least part of this lawsuit is to come up with a number both parties can agree on. The PLAINTIFF reminds the DEFENDANT she has saved the company money by representing herself in this matter. As a member of class action case recently settled, the PLAINTIFF received $16 while the attorneys received well over $1 million.

38

39 **PRELIMINARY SETTLEMENT OFFER**

40

41 Here is a preliminary look at what the PLAINTIFF feels she is owed:

42 Total wages used for Social Security **$39,864 x 52 weeks x 5.5 yrs = $219,252**
43 **Compensation for damage to businesses $219,252 x 3= $657,756**

44 Overtime wages 27 x 4 x 52 = $5,616 annually x 5.5 = $30,888 x 3 **$92,664**
45 **401 K contributions**
46 2019 Employer 401 K contribution $1,675
47 2018 Employer 401 K contributions estimate of $800
48
49 Retirement $2,500 x 5.5 years w/ 4% interest compounded
50 2020: 2600 + 1700 = 4,300
51 2021: 4,300 + 172 interest + 1,700 = 6,172
52 2022: 6,172 + 247 interest + 1,700 = 8,119
53 2023: 8,119 + 326 interest + 1,700 = 10,145
54 2024: 10,145 +405 interest + 1,700 = 12,245
55 2025: 12,245 +490 interest + 1,700 = 14,435

56 Life insurance **$120,000**

| | | | | |
|---|---|---|---|---|
| Health Savings Account employer and employee contributions | $1,050 | | | |
| Cost of employer-sponsored health coverage | $6,349 | | | |
| 2020 COBRA health insurance 594 x 12 = | | | $7,128 | |
| 2021 COBRA $624 x 12 = | | | $7,488 | |
| 2022 COBRA | | | $4,410 | |
| Aug. 27, 2022 paid | | $1341.38 | | |
| Sept. 8 paid | | $1041 | | |
| Oct. 1, 2022 paid | $671 | | | |
| Nov. 8 paid | | $664.90 | | |
| Dec. 14 paid | | <u>$691.98</u> | | |
| | $4,410 | | | |
| 2023 COBRA $598 x 4 | | | $2,392 | |
| 2024 ACA health care $250 x 12 | | | <u>$3,000</u> | |
| | | | | **$24,418** |
| Other benefits | | | | |
| Misc. health care $4,000 deductible, out of pocket physical therapy, etc. | | | | **$4,000** |
| FedEx expenses for sending documentation to Gannett in 2020 | | | | |
| **Moving expenses and re-settlement** | | | | **$17,405** |
| Initial move to Savannah reimbursement of $2,000 not reimbursed | | | $2,000 | |
| Storage locker = | | | $346 | |
| Moving costs | $634+ | $2,070 = | $2,400 | |
| Savannah packing | | | $850 | |
| Mileage 1800 x .50 x 3 trips | | | $2,700 | |
| Loss for missing items, theft and damage | | | $2,000 | |
| 2020 Clean and repair to townhouse (credit card) | | | $4,800 | |
| 2020 Clean, locks plumbing, HVAC, water/sewer, paint, deck repair (checks) | | | <u>$2,309</u> | |
| Loss of vehicle value received due to 2016 minivan being totaled | | | $5,000 | |
| Higher auto insurance premiums at 1,000 per year | | | <u>$5,000</u> | |
| | | | | **$10,000** |
| Loss of rental business revenue: | | | | **$96,300** |
| 2020 Revenue 1,800 x 12 = | | | $19,800 | |
| 2021 Revenue 1,800 x 4 | | | $7,200 | |
| 2022 Revenue 1,800 x 2.5 | | | $4,500 | |
| 2023 Revenue 1,800 x 12 | | | $21,600 | |
| 2024 Revenue 1,800 x 12 | | | $21,600 | |
| 2025 Revenue 1,800 x 7 | | | <u>$12,600</u> | |
| | | | $96,300 x 3 | |
| | | | | **$192,600** |
| Damage to L3C Chicago L3C | | | $50,00 x 3 | **$150,000** |
| Stolen hard drives and lost clips on paper | | 40,000 | | |

| | | |
|---|---|---|
| **101** Damaged laptops | 1,000 | |
| **102** Hacked website | 10.000 | |
| **103** | $50,000 | |
| **104** | | |
| Preliminary total | | $1,365,143 |

**105**

The PLAINTIFF agrees with the DEFENDANT's attorneys some counts of discrimination also should be factored into any settlement. She is concerned about how to assess a monetary value to each count of the injury, particularly as some are ongoing. The PLAINTIFF asserts the Wrongful Termination and Failure to Rehire claims are legitimate claims and could be considered "counts" of violations of the Americans with Disabilities Act, which states the courts may assess civil penalties for ADA violations against the entity in amounts "**not exceeding $50,000 for a first violation and not exceeding $100,000 for any subsequent violation**."

The PLAINTIFF asserts the DEFENDANT employer was well aware she believed invasion of privacy to be discriminatory, as she made this clear on numerous occasions, including before she was hired in 2018, several times after she was hired and when she said she wouldn't sign a document allowing the company to invade her privacy or that of others she came into contact with and in December 2023. She also was the victim of privacy invasions during periods when she wasn't an employee.

**106** The PLAINTIFF reminds the court she was injured by the DEFENDANT and continues to be by its invasive practices, which feel like stalking. Just reviewing the DEFENDANT's print and digital outlets to see how they have invaded her privacy recently is injurious to the PLAINTIFF. This practice of including aspects of the hearsay conversation in the news is counter-productive as it comes across as fake news. It's one reason why some people aren't reading news online. Including hearsay isn't a best practice and it's unnecessary as other newspapers the PLAINTIFF has written for try hard not to include it. It also excludes people who don't understand what it means. Some people get it and others don't. It's blatantly unfair and a violation of the ADA to the extent people with language difficulties don't catch on and are left out of the double-meaning, which might be a blessing but still is unfair.

**107** The PLAINTIFF suspects the DEFENDANT's over-reliance on hearsay in its news output in certain markets is one reason it has excluded the Chicago market, where the use of hearsay is frowned upon and could be illegal as Illinois has strong privacy laws, including an eavesdropping law and a biometric information privacy act. Many digital companies are gathering and selling data, and the

PLAINTIFF suspects the DEFENDANT publicly traded company is involved with this, without fully disclosing what it does.

**108** Trying to come up with an exact number of discrimination counts is a tall order and might reach into the thousands, as the PLAINTIFF doubts many days have gone by without an example of invasion of privacy showing up in a Gannett newspaper somewhere. The mere act of counting these invasions is injurious to the Plaintiff, as it is despicable for any major public company to pick on a sole proprietor in this way. The Plaintiff can't begin to describe how draining the process of going through newspapers and jotting down examples is. She has suffered extreme fatigue in recent weeks because of this. Yet, who else could do it as effectively?

**109** The PLAINTIFF contends the amount of money the DEFENDANT has offered to settle this disability discrimination case suggests the attorneys don't understand the Americans with Disabilities Act, which the U.S. Supreme Court recently strengthened in the case of A.J.T. v Osseo. Area Schools.

**110** While in March of this year, one Taft attorney for the DEFENDANT wanted counts of discrimination, another Taft other attorney sent the PLAINTIFF a low-ball offer with a take-it-by-a-certain-date-or-we-won't-provide-another-offer-ever type of coercive approach the PLAINTIFF contents is a violation of the ADA's ban on coercion. This is another count.

**111** Does the DEFENDANT and its attorneys understand the Americans with Disabilities Act and the Amended Act, which broadened the number of people and the kinds of disabilities covered?

**112** The U.S. Supreme Court recently indicated its support for a broad interpretation of the ADA in a unanimous decision issued June 12, 2025 in A.J.T. v. Osseo Area Schools , which is expected to ease the process of seeking monetary damages for discrimination under the ADA of 1990, according to Edweek, which covered news about the Supreme Court's opinion. https://www.edweek.org/policy-politics/supreme-court-decision-lets-students-sue-schools-more-easily-for-disability-bias/2025/06

**113** The case involved a student with a medical condition and the school's refusal to accommodate her needs, not unlike the DEFENDANT's refusal to accommodate the PLAINTIFF's need for accommodations. The PLAINTIFF doesn't have to show the DEFENDANT acted out of "bad faith or gross misjudgment" to prevail, according to the U.S. Supreme Court. The high court held the schools "are subject to the same standards that apply in other disability discrimination contexts."

**114** Quoting from the Supreme Court opinion, stored on SupremeCourt.gov, https://www.supremecourt.gov/opinions/24pdf/24-249_a86c.pdf, the opinion stated: "Outside the educational services context, courts of appeals permit plaintiffs to establish violations and obtain injunctive relief under the ADA and Rehabilitation Act without proving intent to discriminate. To

obtain compensatory damages, courts generally require a showing of intentional discrimination, which most circuits find satisfied by 'deliberate indifference'—a standard requiring only a showing that the defendant disregarded a strong likelihood that the challenged action would violate federally protected rights."

**115** The PLAINTIFF contends she was terminated when the DEFENDANT became concerned about liability due to its egregious practices. To avoid the invasion of privacy problem that occurred in 2018 and 2019, the PLAINTIFF contends the DEFENDANT presented an agreement it doesn't require from all of its employees and that was blatantly discriminatory in several ways. Further, the coercion the DEFENDANT employer used – saying she must sign the agreement as is to work for the employer and rescinding the offer when she had questions about it – represents at violation of the ADA. **It is a separate count of discrimination**. The agreement she was asked to sign also was discriminatory, in its assumption of her copyright. This is another count of discrimination.

The document raises questions about the DEFENDANT's motivation and its intent back in 2019, she she suspected it was interested in her business' intellectual property.

Failing to hire the PLAINTIFF after extending an offer is another count of discrimination. Was she hired? No, she wasn't.

When she went back to the hiring manager and told him what happened, he said, "This is about negotiation." Yet the company refused to negotiate. This exclusion from negotiations is another count of discrimination. In answering the DEFENDANT employer's demand for "counts," the PLAINTIFF wishes to point out she is not an attorney but she has read up on the laws cited in her Complaints. She also has spoken to dozens of attorneys – at least 60 in Chicago -- regarding employment matters related to the DEFENDANT. Aside from those representing the DEFENDANT, the other attorneys haven't used the word "counts" to the best of her recollection. Nor have they said tallying up counts is the only way to settle a matter. Apparently, there are several ways to skin the cat in this matter. **She doesn't wish to be difficult, so she has included a list of counts of discrimination in Exhibit**

**1** The PLAINTIFF asserts the Wrongful Termination and Failure to Rehire claims are legitimate claims and could be considered "counts" of violations of the Americans with Disabilities Act, which states the courts may assess civil penalties for ADA violations against the entity in amounts "not exceeding $50,000 for a first violation and not exceeding $100,000 for any subsequent violation." The PLAINTIFF asserts the DEFENDANT employer was well aware she believed invasion of privacy to be discriminatory, as she made this clear on numerous occasions, including before she was hired in 2018, several times after she was hired and when she said she wouldn't sign a document allowing the

119 These privacy invasions are particular egregious for the Plaintiff, a protected journalist because she is being taken advantaged of by the tech industry. The Plaintiff developed spiking-pain headaches in 2020 which she believes are related to some form of biometric technology.

120 The PLAINTIFF has observed many people today don't have any idea what a professional journalist is – or what the job entails -- because of the rise of social media and the decline of traditional journalism. The DEFENDANT public company hasn't helped to stem the decline of traditional journalism in the opinion of the PLAINTIFF as well as the NewsGuild-Communications Workers of America, according to a 2023 letter its president, Jon Schleuss, sent to the Securities and Exchange Commission describing some of the public impact of the DEFENDANT's decline, which the News Guild attributed to poor decision-making by company leaders.https://www.sec.gov/Archives/edgar/data/1579684/000177316123000006/gcishareholderletter3.htm

121 The NewsGuild letter didn't mention privacy invasions, perhaps because its membership isn't clear on how they are occurring and the DEFENDANT employer's apparent reliance on surveillance. The PLAINTIFF became aware of the DEFENDANT's use of third-party investigations in 2018 and was immediately concerned about it. As a journalist who is an owner, the PLAINTIFF is not a member of the NewsGuild but is a member of the Society of Professional Journalists. As such, she adheres to a Code of Conduct for professional journalists that allows the journalists to occasionally interview people "not for attribution," or "off the record." For a major news organization to demand a reporter allow a third-party to interview those she comes into contact with for information is abhorrent to the PLAINTIFF. The public doesn't deserve this invasion of privacy, either. This makes this case a matter of public interest. This is not a small injury to the PLAINTIFF or those she associates with, as their civil right to privacy also is impacted by the DEFENDANT's invasive, injurious behavior.

122 The PLAINTIFF contends there is no such thing as Freedom of Speech without privacy, as people will change what they say when they are aware they are being recorded. She points to the strength of the First Amendment, which includes Freedom of the Press, which she is a member of, as well as providing for Freedom of Speech for individuals.

123 These privacy invasions have occurred on a daily basis, and many show up in the DEFENDANT's publications, magnifying the injury. In Wisconsin, for example, where the DEFENDANT employer has a stronghold and where it has failed to hire the PLAINTIFF repeatedly despite the DEFENDANT being hired by two other news organizations with newspapers in

**124** Wisconsin, including one she is writing for, the DEFENDANT's newspapers often contain headlines with references to some aspect of the PLAINTIFF or those she has been associated with at some point. Often the references are twisted in some fashion, as to provide a hint to readers of what they are about while altering the storyline so as to avoid being accused of a privacy violation. This hasn't been successful, as many people in Wisconsin are aware of the hidden storyline and instead of understanding it was purposefully twisted, they believe the twist is accurate.

**125** The confusion this practices causes to readers can contribute to a form of defamation, as the PLAINTIFF's reputation has been impacted by this practice. The DEFENDANT's reputation isn't helped by the invasions, as they've contributed to what some call "fake news." While it's possible the DEFENDANT doesn't know what to do about this problem, other newspaper companies have been far more effective in avoiding the problem. The two newspapers in Wisconsin (and Michigan) the PLAINTIFF has written for largely don't use the hidden language based on the privacy invasions. The Savannah newsroom the PLAINTIFF worked in had a chatter in the background that could have contributed to the problem, but the journalists who worked there largely kept it out of the newspaper. The DEFENDANT's news outlets don't need to use this hidden conversation based on invasion of privacy. It's a liability the DEFENDANT was made aware of in 2018. It's a form of discrimination, as the DEFENDANT doesn't use this hidden language – she isn't able to because of a spoken-language learning disability. The PLAINTIFF is aware others also don't use it; for this reason, the PLAINTIFF asserts using it excludes a significant segment of the population, including those with language difficulties or any other disability, which is a violation of the ADA.

**126** The extent of the damages related to invasions are likely astronomical. Quoting from the privacy case of Cothron v. White Castle System Inc., 2023 IL 128004, which cited Rogers v. BNSF Ry. Co., No. 1:19-cv-03083 (N.D. Ill. Oct. 12, 2022), it said "The federal district court entered judgment on the verdict and assessed damages of $228 million against the defendant based on the Act's provision for statutory damages of **$5,000** for each intentional or reckless violation of the Act identified by the jury."

**127** To create an exact list of discriminatory counts, including discriminatory pay, exclusions from staff meetings, and discriminatory and defamatory actions, would require Discovery. The PLAINTIFF was the victim of privacy invasions possibly related to background investigations by a third party company, as she had been asked to sign a document allowing for a background investigation when she was hired. The PLAINTIFF learned during her employment someone was collecting information on her based on questions and comments in the newsroom, but the information often was erroneous information, such as the presumption the PLAINTIFF was a veteran entitled to veteran's benefits, which she is not. Yet several months before a serious car accident in Evanston, Illinois on Dec. 26 or

Dec. 27 that could have been fatal, the HR director had asked her for her auto insurance card to make a copy of it. When she returned it, she told the PLAINTIFF she would be a disabled veteran in six months.

**128** The PLAINTIFF appreciates the fact the opposing attorneys have said there won't be a counterclaim in this case. To get to a number, she was hoping the Joint Status Report the judge had asked for would be an opening to negotiations. For reasons she doesn't understand, this effort was cut short. Negotiations also were mentioned by the hiring manager in Indiana, who turned down her offer to work as a contractor and said the contract the PLAINTIFF was presented was "about negotiations." Yet no negotiations have ensued.

**129** Several attorneys the PLAINTIFF has spoken with have suggested mediation, which the PLAINTIFF requested in 2022, when the original Complaint was filed. The DEFENDANT turned down this suggestion at the time and instead complained about the format of the PLAINTIFF's Complaint, saying they wanted numbers on the paragraphs of the document. She redid the Complaint with numbered paragraphs, but they still didn't like the format and told her to redo it. The PLAINTIFF points out DEFENDANT's Motion to Dismiss does not contain numbered paragraphs. This seems to be hypocritical.

**130** In 2022, the PLAINTIFF had asked Judge Coleman to withdraw the complaint for the time being because she didn't have any money coming in --- she wasn't on unemployment and needed to find work, which she did a couple months later. Unfortunately, the company she joined in January 2023 was acquired a few months later and she lost her job. Consolidation in the media industry has continued to reduce the number of positions for journalists. With about five more years to go before retirement age, the PLAINTIFF is eager to help the DEFENDANT get back on track.

**131** As a Gannett shareholder and the owner of a media-services company that has worked with other media companies successfully for years, the PLAINTIFF is motivated to see the company turn around its poor performance and is willing to work with the company through her business, which she reopened a year ago. The PLAINTIFF has no intention of giving up on resolving this matter as she needs some compensation and restitution for the injuries she has suffered.

**132** After Judge Coleman dismissed without prejudice the PLAINTIFF's revised complaint, the PLAINTIFF then resumed applying for roles, including at the DEFENDANT employer, as she had been told to do so in 2019 and 2020, when because of her disabilities her doctors told her not to return to the newsroom she was working in, which was located in Savannah, Georgia. She joined a national company with **about** outlets and a small Chicago office. The company could have hired her as a contractor to cover the Chicago area during Covid. She is available now to cover education, including higher education, or any other topic in Illinois. Chicago is home to some of the nation's finest

universities, including Northwestern, University of Chicago, University of Illinois-Chicago, Loyola, DePaul, Roosevelt, North Park, Elmhurst College and several smaller colleges. She also could cover business, consumer finance and many other beats from Chicago. The PLAINTIFF has covered education off and on since the 1978. She has covered business since 1982.

**133** The PLAINTIFF needed to work remotely during Covid-19, which was a reasonable accommodation, and the DEFENDANT denied this reasonable accommodation. The termination letter is dated March 31, 2020, and she was at her home in Evanston when she received it. **This is a "count" of exclusion.**

**134** The DEFENDANT was interested not only in hiring the PLAINTIFF in December 2023 but also seemed to be interested in acquiring her business, which didn't surprise her as it had already taken pieces of it. The DEFENDANT didn't mention its interest in acquiring copyright-protected articles during the job interviews, but instead presented a digital document as part of the written job offer.

**135** The PLAINTIFF declined to sign the agreement as it was inappropriate given the job she was offered was ann hourly, nonexempt and paid about $50,000 a year, less than she $77,000 she grossed through her business a full decade earlier in 2013.

**136** Given the DEFENDANT's prior interest, why would the attorneys for the DEFENDANT be approaching this matter based on counts alone and before any discovery had occurred? The PLAINTIFF shouldn't be expected to have all of the counts of discrimination at this point, as discovery hasn't started. However, the PLAINTIFF suggested another way to go about this in the Joint Status Update, which was taken out of the docket.

**137** The PLAINTIFF doesn't know how counts are assigned in most Wrongful Termination cases, but she suggests she could have been called back in December 2019, but instead was told to pack up her belongs, put them in a pod for storage and go home. She complied. **This is also a Count related to exclusion related to disability discrimination. It may also be related to age discrimination**. Several other older workers lost their jobs in 2019 and 2020 when Gatehouse Media acquired Gannett and took the Gannett name.

**138** The PLAINTIFF was suffering from a health issue, but was capable of working from home. As a result, every day that went by without paid employment could be a count. At what point would you stop tallying these "Counts"? The PLAINTIFF suggests it would be at the point of rehire. She offered to be hired as a contractor if the DEFENDANT wouldn't remove the Confidentiality Agreement, which she felt she couldn't sign because she is a protected journalist.

**139** The PLAINTIFF does have some experience covering the law as a journalist and has read many lawsuits and she asserts most Complaints don't include "Counts" right off the bat. This is a Wrongful Termination and Failure to Rehire case. That's two counts of Exclusion right there.

**140** The PLAINTIFF reminds the Court the DEFENDANT has a history of stonewalling – failing to respond, which is a form of exclusion. The DEFENDANT failed to show up at several Status Hearings in the fall. During these hearings, the Honorable Jorge Alonso agreed the two cases were related and could be heard together.

**141** Both parts of this discrimination case were filed in a timely manner. The PLAINTIFF received a Notice of Right to Sue on July 15, 2024 and had 90 days to file a Complaint. Her Complaint was filed and date-stamped on Oct. 4, 2024 in U.S. District Court for the Northern District of Illinois. The PLAINTIFF received a Notice of Right to Sue in earlier employment matter on May 18, 2022, when she was working full-time for another newspaper company in Michigan and Wisconsin. She made calls on her off hours to attorneys in Illinois and this might have contributed to her losing her position in July 2022. Without money coming in, she filed a Complaint within the 90-day period on Aug. 15, 2022 at the Dirksen Federal Building in person.

**142** The DEFENDANT's counsel asked the PLAINTIFF to redo the Complaint with numbered paragraphes, which she did in an Amended Complaint filed Nov. 23, 2022. At no time was she told the Complaints were untimely. The PLAINTIFF asks the Court to disregard the DEFENDANT's inaccurate accusations about untimeliness and her claims being time-barred. While the PLAINTIFF didn't use the term "counts," she most certainly described the discrimination in these complaint.

**143** The PLAINTIFF reminds the Court one of the DEFENDANT's attorneys presented a low-ball offer to settle this matter Tuesday, March 25, 2025 that contained no mention of "counts" and that carried a coercive take-it-now-or-we're-not-going-to-come-back-to-you-with-a-settlement-offer-again and a deadline of April 4, 2025, which is a form of Coercion, which is unlawful per the Americans with Disabilities Act. So apparently, this Complaint can be settled in more than one way. This Coercion is another "count" of discrimination. , according to the ADA, that carries civil penalties of up to $100,000, per the ADA.

**144** The PLAINTIFF reminds the DEFENDANT and the Court, the DEFENDANT's counsel apparently likes playing games, minimizing the extent of the DEFENDANT's unlawful behavior and the injuries this publicly traded company has caused to many people. The privacy invasions the DEFENDANT engages in on a daily basis have contributed to the DEFENDANT's poor financial results and therefore harmed its shareholders, those individuals and institutions who put their trust in what this DEFENDANT company purported to be.

**145** The DEFENDANT also is out a lot of money because of the injuries she has suffered from the discrimination and privacy invasions and the impact of this employment matter on not just one small business, but two., as the PLAINTIFF worked through her media-services company for decades and also rented out property to generate additional revenue.

**146** The privacy invasions have harmed the PLAINTIFF and her businesses. This is quantified by the precipitous decline in revenue after she did as the DEFENDANT told her and returned to her home.

**147** This is not a simple case, and the PLAINTIFF believes this is the reason she hasn't found an attorney willing to take this case, despite calling most employment attorneys affiliated with the National Employment Lawyers Association. Few have said she doesn't have a case. In declining, most have said the case is too large for them to tackle. Five different attorneys– including two in the Chicago area – told her to file the Complaint herself, which she did in a timely manner. A third in the Chicago area said he would help her and told her "Don't call another attorney," then he backed out without providing a reason. The PLAINTIFF had waited weeks for him to call her after she filed the original Complaint. Filing lawsuits is not really what most journalists aspire to do, yet this case is in the public interest because the PLAINTIFF was so injured, and the injuries are continuing. She is not the only person affected by the DEFENDANT's actions.

**148** To publish a national newspaper called USA Today while largely excluding coverage of the Chicago area would seem to be a form of consumer fraud, a violation of the Federal Trade Act's Section 5. USA Today rarely covers what's going on in the Chicago area aside from sports coverage, recent news about the Pope, who is from Dolton, Illinois, and an occasional gangster-style news story that puts Chicago in a negative light. (SEE EXHIBIT xx) Yet the DEFENDANT has taken advantage of the fact the PLAINTIFF is a protected journalist and followed her quietly likely for decades. She doesn't know for how long because she wasn't reading the DEFENDANT's newspapers on a regular basis because they didn't include Chicago.

**149** The PLAINTIFF is a current shareholder and a customer of the DEFENDANT, and as such, she believes she has more of an interest than the opposing counsel does in seeing the DEFENDANT corporation resolve this issue and get back on track, as it seems to have lost its way based on its financial results, reduced number of outlets and reduced headcount. The PLAINTIFF also has the knowledge and skills to be able to help the DEFENDANT if it is willing, but it may not be willing to rehire her, if it thinks it can get away with its unethical and unlawful behavior by continuing to exclude the PLAINTIFF and most of Chicago while spying on us. Either way, she is owed money from the injuries she has faced and the loss of compensation due to the DEFENDANT's discrimination.

**150** Why does the PLAINTIFF think the DEFENDANT is following her? Because information about her life and her daily activity shows up in Gannett's newspapers. Is this fair? No, not when the PLAINTIFF also owns an LLC company that's holding her intellectual property.

**151** Further, the Agreement the DEFENDANT asked the PLAINTIFF to sign after she had verbally accepted a job offer to be an education reporter contains information suggesting the DEFENDANT

had a nefarious reason for discriminating against her – it wanted her company's intellectual property without having to pay for it.

**152** The DEFENDANT was offered an hourly, nonexempt role as education reporter both in 2018 when she worked at the Savannah Morning News and again in December 2023, when she was offered a similar role for a newspaper in Indiana. Without a newsroom because the DEFENDANT had sold the block-long building the newspaper had worked from for deacdes, this was a remote role.

**153** The PLAINTIFF was in Evanston, Illinois when she interviewed for the position and when she received the offer. The PLAINTIFF is currently covering northeast Wisconsin for another newspaper company, working remotely from Evanston, Illinois, through her business. She also covered business news and features in Chicago remotely from her suburban home for eight years for the Chicago Tribune, working through her business.

**154** The Exclusions the PLAINTIFF has suffered from are continuing as the DEFENDANT has failed to hire her either through her business or as an hourly employee. As a result, so are the "Counts," the DEFENDANT's attorneys seem to want enumerated.

**155** Enumerating the "counts" of invasion of privacy is a challenging task, the PLAINTIFF attests, because of the amount of time it takes to keep up with various Gannett newspapers to determine whether they are continuing to invade her privacy. These invasions were the reason the PLAINTIFF didn't sign the employment agreement for the Indiana education reporter role – but the DEFENDANT, a publicly traded company, already knew she wouldn't sign it because she had told the HR director in Savannah she wouldn't sign another consumer reporting background agreement that gave the DEFENDANT (or a third-party it worked with) the right to invade not only her privacy, but that of her sources, her neighbors, her friends, relatives, associates, and anyone she came into contact with.

**156** In the PLAINTIFF's opinion and from her years of experience covering technology and data-collection in direct marketing, this is what happens when a traditional newspaper company puts tech interest above its core mission of reporting the news accurately and without injuring its employees or the public.

**157** The PLAINTIFF reminds the Court and the DEFENDANT, she has honors in business and in nonprofit and social enterprises, as journalism is mission-based business. Her bachelor's degree in journalism was conferred with the honor of a "done diploma" at Northwestern University and it was supposed to be the only degree she would need. However, with the news industry contracting and the Chicago Tribune (Tribune Publishing) in bankruptcy in 2008, she returned to graduate school at North Park University's School of Business and Nonprofit Management and received a master's degree with distinction -- a 4.0/4.0 – in 2011. Not only had she operated a profitable business for

over 20 years, but business news was her specialty and she learned a considerable amount through her research, reporting, writing and editing. Her knowledge and understanding of the news industry is vast, as she began studying it in 1982 when she worked for Byline, Northwestern's Journalism Review as well as at the Evanston Review newspaper while a student. She graduated early – in about 3-1/2 years – and had held internships at two newspapers and two magazines before she graduated. She also was on staff of her nationally recognized high school newspaper for three years prior to this, including as editor in chief her senior year. Her first job out of college was covering police and education for a daily paper affiliated with the prestigious Poynter Institute for Journalism. This was in Florida, and her asthma and allergies presented a health issue then, despite her age then of 21, not dissimilar from what she experience in Savannah in 2019. The South isn't the best environment for the PLAINTIFF.

**158** A key question in this employment matter is why would a legitimate news organization – one of the nation's largest news companies – ask any journalist to give up their civil liberties, their right to privacy, to work for it? Why would it allow the public to be surveilled in this process, as this apparently is what it routinely allows for. This is an illegal activity in Illinois, due to its strong privacy laws. As a member of the Society of Professional Journalists, the PLAINTIFF is aghast one of the nation's leading news organizations is violating the public's right to privacy on a regular basis. Professional journalists understand the public has the right to decline to comment or participate in a news story until the news becomes a public issue. Why would the DEFENDANT ever coerce its employees, including those with disabilities, to sign an agreement the employee had good reason to protest? The PLAINTIFF believes the DEFENDANT's nefarious practices are engrained in its invasive practices and this needs to stop.

**159** The extent of the DEFENDANT's invasions have affected every aspect of the PLAINTIFF's life, to the point where people don't want to socialize with her because they don't want their privacy invaded. The PLAINTIFF herself is cautious about what she says to people, and this has resulted in a chilling effect on her Freedom of Speech and her relationships with other people. This has affected her quality of life, as she feels like she is being treated like a wrongdoer, and she maintains her innocence.

**160** The injuries the PLAINTIFF has faced from losing her job and not being rehired either as an employee or through her business also has harmed her journalism business and her real-estate rental business. The Sherman Act prohibits restraint of trade and other anti-competitive behavior

**161** On Dec. 18, 2023, the following occurred, which are obvious violations of the Americans with Disabilities Act (ADA) and the ADA Amended Act of 2008 (ADAAA):

**162** The Plaintiff, a professional journalist with disabilities and a former employee in high regard at the company named in this complaint, was coerced and retaliated against when she was told she must sign an unlawful employment agreement after being offered a full-time position. She received the offer for full-time remote work while at her home in Evanston, Illinois, and was at this same location when the job offer was unlawfully rescinded.

**163** The Plaintiff was excluded from employment in a discriminatory act.

**164** The Plaintiff was denied a reasonable accommodation.

**165** The Plaintiff was retaliated against for asserting her rights, for pointing out an employment agreement she was being coerced to sign was unlawful, for having worked through her business previously in part because of her disabilities, and for filing an earlier complaint about disability discrimination at this same employer, which she had worked for from June 2018 to March 2020, at which time she was terminated in a discriminatory and retaliatory act. The Plaintiff filed a legal complaint in U.S. District Court for the Northern District of Illinois on August xx 2022 after receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission. She received another Notice of Right to Sue from the EEOC on July 15, 2024 following these more recent acts of discrimination, described as follows:

**166** On Dec. 18, 2023, after accepting a job offer at the South Bend Tribune, owned by Gannett Co. Inc., the offer was rescinded in a discriminatory act, which is a Failure to Rehire, as the Plaintiff believes she had been unlawfully let go in March 2020 from the same employer in a different newsroom.

**167** On Dec. 18, 2023, the Plaintiff was discriminated against in a violation of the Equal Pay Act when a job offer for a nonexempt position was described as at an "annualized rate of approximately $50,000" or $24.04 per hour. This is less than the Plaintiff was earning at her last journalism job, which was $60,000 annually in 2023 in an exempt position as a journalist. It also is less than the Plaintiff grossed working full-time through her company in 2013, which was about $77,000 annually.

**168** The offer for $24 an hour doesn't fully consider the Plaintiff's experience and training, nor does it take into account wage inflation.

**169** The extent of the discrimination and obstruction the Plaintiff has faced from the Defendant she believes amounts to a violation of U.S.C. 241, which prevents any concerted effort involving two or more people from interfering with someone's Constitutional rights, including freedom of speech and freedom of the press.

**170** The Plaintiff also believes she was subject to age and gender discrimination, as she is an over-40, single, divorced female with disabilities and receives no government assistance and no alimony. She needs and deserves a wage or salary commensurate with her experience and education, which are considerable. She was interviewed by two males younger than her and with less relevant education

and experience, both of whom would have been above her in the company's hierarchy. Further, the HR representative who rescinded the job offer also apparently had less education and certainly less experience in contracts or this complaint would be unnecessary.

**171** The Plaintiff, who worked through her own company prior to joining the Defendant employer and continues to own and work through her company, called L3C Chicago L3C LLC and which does business as Ann Meyer Communications, also was the victim of several antitrust laws, as she also offered to do the role offered by working through her business, but this offer was rejected. The Plaintiff requests the court to consider the historical context of this matter, as it was during the Covid-19 pandemic and during a particularly difficult economic time for the media industry, which is what the Plaintiff's business relates to as does the employer Defendant's. Like many small business owners, the Plaintiff decided due to economic challenges, it was not prudent to relaunch her company in a big way. Instead, it was active as a holding company and was holding her intellectual property. She had relaunched a website in April 2020, just after being terminated from the employer Defendant, only to have her site repeatedly hacked. She doesn't know who hacked the site. With the damages costly to repair, she put the site on hold while pursuing full-time employment and she doesn't not believe she should be punished or retaliated against for this decision, which to a certain extent reduced the financial losses she suffered because of this employer Defendant's discriminatory actions.

**172** Upon reading the four-page single-spaced "Confidential Information and Invention Assignment Agreement" employer Defendant said was required for me to sign -- which was a blatantly false statement because several federal laws exist barring this type of coercive document presented with a job offer. It also was symptomatic of the employer Defendant's poor judgment and apparent incompetence in the human resources (HR) department – and this is based on the Plaintiff witnessing not one or two but several serious errors and discriminatory actions on the part of the employer Defendant's HR departments in several locations. Further, the journalists extending the offer also apparently aren't well trained in human resources and employment law or this could have been resolved to mutual satisfaction. The Plaintiff points out she is not trained as a lawyer, but in her journalism training she was taught to stay abreast of new laws, legislation and other rules and regulations that would change the status quo, in part because they are often newsworthy, either in and of themselves or as they are given practical consideration in the the courtroom and in part because it's useful for everyone to know what's consider "against the law" in this country.

**173** Most people are aware of the Americans with Disabilities Act to some extent, though not necessarily every aspect of it. The Plaintiff made a point of discussing her physical disabilities during the job interview when she said she would like to be certain her workspace – whether it be the newsroom

(which had been closed so wasn't a viable option) or an apartment – was clean and free of allergens, contaminants, and germs.

**174** While the Plaintiff's condition has affected her periodically for most of her life, this was still during the Covid-19 pandemic, which exacerbated her likelihood of becoming ill. At a minimum, the Plaintiff needed the employer Defendant to comply with the ADA, which provides for access and requires reasonable accommodations. It also prohibits discrimination, including exclusion and retaliation.

**175** The Plaintiff had suffered a health issue when she was last employed by the Defendant, which also failed to provide reasonable accommodations in the form of remote work in March 2020, which was during the Covid shutdown and stay-at-home order in Chicago. The HR representatives at the time instructed her to apply for positions in other newsrooms, as the one she had worked in wasn't clean.

**176** Partly because of Covid and quite likely because many newsroom hiring managers don't consider the ADA's provisions for access, the Plaintiff wasn't rehired by employer Defendant until December 2023 – or about 44 months after her wrongful termination -- despite dozens of applications to Gannett positions she was highly qualified for. The Plaintiff incurred a significant financial loss – estimated at well over six figures – and other hardship, including illness and surgery for a life-threatening health issue related to her disability during this period of waiting to be rehired. She might not have experienced this severe health issue at all had she been allowed to work remotely from 2019 through Covid and possibly indefinitely – for does it really matter where she works from? Then, about four years after she suffered a serious health issue from working in the employer Defendant's contaminated newsroom, she was discriminated against again.

**177** After spending countless hours diligently applying for dozens of positions at the employer Defendant, she was highly qualified for, on Dec. 18, 2023, she was told she was **hired** for the full-time role of education reporter. To have this job offer rescinded for unlawful reasons was appalling and unlawful.

**178** Further, the Plaintiff has every reason to believe the way the offer was rescinded, with the HR representative essentially interrupting her during a phone call, and telling the Plaintiff, "I'll just rescind the offer then," instead of granting the Plaintiff's reasonable request to recuse herself from any discussion of trade secrets or highly sensitive information, was discriminatory and a violation of the ADA.

**179** This is a also worker classification/misclassification issue, as the DEFENDANT shouldn't have control over an hourly nonexempt worker's off hours. If the DEFENDANT had followed through on its offer without the extra agreement, the hourly nonexempt arrangement shouldn't have interfered in the PLAINTIFF's business to be pursued at a future date, and it also wouldn't have interfered in Gannett's business.

**180** The employer Defendant engaged in this discriminatory act of exclusion and retaliation without fully considering the Plaintiff's valid and lawful reason for wanting to **amend** the Confidential Information agreement to allow the Plaintiff to recuse herself from any discussion of confidential trade secrets, which would be a reasonable request. To the extent hearsay travels between news companies, the Plaintiff suspects other hiring managers at other employers also have used this as a reason not to extend an offer to the Plaintiff, instead of attempting to discuss the issue and work out a resolution. Not a single person from the DEFENDANT company has attempted to resolve any part of this two-part employment matter that seriously injured the PLAINTIFF. It's reprehensible.

# 1 Business interests

**2** The Plaintiff has seen quite a few agreements, as she has worked as an independent journalist for over 30 years. She also has written and edited for publications without any agreement, and this is allowed, leading her to suggest this entire document was unnecessary and served a purpose other than welcoming her back to Gannett. She believes it was being used to allow Gannett to take her intellectual company, which her business L3C Chicago L3C LLC holds. It is registered with the State of Illinois. Much of the IP involves copyright, which is in effect for 70 years past the creator's death. The plaintiff also had come up with an original tagline when she was covering small business and trademarked the following: "Informing, inspiring and connecting businesses." She also holds domain names related to content creation.

**3** In another disturbing part of the document, it raises the possibility of the Plaintiff's demise –such as because of an incapacitating illness – in which case Gannett would become her agent. It states: "If the company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me."

**4** Given the Plaintiff's previous injuries in the Defendant's newsroom and during Covid when she was on an unpaid Family and Medical Leave Act leave, this raises a serious concern for her about whether Gannett might actually try to harm her in an effort to become her agent and take over her business and intellectual property.

5 WHEREFORE, PLAINTIFF respectfully requests the court grant immediate relief from the Wrongful Termination and Failure to Hire in the form of a partial settlement as she currently isn't generating sufficient income to keep up with her bills and make much-needed repairs to her townhome;

6 the ADA provides immediate relief, and the PLAINTIFF asks the court to award this so she might begin to repay the debt she is incurring while waiting for other parts of this dispute to be resolved, such as the privacy violations;

7 The PLAINTIFF also requests injunctive relief from the privacy invasions

8 The PLAINTIFF requests equitable, compensatory, declaratory and punitive relief from the Defendant's discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA), the Clayton Act, the Sherman Act, and other laws that also could have contributed to exclusion, discrimination and retaliation that blocked the Plaintiff, who is a member of the Society of Professional Journalists, from pursuing the profession of journalism independently and freely as the U.S. Constitution provides for.

Respectfully submitted,
Ann Meyer
*Pro Se*
Evanston, IL 847-271-0177
ameyerwrtr@aol.com

July 16, 2025