BC

FILED
7/17/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

LJ

Meyer v Gannett

United States District Court for the Northern District of Illinois

ANN MEYER

Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media)

Defendant

Case No. 1-24-cv-09529
Judge Jorge L. Alonso

Ms. Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (work)
847-271-0177 (cellphone)

Ms. Julie C. Ratliff, associate
jratliff@taftlaw.com
Direct dial: 312-537-4011

Mr. Andrew Murphy, associate
hjackson@taftlaw.com
Direct dial: 312-836-4145

Ms. Heather Jackson, partner
hjackson@taftlaw.com
Direct dial: 312-836-4172

Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601-4208
Tel: 312-527-4000

RESPONSE TO MOTION TO DISMISS Part II: Discriminatory Counts

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth this Part II Response to the DEFENDANT's Motion to Dismiss and asserts **Counts of Discrimination,** as the DEFENDANT's attorneys have requested, and other information about disability law as it pertains to employment at one of the nation's largest publicly traded news media companies.

1 The DEFENDANT's request for "counts" might sound simple, except for the fact the discrimination occurred on a daily basis, including during the PLAINTIFF's off hours and it continues today while the PLAINTIFF isn't employed by the DEFENDANT company.

2 To fully understand the extent of the discrimination, it helps to understand the reason Congress passed the Americans with Disabilities Act and the Amended Act in 2008/2009. Without intending to be repetitive, the PLAINTIFF feels it's worth a paragraph or two to refresh the DEFENDANT's attorneys on what the Americans with Disabilities Act is all about and why it is stronger today than ever -- because the attorneys haven't demonstrated they understand it.

and an adjunct role at Northwestern University, yet she didn't receive any offers due to Covid and various furloughs. One employer told her they were concerned about her health being an issue. She also likely was denied employment based on the condition of newsrooms throughout the country and her history of allergies, asthma, sinus issues and lack of smell rather than considering the fact her performance and her attendance were excellent and with due care, she is able to work in a newsroom, another office or remotely. She ended up working for Census2020 in two states but returned from Iowa with a sinus infection and needed emergency sinus surgery in November 2020 for the same condition that had been an issue in Savannah.

The ADA is an ideal law for this case, which also involves anti-trust issues as the PLAINTIFF is the owner of an LLC company. She had largely put this business on hold while she worked in Savannah, though she took several online courses and produced works that weren't for the Savannah Morning News. She was an hourly employee. Many business owners also are employed. This isn't a new concept. Large publicly traded companies aren't supposed to block small businesses, per the Sherman Act.

7 The ADA also is ideal because the news media also has been provided access through interpretations of the First Amendment and the traditional media's important and foundational role in this nation's democratic form of government. The traditional news media isn't just another business; nor should it ever be considered a part of the tech industry, because it must be able – and allowed -- to criticize the tech industry if it's in the public's interest to do so.

8 The traditional news media, of which the PLAINTIFF is a member, is known as the Fourth Estate. It is called this because it forms what's often referred to as the fourth leg of a table, with the other three legs being the branches of our government. It provides the balance to keep this table from becoming wobbly, as some might assert it is today because the press has become weakened. The traditional news media provides a check on the three branches of government – as well as on corporations, nonprofits, etc. – which is necessary to keep our system operating as it was intended. Journalism helps to fight corruption by exposing it. It also is an influencer of change. This important role shouldn't be overlooked in this case, because it explains why the PLAINTIFF is so annoyed about the disrespectful, discriminatory way she was treated and about what she — and many others — say are the DEFENDANT company's mistakes.

9 The DEFENDANT's attorneys seem to be representing Gannett, the employer, which isn't an envious position to be in. The DEFENDANT's attorneys resemble the DEFENDANT employer in that its people are talking to one another – they're sending contradictory messages. They're also not listening to the PLAINTIFF's reasonable suggestions, in her opinion. This is another form of blocking access, which the ADA prohibits.

**10** The PLAINTIFF, in representing herself, also is representing the interests of many journalists and shareholders who thought they were joining or buying a stake in a traditional newspaper company, not a poorly performing tech company (as plenty of other tech companies exist), but one that understood the news media's important role. On the face of it, a news media company should understand the laws of this nation and abide by them. (A news company really shouldn't ever act as if it is above the law or try to abuse its authority -- because it would be so profoundly hypocritical to do so as to raise an allegation of fraud, per the Federal Trade Act, Section 5.)

**11** Representing shareholders is a natural position for the PLAINTIFF, a journalist with 40 years of experience who is highly knowledgeable about the news industry and who also is a business owner dating back to 1988 and the owner of published works dating back to 1978. She understands the news business because she has served it as a supplier and consultant for decades. The PLAINTIFF became a shareholder of DEFENDANT corporation in November 2023, just weeks before she was offered a full-time, hourly, nonexempt position with the DEFENDANT employer. She doesn't think this is a coincidence; she thinks it is another example of invasion of privacy. How would the DEFENDANT corporation know she bought shares? She didn't tell the hiring managers.

**12** The PLAINTIFF believes in holding the DEFENDANT accountable, because she believes in order to succeed it needs to correct problems that have led to its decline. As one of the nation's largest news organizations, with reportedly about 250 news outlets, the DEFENDANT's success or failure also determines that of the news industry overall to a certain extent.

**13** As a journalist and as a supplier to news organizations, the PLAINTIFF is concerned about what's occurred as the DEFENDANT company has become smaller and has de-emphasized its core print product – the newspaper — despite the fact print is where the money is. This isn't about technology coming in and making news more efficient, because it's really not working for the company and for the public. Fewer people are reading local – and possibly national news – on a regularly. This doesn't mean a nation of people in the dark is what we should be aiming for.

**14** The DEFENDANT's attorneys are welcome to take the PLAINTIFF's offer to help guide the company back to success as long as the PLAINTIFF is paid and receives the credit for any suggestions she makes as part of this litigation. She is not giving her ideas to the DEFENDANT's attorneys, and they are not to take the PLAINTIFF's intellectual property without her permission, despite the fact this is what the DEFENDANT company allegedly has done for years. The DEFENDANT company apparently understands copyright and IP on some level or they wouldn't have expressed such a keen interest in taking her copyright in the agreement they presented to the PLAINTIFF in 2023. If the DEFENDANT's attorneys are doing

their job well, they should be recommending Gannett's people work with the PLAINTIFF to prevent the counts of discrimination from continuing to accrue.

## Courtroom antics: Retaliatory for bringing an employment complaint?

**15** Employees at most companies today are trained to speak up with concerns about the workplace to reduce the risk of litigation. Per the Sarbanes Oxley Act of 2002, employees of a publicly traded company should not be retaliated against for speaking up. The ADA also provides for access and prohibits retaliation. Do the DEFENDANT's attorneys realize this? Employers have to allow employees to speak and to be listened to, and so does the law firm representing the DEFENDANT. Many hours are devoted to new-hire webinars and training so employees, including managers, know the rules, such as what harassment looks like so it can be avoided. They also often are trained to include others who are different from them. Despite going through the act of providing training, the DEFENDANT hasn't been winning at the labor game. Its headcount is drastically smaller than it was just five years ago. Compensation hasn't kept up with inflation at many outlets, and the employer has lost a lot of experienced journalists, resulting in weaker products. Reductions in headcount only exacerbate other employment issues, such as discrimination. The DEFENDANT company needs to generate more revenue.

**16** It's one thing to acknowledge an employment issue and another to resolve it. The DEFENDANT company's standard procedure of stonewalling employees who have concerns doesn't resolve the issues and doesn't prevent the issues from coming back. The coercion a DEFENDANT's attorney used in March 2025 is prohibited by the Americans with Disabilities Act. It's reminiscent of the DEFENDANT employer's coercion, which the PLAINTIFF has faced over and over, including in 2023. These coercive acts are illegal. The DEFENDANT's legal counsel from Taft Law also used a form of coercion and retaliation in the courtroom in 2022 when it refused to negotiate or settle the case, preferring instead to criticize the format of a document created by PLAINTIFF, a person with multiple disabilities who has faced discrimination for years on many fronts and who has become economically disadvantaged because of this discrimination. The DEFENDANT's attorneys and their tactics seem intent on distracting the court from the primary issue in need of addressing. This is discriminatory.

**17** After the PLAINTIFF redid the Complaint in November 2022, the DEFENDANT's attorney complained again, saying she didn't like the numbering system the PLAINTIFF used. Perhaps she thinks this is what the editors at the DEFENDANT company do; they don't. The PLAINTIFF's work wasn't an issue, and the DEFENDANT employer hasn't said it was. Further, the PLAINTIFF reminds the opposing party the United States has outlawed slavery. She

hasn't been paid for her time or her work product in this case, despite providing valuable information to the DEFENDANT's leaders if they care to know about it. In late 2022, Judge Coleman dismissed the Complaint without prejudice so the PLAINTIFF employee/small business owner could bring it back. Contrary to the DEFENDANT attorney's defaming accusation the PLAINTIFF didn't file complaint on time, this is false. The PLAINTIFF is attaching dated documents to this brief.

**18** The PLAINTIFF employee/small business owner hasn't found the right attorney as the case became more complicated – and perhaps also more clearly malicious – in 2023, when the PLAINTIFF received an offer with an agreement that shined a light on the DEFENDANT public company's motivation to acquire the PLAINTIFF's business without paying for it. This is the extreme opposite of what the ADA allows; in fact, it's what the ADA tries to prevent, economic disadvantage among people with disabilities.

**19** The economic disadvantage the PLAINTIFF has suffered continues to the present: Not only was the PLAINTIFF's furniture and belongings damaged, stolen or lost in the moves to and from Georgia, the PLAINTIFF's businesses were impaired. She hasn't been able to reopen her real-estate rental business since October 2022, due to her poor economic situation, where she has more debt than the amount of revenue she is generating.

**20** Seven years after the PLAINTIFF rented the townhouse unit to go to work for the DEFENDANT, she has been economically disadvantaged to the point where the townhouse now needs extensive repairs and PLAINTIFF doesn't have the funds available, in part due to the discrimination she has faced from the DEFENDANT, one of the nation's largest news companies.

**21** Similarly, the equipment she used for her journalism company also was damaged, lost and stolen, and she doesn't have the funds to replace it. This is contributing to ongoing financial hardship.

# Counting the Counts of Discrimination

**22** **2025**

**23** October 2024 to March 2025: The DEFENDANT is **blocked** from settling this dispute, in several **counts of exclusion and retaliation**, when DEFENDANT's habit of **stonewalling** continues, as it fails to show for **three** Status Hearings. PLAINTIFF contacts Investor Relations for addresses and sends certified letters to DEFENDANT's registered agent, its Chief Legal Officer as well as to attorneys at Taft Law in Chicago. **Three counts.**

24 Other counts of blocking were described above, along with a count of coercion. **Three counts.**

25 The PLAINTIFF also applied for a couple of other positions and extended an offer to help as an independent journalist, working through her business in 2024. **At least two counts.**

26 Invasions of privacy (see other section below around p. 26). How many? Counts are to be determined.

27 **2024**

28 PLAINTIFF is excluded from accessing clips on Proquest, though they had appeared in this database in 2020. PLAINTIFF produced about 340 articles and projects while she worked for the Savannah Morning News, which appeared on Proquest.

29 PLAINTIFF also is excluded from accessing online some of the articles, photos and videos she produced while working for the DEFENDANT as they have been taken down or her name removed for them. In general, this isn't allowed in the profession of journalism. These exclusions and retaliatory actions following the PLAINTIFF's second complaint to the EEOC have impaired her job search and damaged her reputation. **Number of counts to be determined.**

30 Summer 2024: PLAINTIFF is excluded from working for DEFENDANT company through PLAINTIFF's business, when she contacted an editor she had interviewed with previously and offered to help cover Milwaukee during a news event. She received a rejection. She also applied for several full-time positions. However, she also realized if the DEFENDANT employer was going to continue to coerce her to sign an agreement she isn't comfortable signing, she is wasting her time in sending in more applications. While PLAINTIFF reopened her journalism/media-services business in 2024, she isn't making ends meet yet as fees being paid for stories aren't at the level they were when she worked full-time through her business previously, when she earned between 50 cents and $1 a word or from $50 to $100 an hour working through her business. The DEFENDANT's poor financial performance has impacted the entire news market, as because of its size it sets market rates and rates haven't increased. The DEFENDANT shouldn't be allowed to block PLAINTIFF in working through her business and in employees, as this would be a violation of anti-trust laws, such as the Sherman Act, which prohibits monopolies. **Counts: Several**

31 For counts of discriminatory exclusion, please see section below on job applications during 2024.

32 **2023**

33 Dec. 18, 2023 **discriminatory counts** against the PLAINTIFF include:

34 PLAINTIFF was coerced and retaliated against when she was told she must sign an unlawful employment agreement that also would have involved a hostile takeover of her company, in a violation of the ADA prohibitions against coercion and exclusion and in a violation of the Sherman and Clayton Acts regarding anti-trust behavior. How many other applicants were presented with this agreement to sign as a condition of hourly employment? PLAINTIFF contents this is likely an example of unequal treatment (segregation) along with retaliation and coercion. **Three counts.**

35 PLAINTIFF asserts the employment agreement was blatantly discriminatory and would have caused further economic discrimination, which the ADA prohibits, because the agreement would have allowed the DEFENDANT to steal her business – everything she had created or would later create – in exchange for hiring her for an hourly position paying $24 an hour. She was earning $29.50 working plus overtime for the Census Bureau in 2020 and she was earning $60,000 as a journalist in 2023. Do other journalists offered positions paying $24 an hour have to give property to the DEFENDANT employer in exchange for a job paying below market? If not, she was discriminated against. This is a violation of the Equal Pay Act and the ADA (compensation clause and fairness). **Two counts.**

36 The PLAINTIFF's business apparently had some value or the DEFENDANT wouldn't have been interested in it. Why would the DEFENDANT care about it; why the DEFENDANT have mentioned it at all? The PLAINTIFF is the sole owner of her company. She holds the rights to published articles that were "fixed" in a common law form of copyright as early as 1978. She worked as a volunteer journalist from 1978 to 1985 at least part of the time and owns the rights to works published during this period. She worked through her business from 1988, often as an outsourced editor, newsletter editor, reporter, columnist, writer and photographer, and continues to work in the business currently. The attempted theft of thousands of articles is discriminatory. **Counts to be determined.**

37 PLAINTIFF was excluded from employment in a discriminatory act when the job offer was rescinded. This is a **failure to rehire**, as the PLAINTIFF had received a job offer. The job offer also indicates the PLAINTIFF was considered employable and a top candidate for an education reporter position in a mid-size market four years after she experienced a health issue in a contaminated newsroom owned by the same company. While this was just one count of failure to rehire, it represented the culmination of three years of sending out dozens of applications. **One count at $100,000.**

38 PLAINTIFF was denied **reasonable accommodations**, in a violation of the ADA, such as being exempted from having to sign the form and being allowed to recuse herself from any meeting

where the company's proprietary information was revealed. Why would a publicly traded company want to tell a protected news reporter confidential information that it wanted kept a secret? **One count.**

**39** PLAINTIFF was excluded from continuing a discussion with an HR manager named Joann when the HR manager interrupted the PLAINTIFF and said she would rescind the offer, instead of negotiating. PLAINTIFF was further excluded from any further negotiations as the DEFENDANT apparently didn't understand or didn't care that what it did was a violation of the ADA. **Two counts of segregation and exclusion.**

**40** PLAINTIFF suspects she was retaliated against for pointing out an employment agreement she was told she must sign was unlawful. She told this to the HR manager and to the hiring manager. The company hasn't hired the PLAINTIFF since this time -- either through freelance/contract work or employment. This discriminatory exclusion is ongoing. **Two counts of retaliation/whistleblower.**

**41** PLAINTIFF was retaliated against for protecting her small business' interests when the DEFENDANT's regional executive editor turned down the PLAINTIFF's verbal offer to do the job offered through her business, instead of as a full-time employee. To box out a small business and also not hire the person after having made a determination she should be presented with a job offer is a triple-whammy of discrimination. Three counts at $100,000 each.

**42** PLAINTIFF was injured and excluded when, upon calling hiring manager after a job offer was rescinded and offering to work through her business, he not only said "No," he also said, "this is about negotiations." Was the DEFENDANT trying to take over the PLAINTIFF's business? Was it trying to get itself out of possible IP infringement by acquiring her company? Was the hiring manager aware the PLAINTIFF's offer for a nonexempt hourly position didn't necessarily mean she would be prevented from working through her business on her off hours? Why wasn't she allowed to work in an hourly position? Likely because it was more important for the DEFENDANT to acquire her IP and continuing spying on her to gather more IP– yet the DEFENDANT preferred not to state this explicitly, as it's illegal and discriminatory. The DEFENDANT's decision not to follow up led to considerable financial hardship for the PLAINTIFF and should be a separate count of discrimination, which is ongoing. **Two counts for lack of access and segregation/treated differently.**

**43** PLAINTIFF's **real estate rental** business also was impaired by the DEFENDANT's decision to rescind the job offer she received verbally on Dec. 13 as she likely would have relocated to be closer to the territory if the DEFENDANT had lived up to its verbal offer and not attempted to steal her business without discussing it. Treble damages. **Three counts $100,000 each.**

**44** The 2023 exclusions put back in PLAINTIFF's face the horrendous discrimination and exclusion she faced in 2019 and 2020 when her health suffered and she was told to pack up her belongings, put them in storage and go home, due to the newsroom environment. Who else did she say this to? This is a count of segregation/exclusion/failure to provide a reasonable accommodation.

**45 2021 and 2022**

**46** At some point in 2021 or 2022, for retaliatory reasons the PLAINTIFF doesn't understand, Gannett took down photos and videos the PLAINTIFF produced for the public's information and benefit, depriving the public of this content. After news is published, it continues to have historical value. Libraries keep news archives from local and national publications because they remain of scholarly interest to historians and researchers in a variety of academic disciplines, such as social studies, business and law. It's rare for a legitimate news organization to take down previously published content and replace elements, such as photos and videos, because it violates the public trust. During this period, PLAINTIFF continued to apply for other positions with the company. Sabotaging her work would be a way to reduce her chances from being rehired, as this company doesn't hire for experience possible because it doesn't want to pay people what they're worth. This is another example of how the DEFENDANT went to great lengths to exclude and retaliate against the PLAINTIFF. **Multiple counts of retaliation/harassment/sabotage.**

**47** In a disheartening discovery, Many of the PLAINTIFF's videos on YouTube also were tampered with in apparent sabotage. Repairing them at this late date would require substantial time and effort. Multiple counts of **retaliation/harassment/sabotage.**

**48** 2020: While recovering from a respiratory illness and a fractured/bruised sternum, PLAINTIFF felt blocked from two different businesses – one being the real estate rental business she said was a condition of her employment and the other the journalism business she had worked through since 1988. While recovering and on unpaid leave, the PLAINTIFF updated her own website, SmallBizChicago.com, with new articles and photos, only to have it hacked with typos inserted into the posts. The hacking continued to the point where she had to take it down because it was damaging her reputation while she pursued other opportunities. The PLAINTIFF doesn't know who hacked the site, but it's clear her photos and videos were taken down in an act of retaliation, providing fewer work samples for her to show as she looked for work and destroying the public trust. **Multiple counts of retaliation and ongoing blocking and exclusion/treble damages.**

**49** 2020: Both businesses were damaged by the obstacles the plaintiff faced. The rental property needed several large repairs, but PLAINTIFF couldn't afford to make them during Covid, due to supply and labor shortages in 2020. Five years later, the PLAINTIFF still hasn't been able to afford tuckpointing, a new roof, counter replacement, flooring, some new windows and landscaping. As a result her property is somewhat diminished from where it was in 2018 when she left Evanston for Savannah. She lost a lot of kitchen and household items and some furniture was permanently damaged. She is estimating the work needed on her townhouse to in excess of $70,000.

**50** PLAINTIFF intended to purchase a rental property to generate income lost from living in her townhouse, but hasn't been able to do so because she can't afford properties near her and won't qualify for a loan in other locations. This is permanent damage to a profitable business. If she had been allowed to keep her position, the PLAINTIFF could have purchased another rental property or moved from her townhouse and rented it out for supplemental income to pay off debt and return funds taken out early from retirement accounts, due to the hardship she faced. Ongoing count of blocking from business pursuit due to economic hardship.

**51** March 31, 2020: When PLAINTIFF's job was terminated on March 31, she faced one count of Wrongful Termination and one of failure to provide reasonable accommodations.

**52** This action also include **eight counts** of discriminatory exclusion in violation of the ADA, including:

- exclusion from pension benefits;
- exclusion from life insurance benefit;
- exclusion from paid employer health care benefits;
- exclusion from paid holidays;
- exclusion from vacation days;
- exclusion from comp time, personal days and other paid time off;
- exclusion from employer's disability insurance and workman's comp.
- exclusion from employer-portion of payroll taxes and FICA.

4

**53** In this case, PLAINTIFF also was excluded from working for DEFENDANT through her business; as the HR Director wanted her to be a disabled veteran so she wouldn't have to pay property taxes. The HR director didn't involve PLAINTIFF in discussing this; the PLAINTIFF wasn't interested in becoming disabled and she wasn't a veteran. **Count of segregation.**

**54** 2020: The PLAINTIFF was excluded from disability insurance benefits. The HR Director instructed the PLAINTIFF to use the employee benefit of disability insurance and not to mention newsroom chemicals on her application; just to use the car accident. The insurance company

**denies the claim**, saying it is a workman's compensation case. However, the PLAINTIFF was denied workman's compensation as the in-taker didn't understand how PLAINTIFF's chronic respiratory health condition was involved. **One count** of discriminatory lack of access.

**55** March 31, 2020: PLAINTIFF received termination letter, as FMLA leave has expired. This count is related to **failure to provide a reasonable accommodation and discriminatory exclusion.**

**56** March 19, 2020: HR director told the PLAINTIFF she must work from the newsroom at least part of the time and asked PLAINTIFF for how long she will be able to be in the newsroom. PLAINTIFF said she didn't know because she didn't know if the conditions have improved; she repeats that she is cleared for remote work. The HR director said it won't work out if PLAINTIFF can't say how many minutes per day she will be in the newsroom. This is a blatant failure to provide reasonable accommodations and discriminatory exclusion.

**57** **March 19, 2020:** PLAINTIFF's recollection is HR Director tells PLAINTIFF to re-apply for Disability Insurance through the Standard Insurance Company, which she does. She faxes form with her doctor's signature on March 19, 2020. This claim is denied, in another **exclusion.**

**58** **Count:** March 16, 2020: After seeing cardiologist on March 9, PLAINTIFF had a cardio stress test on March 16, and was told she was cleared to return to full-time work remote from the newsroom, as this is during the COVID-19 shutdown and Illinois as a stay-at-home order in place. PLAINTIFF calls HR director and tells her she has been OKed to return to work. HR director requests to see this in writing, despite her primary care already giving her OK.

**59** Feb. 24, 2020: PLAINTIFF's primary care physician in Wilmette provides a signed Fitness for Duty Certification form stating: "patient is still being treated for a allergic rhinitis/nasal polyps/sinus infection/asthma that was exacerbated by previous working environment. Recommendation at this time would be for patient to work remotely while her specialists care" for her. The HR director rejects this and asks when her next doctor's appointment is. This is another example of discriminatory over-reach and abuse of position authority on the part of the HR director, in the PLAINTIFF's opinion, as the PLAINTifF could have worked remotely. PLAINTIFF is on an unpaid leave and not eligible for unemployment, incurring a financial hardship with no income coming in. She is being excluded from a paycheck, a violation of the ADA and the 13th Amendment prohibition of slavery, as she is still negotiating with the DEFENDANAT. Every day that goes by is another count of ADA discrimination per lack of compensation and exclusion from working.

**60** Feb. 19, 2020: The PLAINTIFF has appointment with Ear/Nose/Throat doctor, who sees polyps in nasal passage and sinuses. He recommends she see a cardiologist as her condition could

contribute to a cardiac issue. He said she may work remotely. PLAINTIFF continues to be **excluded** from returning to work and from being paid. The PLAINTIFF was denied compensation when DEFENDANT employer denied her request to work at least some hours per week during her recovery from a health issue that started in the newsroom with an exposure to chemicals she couldn't tolerate. Every day from this date on should be a count of exclusion: 250 work days x 5 years = 1,250 plus 5 months = 1,375 counts

**61** Early February 2020: Covid-19 is declared. PLAINTIFF regains possession of her townhouse on Feb. 1, and starts what will be months of cleaning. She does not move her furniture from Savannah until the beginning of June, as she continues to negotiate a return. **Continued segregation and exclusion** resulting in financial hardship from cost of storage, which editor instructed.

**62** January 2020: Hardship and economic disadvantage to PLAINTIFF continues as PLAINTIFF, injured and without income, stays with friends and relatives for several weeks, then rents a room by the week in Oak Park as she learns it's going to be several more weeks before her late tenant's relatives can clean out the tenant's belongings and repair damages to townhouse.

**63** January 2020: PLAINTIFF was hit two other times in January, including once as a pedestrian crossing in a crosswalk in Oak Park and another when she was driving a rental minivan on a thoroughfare and a car on a side street disregarded a stop sign and proceeded into the intersection before her car had cleared it, hitting a back corner of the vehicle's fender. The PLAINTIFF believes these "accidents" were related to the comment the HR Director made about her becoming a disabled veteran in six months. They also are evidence of **invasion of privacy**; how would the perpetrators know her precise whereabouts if privacy hadn't been invaded? **These are three counts of invasion of privacy.**

**64** Early 2020: The PLAINTIFF was excluded from working for Gannett at a time when all employees were told they should be working remotely and not in the newsrooms. This is a violation of the ADA and the Amended Act. The PLAINTIFF recalls Chief Executive Officer Michael Reed and another key executive of Gannett stating during a virtual staff meeting in early 2020, "No one should be working in the newsroom," due to COVID-19. The PLAINTIFF was allowed to participate in this virtual meeting, but wasn't invited to other virtual meetings or to work remotely. When the PLAINTIFF's work email address was shut down, she was excluded from other staff meetings and from returning emails from colleagues and sources. Several counts of discrimination and exclusions.

**65** January 2020: PLAINTIFF also applied for a night editor role posted online as she could have performed this remotely, but this was denied. **One count.**

**66** Dec. 26, 2019: The PLAINTIFF is seriously injured and her minivan is totaled when it was rolled in a high-impact crash in Evanston, Illinois that she believes was an extreme form of **harassment** and a **retaliatory** act. Every airbag except the front driver's side deployed, as the vehicle was hit on the side, flipped and rolled. She suffered a fractured or badly bruised sternum. Fortunately, the PLAINTIFF had her seatbelt fastened. Her primary care physician at the time said she may have suffered from a concussion when the car flipped over and her head touched the ceiling. This wasn't an ordinary accident; the car was hit at a high speed from a vehicle that blew a red light and made no attempt to slow down while crossing an intersection where PLAINTIFF had the green light and was proceeding within the speed limit. It was perfectly timed.

**67** December 2019: PLAINTIFF asked to work remotely and continue writing for the paper or editing. This request for a reasonable accommodation was denied. The PLAINTIFF received her regular paid hours in December to move to her home in Illinois and interview for other positions at the company. She was told to apply for positions at other newsrooms and she would be recommended. However, the PLAINTIFF feels she was **wrongfully excluded** from working as the education reporter, the role she was hired for and had performed admirably for about 17 months. Ongoing counts of discriminatory exclusion.

**68** December 2019: After 10 days in Illinois, PLAINTIFF's health improved and she returned to Savannah **on Dec. 13**, but immediately felt a tightness in her chest in the newsroom. Editor tells her to pack up her belongings and put them in a storage pod. Several other employees also weren't feeling well, many were working remotely. This feels like discrimination and possible retaliation, but she did as she was told to do. **Retaliation and harassment counts.**

**69** Subsequent to being told to apply for a transfer, DEFENDANT told the PLAINTIFF not to speak with Executive Editor Susan Catron and only to work with HR Director Frankie Fort. This reduced the likelihood the PLAINTIFF would return to her position or be invited to write for the publication. This resulted in further **exclusions** and **economic disadvantage**. **Several counts of discrimination.**

**70** Upon contacting the human resources department about an FMLA leave, the DEFENDANT is told to apply for jobs in other newsrooms and was given the names of a couple of HR managers. This is right when the merger was completed, and people were uncertain what was coming down the pike.

**71** November/December 2019: PLAINTIFF returns to Evanston and learns her tenant has died and it will be several months before her tenant's relatives can clean out her stuff.

72 The HR Director tells her to go to the urgent care facility. The editor tells her to pack up her Richmond Hill apartment and put her belonging in a pod for storage and return home to Chicago. She opted to rent a storage locker in Savannah instead of a pod. She assumed she would continue to work for the company. She didn't know Covid-19 would soon be declared. Her doctors in Illinois, whom she had visited in November, didn't want her returning to the newsroom, and neither did the editor, as it was contaminated with a chemical she was allergic to or couldn't tolerate given her respiratory and nasal/sinus conditions. **Multiple counts of exclusion.**

73 November 2019: Chemicals in the newsroom also are a violation of (a) the Environmental Protection Agency's General Duty Clean Air Act Section 112(r)(1), which "makes the owners/operators of facilities with regulated hazardous substances responsible for managing chemicals safely." https://www.epa.gov/rmp/general-duty-clause-fact-sheet# OSHA's General Duty Clause. Public Law 91-596 84 STAT. 1590 of 1970, amended in 2004, SEC 5, Duties (a), states: Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this Act. https://www.osha.gov/laws-regs/oshact/completeoshact. The PLAINTIFF isn't certain over what period of time this exposure occurred, because of her disabilities, including lack of sense of smell. Whatever contaminants worked their way into the PLAINTIFF's physical body remained there, and her allergist told her in February2020, "You were poisoned.

74 Nov. 25, 2019: PLAINTIFF and others in the newsroom are told to clear out because a chemical the HR director referred to as "meth" was being sprayed in it. **Count of harassment**

75 PLAINTIFF suspects the use of chemicals was aimed at getting older workers out of the newsroom following news of the merger in the summer of 2019. **ADEA count.**

76 During a virtual meeting in November 2019, the CEO announces the company plans to launch a small business hub. Given the amount of time PLAINTIFF spent in this specialized area of journalism and the fact she wasn't invited to participate, this feels like segregation and exclusion. **Two counts.**

77 Fall 2019: PLAINTIFF She is accused of being a "nigger lover" by a white male candidate. **Count of discrimination.**

78 On Nov. 12, editor attempted to exclude PLAINTIFF from covering an important aspect of this breaking-news story by telling her not to go to Pembroke to get the election results, despite the fact the officials in Richmond Hill weren't releasing the results. **Count of discrimination.**

**79** Fall 2019: Editor said "Go Home" or "Go Home, Ann" in the newsroom on a regular, if not daily, basis in the fall of 2019, from September to November 23. This occurred at all hours, including as early as 10 a.m. and also later in the day. She did not say it directly to the PLAINTIFF but rather while walking through the newsroom as if to no one in particular or from her office, a few feet from where the PLAINTIFF sat. Despite this, the editor gave the PLAINTIFF a strong performance review and had no complaints about the PLAINTIFF's work or her productivity. **Multiple counts of harassment.**

**80** Oct. 23, 2019: While covering a school district event at a convention center in Savannah, the PLAINTIFF notices a similar white mist in the atmosphere at the conference. She hadn't been feeling well and decided to leave the event and do some other reporting. She felt better in the fresh air. **Count of harassment/OSHA violation.**

**81** October 2019: A strange chemical mist/spray is being used in the newsroom in several locations, including the editor's office, which the PLAINTIFF sat outside of and another work station not far from hers. PLAINTIFF didn't know what it was. After several days, she noticed more of the other reporters weren't coming in to the office. She also had a large number of out-of-office stories to cover. Then HR director started telling people to clear out of the newsroom. Another reporter is bringing a portable air purifier to the newsroom and carrying it around with her, complaining the air didn't seem to be good. PLAINTIFF also wasn't feeling well. The DEFENDANT employers shouldn't have allowed this chemical use to occur. HR director and editor were aware of it, as were others. To subject someone with a respiratory disability to this and then to forbid them from working remotely when other people are is discrimination. **Multiple counts of harassment.**.

**82** Fall 2019: HR Director walked through the newsroom and behind PLAINTIFF's desk saying "Editor," "Editor," without inviting any real discussion. She also mentioned the current editor was supposed to be finding her replacement. No one said anything. Perhaps no one knew what to do with these random remarks; no email went out or any real announcement**. Count of segregation**

**83** Summer/Fall 2019: Strange comments continue to be made in the newsroom, with some that seem to be related to personal information about PLAINTIFF. Editor would call out "Britney," and "Britney, Avery." There was a woman named Britney on staff, but not an Avery. The PLAINTIFF happens to know people with these names. The Editor also said out of the blue and repeatedly, "Drop it," a familiar phrase to the PLAINTIFF. She asked, "Who said, 'We're poor?'" This is comment made in the PLAINTIFF's dining room over a decade earlier. While other people may have said the same thing, when all of the random comments are put together,

and considering the Background Investigation document the PLAINTIFF was required to sign, it began to feel like harassment and stalking. She also was asked in the newsroom about her religion, whether she was a Boy Scout and other personal information. This is discriminatory harassment and possible privacy invasion. The PLAINTIFF doesn't know how many "counts" of this occurred; it depends on how you define a count. **Multiple counts of harassment.**

84 At one point, the HR director approached the PLAINTIFF as she was writing a story on deadline and asked for her auto insurance card. After making a photocopy of it, the HR director brought it back to her and said, "In six months, you'll be a disabled veteran." The PLAINTIFF didn't give much thought to this remark, as strange comments were made in the newsroom on a regular basis. However, after the car accident in December 2019, she recalled it. In hindsight, this was discrimination as there were no grounds for this comment or any action related to it. This was not a dialogue, as the HR director who reportedly was a military veteran had a command-and-control approach. The PLAINTIFF was excluded from any kind of discussion or negotiation related to this. The PLAINTIFF is not a military veteran, nor did she say she was. **Count of defamation and exclusion.**

85 Summer 2019: PLAINTIFF is excluded from promotion to Senior Education Reporter role. Position wasn't filled.. **Count of equal pay discrimination.**

86 Summer 2019: PLAINTIFF is excluded from at least two opportunities at Gannett in Wisconsin, which PLAINTIFF was highly qualified for. **Two counts of discrimination/unfair treatment.**

87 April 2018: The PLAINTIFF was coerced to sign a Background Investigation document she had serious concerns about, particularly regarding how it gave third-parties permission to interview sources, neighbors, friends, family, acquaintances and anyone the PLAINTIFF came in contact with. This coercion was discriminatory, as she had the experience and knowledge to foresee the risk of invasion of privacy. The ADA prohibits coercion. This issue also may have led the DEFENDANT to retaliate against the PLAINTIFF, as it put interest in invasions above its mission of covering the news accurately and objectively. **Count of coercion and multiple counts of invasion of privacy.**

88 Shortly after she was hired in 2018, it became obvious the PLAINTIFF wasn't being invited to participate staff meetings and many other discussions that occurred without her, as they were held when she was covering school board meetings or behind closed doors. Excluded from at least four staffing meetings. **Multiple counts of exclusions.**

89 2018: Excluded from doing a health care story on sexual assault by doctors; this story won a Pulitzer Prize for the Los Angeles Times in 2019. The PLAINTIFF received a tip from a caller

in 2018 and discussed it with the editor, who turned down the story idea, saying the hospital wouldn't cooperate with its requests for documents

## Discriminatory exclusions from other opportunities

1 This section is in chronological order and is not a complete list of the PLAINTIFF's applications to Gannett and Gatehouse Media. These are the ones for which she has correspondence for. The following represent a small number of the many Gatehouse/Gannett posted job openings the PLAINTIFF applied for, starting in 2019 when her respiratory condition became an issue in the Southern tropical climate conducive to molds and other allergens.

2 The PLAINTIFF also applied for countless positions at other DEFENDANT newsrooms. She served in several temporary capacities in 2020, 2021-2002 and 2023. She restarted a website in April 2020 that she had launched years earlier but put on hold in 2018 and 2019, but the site was hacked over and over in 2020, and it was expensive to repair it. She restarted her business again after recovering from a prolonged respiratory illness that began in the fall of 2023. She currently is working through the business (Ann Meyer Communication/L3C Chicago L3C LLC), serving as a reporter for a newspaper in northeast Wisconsin in a remote capacity.

3 While Gannett has refused to hire the PLAINTIFF in any capacity in Wisconsin, where the company has owned several major newspapers, including the Milwaukee, Green Bay and Appleton newspapers, the PLAINTIFF has served as a reporter for two other Wisconsin newspaper companies since 2021, producing over 600 news stories.

4 Job applications from 2019 to 2023 in chronological order:

5 PLAINTIFF applied for dozens, likely over 100 jobs at Gatehouse and Gannett in 2019, 2020 and 2021. She was working through her business in 2016 when she reached out to a company director of Gannett with an interest in partnering through her company, as this is the way she has worked for decades through her media services company. As a result, the DEFENDANT was aware of the PLAINTIFF's small business, yet has refused to work with her, which she regards as an anti-trust issue.

6 May 18, 2019: Jim Nelson at Milwaukee Journal Sentinel tells PLAINTIFF to contact Mr. Zizzo, who refers her to Jim Fitzhenry.

7 June 2, 2019: Fitzhenry invites PLAINTIFF to a phone interview June 6, 2019. It seemed to go well.

8 June 5, 2019: Corporate recruiter Nick Capaz sends PLAINTIFF "screening questions" as a preliminary step to interviewing for a position. He sends her an invite to interview for two possible positions, a News Content Coach role in Appleton, WI, and a Living & Storytelling Editor role with several newspaper groups in Wisconsin.

9 June 10, 2019: PLAINTIFF interviews with Mark Treinen, who is still an editor in Wisconsin. Others on the call include Jim, Mark, Larry and Robert.

10 July 20, 2019: PLAINTIFF applies for Senior Education Reporter role in Savannah, which would bring her wages up to a more competitive level, as she was underpaid when she was hired.

11 Aug. 1, 2019: PLAINTIFF contacts Mark Trienen to follow up on positions she interviewed for in Wisconsin. He replies Jim Fitzhenry filled one of the positions with an internal candidate but said, "I'm going to forward your email to Jim for consideration of any other openings or future openings."

12 Aug. 2019: Fitzhenry tells PLAINTIFF to contact Peter Bhatia, editor of Detroit Free Press and Great Lakes regional editor for USA Today Network. On Aug. 11, 2019, PLAINTIFF contacts Bhatia by email and asks if anyone will be at SPJ. He tells her to seek out Gannett's recruiters there.

13 Sept. 2019, Society of Professional Journalists annual conference is held in San Antonio, Texas. PLAINTIFF attends and talks to recruiters in person, and some people from Gannett.

14 PLAINTIFF meets with Mizell Stewart III, Gannett's Vice President of News Performance, Talent and Partnerships, and he tells her Gannett doesn't hire for experience. This is a count of blatant age discrimination and also exclusion, a violation of the ADA.

15 Dec. 6, 2019: Meets with George Stanley, editor of the Milwaukee Journal Sentinel, in Milwaukee and tells him she had an issue where due to a local leader's tight grip, the editor felt it would be better if she transferred to another newsroom. Stanley said he has heard they are going to be moving out of the historic building and the company plans to sell the real estate. He said he isn't hiring but will keep her resume on file. PLAINTIFF is on an FMLA leave but feels well enough to drive to Milwaukee, as she needs to work. Why the DEFENDANT didn't allow her to cover Chicago for the national company isn't clear.

16 Dec. 9, 2019: PLAINTIFF sends email to State Journal-Register editor Jon Styf in Springfield, Illinois and is told Mr. Styl is no longer at the newspaper but is invited to visit for an interview with the new editor. Dec. 9 or 10: Meets with Letia (sp?) Richardson, editor of the Springfield,

Illinois paper. Newsroom is largely empty, and Richardson also said she didn't have a current opening but would keep PLAINTIFF's resume on file.

17 Dec. 13: While on the FMLA leave, PLAINTIFF is feeling well enough to return to Savannah. She drives from Springfield and arrives on Dec. 13. She returns to the newsroom on Monday, Dec. 16 and almost immediately feels ill. Instead of discussing a reasonable accommodation, the HR Director tells her to go to urgent care and then apply for disability and Editor tells her to pack up her belongings and put them in a pod for storage and go home.

18 Jan-Feb, 2020: PLAINTIFF is recovering from car accident and is between homes as her townhouse is occupied. PLAINTIFF doesn't have access to any applications submitted in 2020 as she did them at public libraries.

19 March 10, 2020: PLAINTIFF applies for a Reporter III role in Springfield and is not hired.

20 April 2020: PLAINTIFF continues to apply for positions at Gatehouse/Gannett. Due to the merger, there are technical issues with the platforms. PLAINTIFF was blocked from the career site on numerous occasions. With no one answering the phone lines at headquarters, she contacted investor relations and was provided access to the Career site.

21 PLAINTIFF doesn't have a completed list of the roles she applied for; DEFENDANT may have this information. PLAINTIFF was continuing to negotiate for her right to work remotely until March 31, 2020 when she received a termination letter. Her belongings remained in a Savannah storage locker until the end of May.

22 July 15, 2020: PLAINTIFF applied for Business Reporter position at IndyStar in Indianapolis, a position she is highly qualified for as she has covered business for over 20 years.

23 July 23, 2020: PLAINTIFF applied for Milwaukee suburbs reporter role at Milwaukee Journal Sentinel.

24 July 2020: Plantiff makes contact with Lee Horwich at USA Today about covering the Chicago area. She was referred from a reporter in Chicago.

25 Late July 2020; PLAINTIFF starts working for Census2020, which was delayed from May due to Covid. After several weeks in Chicago suburbs, she is transferred to Iowa for full-time work. She exceeds expectations and is

26 Aug. 2, 2020: PLAINTIFF applies for open courts reporter position at Des Moines Register. Correspondence with editor Carol Hunter is ongoing for the months of August and September and into October, when PLAINTIFF is working for the Census Bureau in Des Moines.

27 Aug. 2, 2020: PLAINTIFF applies for job at Nashville paper.

28 Aug. 23, 2020: While working for the Census Bureau in Des Moines, Iowa, PLAINTIFF contacts Carol Hunter, editor of the Des Moines Register and says she is in town and would like

to meet with her. Hunter replies and says she is on vacation. On Sept. 14, Hunter offers to set up a Zoom interview. This doesn't occur. Sept. 14, PLAINTIFF's email bounces back with automatic reply Hunter is out of the office until Aug. 31.

**29** Nov. 17, 2020: PLAINTIFF applies for a Culture, Diversity and Inclusion Trends reporter role at the State Journal-Register in Springfield.

**30** Jan. 4, 2021: PLAINTIFF applies for Visual Journalist position at Milwaukee Journal Sentinel.

**31** Jan. 7, 2021: PLAINTIFF applies for Statewide Georgia Reporter role at August Chronicle.

**32** Jan. 7, 2021: PLAINTIFF applies for Government and Business Watchdog Reporter role at State Journal Register in Springfield.

**33** Sept. 22, 2022: PLAINTIFF applies for virtual Part-Time Digital Editor III.

**34** Nov. 10, 2022: PLAINTIFF applies for Digital Editor III, Wisconsin Statewide Health, Science & Environmental Editor in Milwaukee.

**35** Dec. 13, 2023: Applies for Investigative Reporter role in Cincinnati.

**36** Feb. 5, 2022: Applies for National News Editor, a virtual role at USA Today.

**37** Jan. 12, 2023: Applies for Executive Editor role at Milwaukee Journal Sentinel.

**38** 2023 (no date): Applies for Commentary Editor virtual at USA Today.

**39** Jan. 10, 2024: Applies for Trending Business/Breaking News Reporter role at Milwaukee Journal Sentinel.

**40** Feb. 5, 2024: Applies for National News Editor virtual at USA Today.

**41** Feb. 20, 2024: Applies for Executive Producer role at USA Today.

**42** March 22, 2024: Applies for Money Reporter/National News Reporter III role at USA Today. Pay is listed at $72,000 to $161,000 per year.

**43** May 29, 2024: Applies for National News Editor virtual role. Was this role ever filled?

**44** June 26, 2024: Reaches out to Jim Fitzhenry in Wisconsin/Oshkosh about unnamed role.

## Privacy violations are a form of discrimination; these are ongoing

**45** **Occurrences: 2,649 days and counting.**

**46** Most privacy violations are a form of exclusion, as the PLAINTIFF is a victim and isn't being included in the discussions aside from the invasions, which fail to provide attribution, a tenet of professional journalism.

**47** Trying to come up with an exact number of privacy-invasion/discrimination counts is a tall order and it might reach into the thousands, as the PLAINTIFF doubts many days have gone by without an example of invasion of privacy showing up in a Gannett newspaper somewhere. The

mere act of counting these invasions is injurious to the Plaintiff, as it is despicable for any major public company to pick on any single person, let alone a business owner, in this way. The Plaintiff can't begin to describe how draining the process of going through newspapers and jotting down examples is. She has suffered extreme fatigue in recent weeks because of this.

48 Regarding the best way to settle this case, there are multiple ways to skin the cat or get to the damages the Plaintiff/business owner/shareholder/customer believes she is owed. Trying to come up with an exact number of counts is a tall order and might reach into the thousands, as the Plaintiff doubts many days have gone by without an example of invasion of privacy showing up in a Gannett newspaper somewhere. The mere act of counting these invasions is injurious to the Plaintiff, as it is despicable for any major public company to pick on a sole proprietor in this way. The Plaintiff can't begin to describe how draining the process of going through newspapers and jotting down examples is. Professor Nita Farahany explains this below.

49 "The Battle for Your Brain," a 2023 book by Nita Farahany, a professor of law and philosophy at Duke University, published by St. Martin's Press, described the risks neurotechnology poses to privacy: "When it comes to privacy protections in general, trying to restrict the flow of information is both impossible and potentially limits the insights we can gain to address **the leading causes of disability and human suffering**. Instead, we should focus on securing rights and remedies against the *misuse* of information. If people have the right to decide how their brain data is shared, and more importantly, have legal redress if it is misused (say, to discriminate against them in an employment setting or in health care or education) that will go a long way toward building trust. Neurotechnology has unprecedented power to either empower or oppress us." Farahany is the director of the Duke Institute for Science and Society.

50 This kind of privacy invasion unfortunately is occurring at other employers as well, Farahany writes, such as financial services firms and transportation companies. Many people are concerned about it. PLAINTIFF doesn't know if this is the same technology the DEFENDANT company is using, but somehow it is gaining access to her words, writings and even her thoughts.

51 The Plaintiff acknowledges some of the invasions seemed inexplicable, as how could this company know what she was thinking before she had the chance to write down her thoughts? She passed many of them off as coincidences until she read Farahany's book, which describes the science of neurotechnology being used for what the PLAINTIFF considers privacy invasions many employers are frightfully using today.

52 The book describes the neurotechnology used in the workplace as a form of employee surveillance, where employers tap employees' brain waves and emotions to gain insights and

guard against potential problems, such as insider trading. Surveillance is "legally required in the financial industry to prevent insider trading. But it can also be used to control employees, to discriminate against them, and to chill workers' ability to unionize." P. 59.

53 "Governments must enact laws and regulations that explicitly spell out employees' rights. This should begin with the following three-part test in international human rights law for determining whether a relative right like mental privacy can be limited: (1) legality, (2) necessity, and (3) proportionality. In other words, the human right to mental privacy would prohibit unauthorized access to employees' neural data without an explicit law justifying doing so, based on a compelling societal interest in so doing, in a manner that is narrowly tailored to balance the interests of the employee with those of society. "P. 59

54 **Biometric privacy laws**

55 Illinois has a particularly strict biometric privacy law, where for each instance, employers can incur a fine. (White Castle case is discussed in Part I.) The Plaintiff/employee/business owner isn't aware of case law pertaining specifically to exploitative brain wave tapping, but it would be covered by Illinois' privacy laws, which also prohibit eavesdropping.

56 As Farahany writes, "Only when there is a bona fide need – a necessity – for employers to access employee brain data –such as to monitor fatigue in a commercial driver, or attention in an air traffic controller – should employers ask to do so. Even then, they should be limited to collecting data for the specific purpose it serves, and employers should be prohibited from mining brain data for other insights about the employee to ensure that the impact on employee privacy is proportional to the societal benefit it affords.'

57 The Plaintiff can think of no "need" that would explain or justify the Defendant/employer's egregious behavior if this is what it was doing. Georgia has a fair amount of technology innovation, so it wouldn't surprise the PLAINTIFF if some form of remote biometric technology was involved.. The Plaintiff is no longer an employee and should not be subjected to the continued invasions of privacy. She doesn't understand exactly how this is occurring, but the invasions of privacy have appeared in Gannett' news products.

58 Farahany states "neurotechnology should be a tool of empowerment, not a means of control; any law authorizing the use of neurotechnology in the workplace should require employers to provide clear notice in their employee handbook and company polices about how they intend to use the neural data collected, as well as any insights they glean from it." p. 60.

59 After the Plaintiff made it clear she wasn't willing to sign another agreement allowing the company or a subcontractor to invade her privacy, she suspects the Defendant became concerned

about the invasions and wanted her out of the company, because the editor started to repeatedly tell her to "Go home."

60 PLAINTIFF hasn't been paid by DEFENDANT since Dec. 31, 2019, yet **the invasion of privacy continues.** Since signing the form and returning it in mid-April, 2018, this includes 365 days x 7 years and about three months or 94 days to July 15 = 2,555 + 94 days = **2,649 days and counting.**

61 These ongoing invasions have had a chilling effect on PLAINTIFF's normal conversation and relationships with people, as she doesn't want their personal information picked up and published in the news. This also affects DEFENDANT's story selection and leads to questionable news judgment.

62 Instead of feeling included, the use of surveillance and other surreptitious means of obtaining personal information about her has the effect of leaving the Plaintiff out of the discussion, as she doesn't want to be recorded without permission. This is the standard she is accustomed to as an Illinois resident. Besides the violation of her human rights, this is a form of exclusion, a violation of the ADA. The PLAINTIFF wonders if Illinois' strong privacy laws provide one explanation for the DEFENDANT's almost nonexistent coverage of Chicago. See attached Exhibit showing lack of Chicago stories in USA Today.

63 The invasion of privacy is a discriminatory act, as it takes away the PLAINTIFF's civil right to lead a normal life. No one wants to be stalked. Cyber stalking is a growing issue; it also poses a risk to the DEFENDANT's digital-first strategy. While the following examples show how PLAINTIFF's personal life ends up in the headlines and story selection of USA Today, the PLAINTIFF also has observed other Gannett newspapers following her daily life and using aspects of it in headlines and stories, including those in Wisconsin. The newspaper the PLAINTIFF worked for in Savannah was careful to avoid doing this.

## Examples of recent coincidences follow:

64 PLAINTIFF had a doctor's visit Thursday, July 10, when the doctor asked who in her family had a history of diabetes. When PLAINTIFF went online later, she saw this headline on USA Today: "See the first Barbie with Type 1 diabetes." A coincidence?

65 PLAINTIFF was working on a story about a "dri-tri," a triathlon without swimming, and several stories had headlines about dry, try, or fry, such as one on national French fry day.

66 On July 11, PLAINTIFF commented that her shorts being dirty and asked, How did I get that spot? USA Today has a story with the following headline: "Yes, retired Ndamukong Suh was dirty. He's also a Hall of Famer." A coincidence?

67 On Tuesday, July 8, a physical therapist told the PLAINTIFF to use a neck pillow. On July 10, USA Today posted a story with about Amazon Prime Day and a sale on travel pillows. A coincidence?

68 On July 10 or 11, PLAINTIFF opened an electric-company bill and commented on how high it was, as the weather had been warm. I also had told the physical therapist and a few other people, I had bought a fan to try to keep my AC bills down. USA Today published a story with the following headline: Should you turn off your AC when you're not at home. A coincidence?

69 In June, at dinner with a friend, we talked about an older car she wasn't driving much because it needed some work. Soon after, USA Today published a four-page pull-out section on whether to repair an older car or buy a new/used car. A coincidence?

70 June 1, 2025: PLAINTIFF attends a Celebration of Life event June 1 at Brookfield Zoo. Event room is located behind the carousel, or merry go round. On June 3, 2025: USA Today publishes a front- page photo of a large carousel similar to the one at the zoo.

71 Other stories/headlines the same day have references to death or to other recollections from the event:

a. Volunteers scan desert for remains of migrants
b. At US-Mexico border, it's an open graveyard
c. Living room vs bedroom Where kids hang out can speak to family dynamics

72 June 2 stories in USA Today also are related to caregiving; PLAINTIFF's friend was a caregiver to her mother for years:

a. Costs, stresses of caregiving explored in USA Today series By Madeline Mitchell

73 At the event, PLAINTIFF tells another friend she is looking for work but it's not easy as most employers favor younger workers. These stories are published in USA Today June 2:

a. AI, tariffs shake up job market for grads
b. Recent college graduates unemployment rate is now above the national rate
c. The woman who died was devoutly Catholic and at times she seemed to favor her son.

74 These stories also were published in early June, 2025:

a. "Mother tours USA to inspire with account of saintly son" By Eduardo Cuevas Every mother thinks her son is a saint, but Antonia Salzano's is about to become a real one.

**75** PLAINTIFF also has observed USA Today headlines are being picked up by AI. For example, this is a USA Today headline: "Severity of pneumonia depends on the cause and source of illness." The following text is from an AI overview from Microsoft edge/bing search: "Yes, the severity of pneumonia can depend on the cause and source of the illness. Different pathogens like bacteria, viruses, or fungi can cause pneumonia." https://www.google.com/search?q=USA+Today+%2B+Severity+of+pneumonia+depends+on+the+cause+and+source+of+illness&sca_esv=a89d269aec3ce157&ei=Y74_aJP-DuuwkvQPsJzRuQo&ved=0ahUKEwjTu9e26taNAxVrmIQIHTBONKcQ4dUDCBA&uact=5&oq=

**76** More "coincidences" continue in May, such as this one:

a. May 17, 2025: PLAINTIFF receives a text about a relative's background working in coal mines. Within days, news about coal and coal mines starts showing up in USA Today, such as this story from May 23, that references someone with asthma, which the PLAINTIFF also suffers from. "Before leaving her East Texas home, Paulette Goree checks her air monitor. If the hue is green on the connected phone app, she steps outside to tend to her backyard garden where she grows tomatoes, squash and peppers. If it is red, she stays inside. Over the years, she has watched respiratory illnesses strike her family one by one. Her sister died of chronic obstructive pulmonary disease. Her father battled the same lung disease. Her husband has it now. Goree has asthma. Goree, 72, lives in Beckville, a town of fewer than 800 people, just miles from the Martin Lake coal plant, a 2.4-gigawatt facility that has loomed over the region since the late 1970s."

**77** Other times the discrimination takes the form of mimicking the PLAINTIFF's work, such as a photo that appeared in USA Today that was reminiscent of one the PLAINTIFF shot for a back-to-school education story of a family sitting on the steps on Aug. 3, 2019 in Savannah, Georgia. When the PLAINTIFF sees content that resembles work she has created it feels as if the DEFENDANT is mocking or taunting her publishes a similar, distinct image or story excluding the PLAINTIFF from working for the DEFENDANT in any capacity.

Similarly, the PLAINTIFF heard newsroom chatter that also seemed to be reminiscent of dialogue from PLAINTIFF's personal life in an earlier year, such as the following:

1 Upon arriving at the newsroom, the PLAINTIFF quickly caught on to the fact the editor and some others were listening to the hearsay chatter, which could be heard in the newsroom aloud. The editor walked through the newsroom saying things like, "Said, Said; She said," with no other commentary to

give it context. After a while, the "saids" seemed to be correlated with whether people finished their work as promised. Some of the editor's remarks seemed to be about the PLAINTIFF's personal information, though it was mixed up and often not accurate. The PLAINTIFF heard the editor make comments about home schooling repeatedly and thought it was odd; it took months before PLAINTIFF caught on to it being a reference to her elementary school, which was Holmes School. "Drop it" was also a common saying. It might have related to a phrase from the PLAINTIFF's past involving playing ball – or perhaps not. The editor also called out "Brittney, Brittney" and an employee named Brittney worked in the newsroom, but then the editor added "Avery" to it, which could be related to a couple the PLAINTIFF was acquainted with. The editor asked questions out loud in the newsroom, such as: "Who said, 'We're poor?'" or "Who said, 'drop it?'" picking up pieces of conversations from the PLAINTIFF's personal life in Illinois. It was distracting at first; then it became annoying and personally so. The PLAINTIFF didn't respond to it.

2 Often, the DEFENDANTS used a hidden language or a form of double-speak also known as "the Conversation" to taunt, provoke or exclude the PLAINTIFF. It felt like she was being punished and bullied. While she some of understood it, she could not speak this double-speak form of English.

3 The reporter who sat directly across from the PLAINTIFF said "miss you" over and over while looking at his computer, which was situated directly behind the PLAINTIFF's workstation. He didn't seem to be speaking to anyone in particular. He left the company in late 2019 after a 40-year run. An editor died suddenly, another went out on a prolonged medical leave, returned and found a job in his home state. Two other reporters were in serious car accidents.

4 The PLAINTIFF tried to ignore these isolated phrases, but occasionally they were so personal as to be distracting and injurious. A few weeks after the PLAINTIFF arrived in Georgia, when she had Illinois plates on her car, she was pulled over on a highway for no apparent reason. It was a speed trap, with a police officer on a bridge holding a radar gun and several police cars on the side of the road pulling over cars. She wasn't exceeding the speed limit, but the officer gave her a ticket for violating a move over rule, saying she wasn't supposed to merge to the right lane, despite her reduced speed, when a police car was on the shoulder. She told the editor, who seemed to delight in the fact the PLAINTIFF had received a ticket. The editor walked into the newsroom saying, "Busted for traffic" or something that made it sound like a drug crime, in such a way as to be defaming.

5 After the PLAINTIFF worked for the Savannah Morning News for about a year, the editor started saying, "Go home. Go home, Ann," on a regular basis for no apparent reason and without saying it directly to the PLAINTIFF but instead saying it out loud in the newsroom. Other reporters caught on and started saying "malice." It became counterproductive.

## Corporate espionage as invasion of privacy

**78** Ordinarily the PLAINTIFF would pass off some of the similarities she noticed to coincidences. However, with the knowledge and understanding of the DEFENDANT's keen interest in collecting personal information on certain people, calling them coincidences becomes implausible. There were too many coincidences for them all to be coincidences.

**79** USA Today's health care news hub launched in 2022 is a similar concept to one the PLAINTIFF conceived.

**80** A companywide opioid project in 2019 followed a class project at DePaul University in 2017 the PLAINTIFF participated in. Was it a coincidence Gatehouse chose this topic or was it because it had been following the PLAINTIFF when she was involved in the opioid projects at DePaul?

**81** Was it a coincidence staff meetings were scheduled on day s when the PLAINTIFF was going to be out of the office, covering a school board meetings, for example so that any similarities to PLAINTIFF's business discussed in the meetings wouldn't be known by the PLAINTIFF? She also was excluded from other closed-door meetings other reporters were invited to.

**82** Was it a coincidence people in the company for many years seemed to know details about the PLAINTIFF's personal life?

**83** PLAINTIFF suspects the invasion of privacy pre-dates her employment, as she encountered many coincidences when she started working at a DEFENDANT newsroom, such as projects that borrowed strategies from business plans and proposals she had created in 2009-2012 in the Chicago area. The editor of the Savannah Morning News visited the Knight Center for Innovation in Journalism for a conference in 2018 or 2019, and PLAINTIFF wonders if she gained access to PLAINTIFF's grant/contest submissions. PLAINTIFF doesn't know how DEFENDANT learned of these concepts. It also could have been by accessing her laptop, which was tampered with in 2018.

**84** The DEFENDANT company also discussed using editorial strategies similar if not identical to those in a business plan she created in 2009. To take ideas from the PLAINTIFF while she is economically disadvantaged – her was at about the poverty line last year except for early withdrawals of retirement income and credit card lines of credit that kept her afloat.

**85** In 2019, the PLAINTIFF was excluded from participating in Beacon magazine, a print publication the Savannah Morning News publisher and editor launched in early 2019, which may have drawn from strategies she came up with earlier. It seemed odd she wouldn't be asked to help with it, given her years of magazine experience. The publication was published in print and also posted online. The publisher and the editor both left the company in 2020.

**86** The DEFENDANT sued Google in 2022 and 2023, and the PLAINTIFF notes while she didn't agree with the tactic for remedies the litigation took, she had provided information about Google's use of news content in a Google form she was asked to complete in 2018 or 2019, before her laptop was tampered with and the case broken where the cord is to be plugged in. For years, the PLAINTIFF had talked about how Google ended up with Performics' pay-per-click invention, which was partly funded by the news business (Tribune Ventures). Google's search engine was driven by news content, especially in its early years, yet the news industry hadn't claimed a royalty. She felt Google's use of news content without compensation, combined with the amount of advertising revenue it was generating at the expense of the news industry, was a violation. When asked to complete a form on how Google could help the news industry, she suggested a clawback of revenue and a royalty going forward. She completed the Google survey at her Georgia apartment from her laptop, which later would be broken when her apartment was accessed without permission. In 2020, several attorneys general sued Google. The U.S. Department of Justice also sued Google for its monopolistic practices in 2022. Gannett also filed lawsuits against Google after it terminated the PLAINTIFF. In a June 2023 USA Today article, Gannett said that in the previous year, "Google made upwards of $30 billion in revenue from the sale of ad space on publishers' websites, which was six times the digital advertising revenue of all U.S. news publications, combined." Not only did the PLAINTIFF receive no credit for her suggestion to pursue revenue from Google, but she was excluded from the DEFENDANT company before it pursued revenue and it provided no opportunity for continued dialogue. This is discrimination.

**87** Other documents related to PLAINTIFF's business also went missing from the PLAINTIFF's Georgia apartment, including contracts from previous publications where she had served as an outsourced editor.

**88** PLAINTIFF was excluded from use of the laptop she brought down to Georgia when it was tampered with and broken.

**89** The DEFENDANT seems to have used her writing style to such an extent it can be difficult to tell the difference. This is proprietary to the PLAINTIFF's business. The PLAINTIFF understands this is not a Copyright case being heard in a Copyright Court and doesn't expect this to be fully considered, outside of the allegations pertaining to the way she and her business were injured by the ongoing invasion of privacy. Other companies don't see the need to hire her if so much of her intellectual property has been stolen by media companies.

**90** In 2018 and 2019, the PLAINTIFF wondered if the Background Investigation document she was coerced to sign when she was hired was being used to gain information about her business

passively. She had serious concerns about the agreement, particularly regarding how it gave third-parties permission to interview sources, neighbors, friends, family, acquaintances and anyone the PLAINTIFF came in contact with.

**91** PLAINTIFF alleges the invasion of privacy also included surveillance of keystroking in the newsroom and continued after she left the company. The PLAINTIFF continues to notice times when her computer is tapped, as typos are inserted and on several occasions the cursor has jumped around without her touching the mouse. To the extent the DEFENDANT was monitoring the PLAINTIFF's writing or editing style, this would be **cyber espionage**. To the extent the DEFENDANT used the intellectual property, it would be theft and possible infringement. The Plaintiff was employed in an hourly nonexempt position and her business wasn't included in the hire.

**92** The Plaintiff's hard drives were stolen in December 2019, including one that was a mirror-replica back up of a desktop computer she had used for over 10 years. This backup, which had her name emblazoned on it, was professionally performed and cost $3,000. The PLAINTIFF's hard copies of newspapers containing her work also were stolen in 2020. She seeks access to digital versions of the newspaper on microfiche if available.

**93** The Plaintiff has lost countless computer files related to this case. She doesn't think it is random.

**Remedies and Relief**

**94** The PLAINTIFF is seeking monetary remedies and injunctions against invasions of privacy and against obstructions of her small business. The Americans with Disabilities Act, which states the courts may assess civil penalties for ADA violations against the entity in amounts "not exceeding $50,000 for a first violation and not exceeding $100,000 for any subsequent violation." The ADA also provides for immediate relief. The Biometric Information Privacy Act provides for remedies, and Rogers v. BNSF Ry. Co., No. 1:19-cv-03083, asserts a reasonable remedy for a privacy violation is $5,000 per occurrence.

**95** WHEREFORE, PLAINTIFF respectfully requests the court grant immediate relief from the Wrongful Termination and Failure to Hire in the form of a partial settlement as she currently isn't generating sufficient income to keep up with her bills and make much-needed repairs to her townhome;

**96** The PLAINTIFF seeks equitable, compensatory, declaratory and punitive relief from the Defendant's discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA), as well as the Clayton Act, the Sherman Act, and other laws involved.

# Exhibit 1

The following  pages show Notices of Right to Sue from the EEOC and the stamped cover pages from the PLAINTIFF's complaints were filed on time.

Meyer v Gannett

RECEIVED
10/4/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court for the Northern District of Illinois

ANN A. MEYER
Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media)

Defendant

1:24-cv-09529
Judge Thomas M. Durkin
Magistrate Judge Sheila M. Finnegan
RANDOM / CAT. 2

Ms. Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (work)
847-271-0177 (cellphone)

Ms. Heather A. Jackson
Partner, Taft Law
111 E. Wacker Dr., Suite 260
Chicago, IL 60601-4208
hjackson@taftlaw.com
Direct dial: 312-836-4172
Tel. 312-527-4000

Mr. Andrew Murphy
Associate, Taft Law
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601-4208
amurphy@taftlaw.com
Direct dial: 312-836-4145
Tel: 312-527-4000

## COMPLAINT

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth a Complaint against DEFENDANT Gannett Company Inc., and in the pursuit of justice states the following:

1 On Dec. 18, 2023, the following occurred, which are obvious violations of the Americans with Disabilities Act (ADA) and the ADA Amended Act of 2008 (ADAAA):

2 The Plaintiff, a professional journalist with disabilities and a former employee in high regard at the company named in this complaint, was coerced and retaliated against when she was told she must sign an unlawful employment agreement after being offered a full-time position. She received the offer for full-time remote work while at her home in Evanston, Illinois, and was at this same location when the job offer was unlawfully rescinded.

3 The Plaintiff was excluded from employment in a discriminatory act.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Savannah Local Office**
7391 Hodgson Memorial Drive, Suite 200
Savannah, GA 31406
(912) 358-2810
Website: www.eeoc.gov

# DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 05/18/2022

**To:** Ms. Ann A. Meyer
425 6th Ave. Apt. 2
MENOMINEE, MI 49858
Charge No: 415-2020-01079

EEOC Representative and email: Jennifer Bessick
Investigator
jennifer.bessick@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 415-2020-01079.

On behalf of the Commission,

Digitally Signed By:Darrell Graham
05/18/2022

Darrell Graham
District Director

Meyer v Gannett

United States District Court for the Northern District of Illinois

ANN MEYER

Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media and
New Media Investment Group)

Defendant

1:22-cv-04299
Judge Sharon Johnson Coleman
Magistrate Judge Jeffrey Cummings
RANDOM

Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
Cellphone: 847-271-0177

Temporary address:
425 6th Ave., Apt. 2
Menominee, MI 49858

Harter Secrest & Emery LLP
/s/ Robert C. Weissflach
50 Fountain Plaza, Suite 1000
Buffalo, NY 14202
RWEISSFLACH@HSELAW.COM
Direct dial: 716/844-3707

RECEIVED

AUG 1? 2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**COMPLAINT**

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth a Complaint against DEFENDANT Gannett Company Inc., and in the pursuit of justice states the following:

Discrimination can take many forms. No one should be bullied or harassed by their employer or co-workers at the workplace nor expected to work in contaminated conditions.

Several laws protect workers from repeated exposure to a toxic work environment, and the word "toxic" also has several meanings. It can mean poisonous, where it affects employees' physical health, or it can mean abusive, where it affects employees' emotional wellbeing and creates an untenable situation that often prompts employees to leave the company sooner than expected.

For the PLAINTIFF and others with disabilities affecting their ability without assistance to lead a normal life, employment laws are even stronger. Employees aren't required to announce their disabilities, due to

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Indianapolis District Office**
115 W. Washington St., South Tower Suite 600
Indianapolis, IN 46204
(463) 999-1240
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/15/2024

**To:** Ms. Ann Meyer
3308 Central St.
EVANSTON, IL 60201
Charge No: 470-2024-04367

EEOC Representative and email: TIFFANY JOURDAN
Enforcement Supervisor
Tiffany.jourdan@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 470-2024-04367.

On behalf of the Commission,

Digitally Signed By: Michelle Eisele
07/15/2024

Michelle Eisele
District Director

# Exhibit 2

## Information about the accidents from December 2019 and January 2020

The PLAINTIFF's 2016 low-mileage Dodge Grand Caravan was hit with such force it flipped over and rolled in late December 2019, while the PLAINTIFF was in Evanston, Illinois, where she owned a townhouse that was under lease to a tenant who had died in November. The minivan had Georgia plates on it.






The wreck occurred at the intersection of Asbury and Oakton in Evanston, an intersection the PLAINTIFF was very familiar with as she had lived two blocks from the intersection at an earlier time. As the photos above show, every airbag but in the front was deployed. Fortunately, the PLAINTIFF had her seatbelt fastened. Her primary care physician said she may have suffered from a concussion when the car flipped over and her head touched the ceiling. Her sternum was fractured or badly bruised and her neck and back were sore where the seatbelt restrained her. This wasn't an ordinary accident; the car was hit at a high speed from a vehicle that blew a red light and made no attempt to slow down while crossing an intersection where PLAINTIFF had the green light and was proceeding within the speed limit. It was perfectly timed.

The PLAINTIFF was hit two other times within weeks of the above accident in January 2020, including once as a pedestrian crossing in a crosswalk in Oak Park and another when she was driving a rental minivan on a thoroughfare in Wilmette, where she used to live, and a car on a side street disregarded a stop sign and proceeded into the intersection before the minivan had cleared it, hitting a back corner of the minvan's fender. The PLAINTIFF believes these

"accidents" were related to the comment the HR Director made about her becoming a disabled veteran in six months. They also are possibly evidence of invasion of privacy; how would the perpetrators know her precise whereabouts if her privacy hadn't been invaded?

The accident below occurred on Isabella and 5th Street, which becomes Ashland in Evanston and goes by the Northwestern University football stadium. The PLAINTIFF lived within a couple of blocks of the accident site and had been visiting a neighbor.






# Exhibit 3

# Federal Trade Commission Act
# Section 5: Unfair or Deceptive Acts or Practices

## Background

Section 5 of the Federal Trade Commission Act (FTC Act) (15 USC 45) prohibits "unfair or deceptive acts or practices in or affecting commerce." The prohibition applies to all persons engaged in commerce, including banks. Under section 8 of the Federal Deposit Insurance Act, the Board has the authority to take appropriate action when unfair or deceptive acts or practices are discovered.

Responsibilities for enforcing the prohibition against unfair or deceptive practices as they apply to state-chartered banks are spelled out in a joint statement issued on March 11, 2004, by the Board and the Federal Deposit Insurance Corporation. That statement, which is included as an appendix to this chapter, describes in depth the legal standards for unfair and deceptive acts or practices, discusses the management of risks relating to unfair or deceptive acts or practices, and provides general guidance on measures that state-chartered banks can take to avoid engaging in such acts or practices, including best practices.

## Legal Standards

The legal standards for unfairness and deception are independent of each other; depending on the facts, an act or practice may be unfair, deceptive, or both. The legal standards are briefly described here.

### Unfair Acts or Practices

An act or practice is unfair where it

- Causes or is likely to cause substantial injury to consumers,
- Cannot be reasonably avoided by consumers, and
- Is not outweighed by countervailing benefits to consumers or to competition.

Public policy, as established by statute, regulation, or judicial decisions, may be considered with all other evidence in determining whether an act or practice is unfair.

### Deceptive Acts or Practices

An act or practice is deceptive where

- A representation, omission, or practice misleads or is likely to mislead the consumer;
- A consumer's interpretation of the representation, omission, or practice is considered reasonable under the circumstances; and
- The misleading representation, omission, or practice is material.

### Relationship of Section 5 to Other Laws and Ratings

Some acts or practices may violate both section 5 of the FTC Act and other federal or state laws. Other acts or practices may violate only the FTC Act while fully complying with other consumer protection laws and regulations. If a possible violation of the FTC Act is found, the examiner should consider whether other statutory or regulatory violations have occurred (the joint statement identifies laws that warrant particular attention in this regard).

In addition, if an illegal credit practice is identified through a review of FTC Act compliance, the examiner should consider whether the illegal practice would adversely affect the institution's Community Reinvestment Act rating pursuant to the regulatory requirements of 12 CFR 228.28(c).

## Compliance Risk Evaluation

Violations of section 5 of the FTC Act can present significant legal, reputational, and compliance risks for banks. This possibility intensifies the need for examiners to assess compliance with section 5 in conjunction with consumer compliance examinations, related supervisory activities, and consumer complaint investigations. Consistent with the Board's risk-focused consumer compliance supervision program, the need to assess compliance with section 5 should be considered when developing risk assessments, scoping an examination, or investigating a consumer complaint.

A determination about whether a particular act or practice is unfair or deceptive will depend on an analysis of the facts and circumstances. Although individual violations or complaints may appear isolated, they may, when considered in the context of additional information, including other violations or complaints, raise concerns about unfair or deceptive acts or practices.

Furthermore, the prohibition against unfair or deceptive acts or practices applies not only to all products and services offered by a bank, but to every stage and activity, from product develop-

ment to the creation and rollout of marketing campaigns, and to servicing and collections. Therefore, particular attention should be paid to new or modified systems or products and to third-party arrangements.

Federal Trade Commission Act—Section 5

# Examination Objectives and Procedures

## EXAMINATION OBJECTIVES

- To determine the adequacy of the bank's internal procedures, policies, and controls to ensure consistent compliance with section 5 of the FTC Act
- To determine if the bank complies with section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices

## EXAMINATION PROCEDURES

To fulfill the examination objectives, and consistent with the joint statement in the appendix to this chapter, examiners should identify the bank's internal policies, procedures, and controls to be reviewed for compliance with section 5 of the FTC Act. In particular, the bank's compliance management systems, advertising and promotional materials, initial and subsequent disclosures, servicing and collections, and management and monitoring of employees and third parties should be reviewed as they relate to the products and services identified as potential areas of concern.

Examiners also should use these procedures in conjunction with the guidance and best practices contained in the joint statement to determine whether an unfair or deceptive act or practice has occurred. Specifically, examiners should, as appropriate,

- Review previous examinations reports, including consumer compliance and safety-and-soundness examination reports;
- Review current and prior examination findings regarding the institution's compliance with Regulation AA (Unfair or Deceptive Acts or Practices: Credit Practices Rules);[1]
- Review the bank's policies, procedures, and internal controls;
- Review a sample of consumer complaints, advertisements and promotional materials, disclosures, customer agreements, and third-party contracts and instructions;
- Interview management and staff about the bank's acts and practices; and
- Discuss any examiner concerns with bank management.

### Evaluating Compliance Management Programs

A bank's compliance management program should focus on the avoidance of acts or practices that are unfair or deceptive and on the prompt correction of any such identified acts or practices. The degree of specificity with which a compliance management program should address this area will vary depending on the bank's size, complexity, and product offerings. A small bank that offers a limited number of products through a few branches may not need the kind of specific, documented compliance program needed by a bank engaged in, for example, nationwide mortgage or credit card lending.

#### Items to Evaluate

1. Determine whether the bank's policies and procedures include guidance on preventing unfair or deceptive acts or practices.
2. Ascertain whether the bank reviews its practices in the context of federal regulations, policies, and decisions on unfair or deceptive acts or practices.
3. Ascertain whether the bank's compliance management function looks beyond the identification of individual violations to determine if its practices may be unfair or deceptive.
4. Determine whether the bank trains its employees on the provisions of the FTC Act that prohibit unfair or deceptive acts or practices.
5. Determine whether the bank reviews consumer complaints to identify potential compliance problems and negative trends that have the potential to be unfair or deceptive. Determine whether the bank reviews concentrations of complaints about the same product or about bank conduct in order to identify potential areas of concern.
6. Determine whether the bank has identified any potentially unfair or deceptive acts or practices and, if it has, verify that it corrected the identified concerns and provided restitution to affected persons when appropriate.
7. If the bank has identified potentially unfair or deceptive acts or practices, determine if it has implemented changes to prevent future recurrences.

1. See the examination procedures for Regulation AA elsewhere in this handbook. Regulation AA applies to consumer credit contracts other than those for the purchase of real estate. It prohibits banks and their subsidiaries from using (1) certain provisions in their consumer credit contracts, (2) a late-charge accounting practice known as pyramiding, and (3) deceptive cosigner practices.

8. Determine whether the bank clearly discloses a telephone number or mailing address (and an e-mail address or website if applicable) that consumers may use to contact the bank or its third-party servicers regarding any complaints or inquiries they may have.
9. Determine whether the bank's management is involved both in the development of new products and services and in decisions to reprice or change the terms of existing products and services.

## Evaluating Advertising and Promotional Materials

Because of the increasing complexity of certain products, particularly mortgage loans and credit cards, a bank's advertising and promotional materials should be presented in a clear, balanced, and timely manner, with special attention paid to products targeted toward the elderly, financially vulnerable, or financially unsophisticated.[2] Advertising and promotional materials should present not only the benefits of the products and services, but also any potential risks, such as payment shock or negative amortization. When a bank's business is driven largely by product marketing and promotion, it should exercise particular caution to avoid potentially unfair or deceptive acts or practices.

### Items to Evaluate

1. Determine whether the bank reviews all advertisements, promotional materials, and marketing scripts to ensure that there is a reasonable factual basis for all representations made.
2. Determine whether the bank reviews all advertisements, promotional materials, and marketing scripts to ensure that these materials do not use fine print, separate statements, or inconspicuous disclosures to correct potentially misleading headlines.
3. Determine whether the bank tailors advertisements, promotional materials, and marketing scripts to take into account the sophistication and experience of the target audience, including the elderly and financially vulnerable.
4. Determine whether the bank (or its third-party servicer), in advertisements, promotional materials, marketing scripts, and recorded telephone conversations, makes claims, representations, or statements that may mislead members of the target audience about the cost, value, availability, cost savings, benefits, or terms of the product or service.
5. Determine whether the bank reviews all advertisements, promotional materials, and marketing scripts to ensure that they fairly and adequately describe the terms, benefits, and material limitations of the product or service being offered, including any related or optional products or services, and that they do not misrepresent such terms either affirmatively or by omission.
6. Determine whether the bank avoids advertising that a particular service or benefit will be provided in connection with an account if the bank does not intend or is not able to provide the service or benefit to account holders.
7. Determine whether the bank draws the attention of customers to key terms, including limitations and conditions that are important in enabling customers to make informed decisions about whether the product or service meets their needs.
8. Determine whether the bank, when using such terms as "pre-approved," "guaranteed," or "fixed rates," clearly discloses any limitations, conditions, or restrictions on the offer.
9. Determine whether the bank ensures that the costs and benefits of related or optional products and services, such as overdraft protection, are clearly explained and are not misrepresented or presented in an incomplete or overly complex manner.
10. Determine whether the bank avoids advertising terms that are not available to most customers and avoids using unrepresentative examples in advertising, marketing, and promotional materials.
11. Determine whether the bank reviews its website content and navigational process to ensure that consumers are able to readily obtain the necessary disclosures for its products.
12. Determine whether the bank reviews its advertising and promotional materials to avoid raising concerns about unfair or deceptive acts or practices.

## Evaluating Initial and Subsequent Disclosures

A bank's disclosures with respect to initial terms and conditions, repricing, and changes in terms should be clear and accurate. The terms and conditions of many credit and deposit products are variable and may change periodically on the basis of external variables, such as changes in the prime rate. Many credit card products have terms that

2. Advertising and promotional materials include print and electronic materials as well as scripts used for radio, Internet, or television advertising and telemarketing.

may change or increase automatically following a specific event, such as an interest rate increase triggered by a consumer's delinquency with the creditor or another creditor. The disclosures for products such as these—products having variable terms and conditions—should be clearly presented.

### Items to Evaluate

1. Determine whether the bank reviews all customer agreements and disclosures to ensure that there is a reasonable factual basis for all representations made.
2. Determine whether the bank's customer agreements and disclosures fairly and adequately describe the terms, benefits, and material limitations or conditions of the product or service being offered. Limitations may take the form of, for example, limited applicability (for instance, a special interest rate that applies only to balance transfers), limited duration (for instance, an expiration date for terms that apply only during an introductory period), or a prerequisite for obtaining particular terms (for instance, minimum transaction amounts or introductory or other fees). Conditions may include, for example, the consumer's ability to cancel a service without a charge.
3. Determine whether the bank's disclosures make claims, representations, or statements that may mislead members of the target audience about the cost, value, availability, cost savings, benefits, or terms of the product or service.
4. Determine whether the bank informs consumers in a clear and timely manner about any fees, penalties, or other charges that have been imposed (including charges for any force-placed products), and the reasons for their imposition.
5. Determine whether the bank clearly discloses that optional or related products and services that are offered simultaneously with credit—such as insurance, travel services, credit protection, and consumer report update services—are not required as a prerequisite to obtaining credit or are not considered in decisions to grant credit.
6. Determine whether the bank, when making claims about amounts of credit available to consumers, accurately and completely represents the amount of potential, approved, or usable credit that the consumer will receive.
7. Determine whether the bank clearly informs a consumer when the account terms approved for the consumer are less favorable than the terms advertised or previously disclosed.
8. If the bank reserves the right to change the terms of an account or product, determine whether the bank's customer agreements clearly disclose that the bank may make future changes to the rate, terms, and conditions otherwise specified in any agreement signed by or given to the consumer. Determine whether the circumstances under which such changes may be made are clearly explained.

## Evaluating Servicing and Collections

Servicing and collection activities present a greater risk of potential violations of section 5 of the FTC Act when conducted by affiliates or third-party vendors and servicers. Thus, a bank should ensure that the disclosures provided for these servicing and collection activities are accurate and not misleading. The bank should also ensure that the activities are conducted fairly and in consonance with any disclosures or agreements. For example, statements should clearly indicate when payments are due if penalties are to be avoided.

### Items to Evaluate

1. Determine whether the bank ensures that its employees and third-party servicers have, and follow, procedures to credit consumer payments in a timely manner.
2. Determine whether consumers are clearly told when and if monthly payments are applied to fees, penalties, or other charges before being applied to regular principal and interest.
3. Determine whether account statements clearly disclose how fees, penalties, other charges, and interest and principal payments affect the account balance and whether these charges and payments have been calculated in accordance with any written agreements with the borrower.

## Monitoring the Conduct of Employees and Third Parties

A bank should have effective controls in place for hiring personnel and for contracting and maintaining relationships with third parties. The controls should, for example, establish responsibilities vis-a-vis third parties for training and monitoring staff. The controls should also foster the bank's ability to monitor the actual practices of its employees and third-party contractors and ensure that these practices are consistent with the bank's policies and procedures, applicable laws and regulations, and third-party agreements. In addition, the bank's monitoring should include a review of training and promotional materials used by its employees and by third parties, to ensure that any concerns about

unfair or deceptive acts or practices are identified early.

## Items to Evaluate

1. Determine whether, through its third-party agreements and internal policies, the bank has effective controls for monitoring risks associated with selecting and managing third-party contractors. Such agreements and policies should outline the degree of monitoring, acceptable error rates, and corrective action provisions in case of noncompliance. They also should identify issues that would need to be brought to the attention of bank management.
2. Determine whether the bank's compensation programs for employees and third-party contractors provide incentives for acts or practices that could raise potential concerns, such as compensation programs that steer consumers to particular products to the exclusion of other, potentially beneficial products.
3. Determine whether the bank monitors the training of employees and third parties who market or promote bank products or service loans, to ensure that they are adequately trained to avoid making statements or taking actions that might be unfair or deceptive. Monitoring should include a review of training and promotional materials, including telemarketing scripts.
4. Determine whether the bank monitors a third party's primary interface with consumers by, for example, reviewing recorded telephone calls or transcripts of online communications.

Federal Trade Commission Act—Section 5

# Appendix: Statement on Unfair or Deceptive Acts or Practices by State-Chartered Banks

*The following statement was issued jointly by the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation on March 11, 2004.*

## Purpose

The Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation (the Board and the FDIC, or, collectively, the agencies) are issuing this statement to outline the standards that will be considered by the agencies as they carry out their responsibility to enforce the prohibitions against unfair or deceptive trade practices found in section 5 of the Federal Trade Commission Act (FTC Act)[3] as they apply to acts and practices of state-chartered banks. The agencies will apply these standards when weighing the need to take supervisory and enforcement actions and when seeking to ensure that unfair or deceptive practices do not recur.

This statement also contains a section on managing risks relating to unfair or deceptive acts or practices that includes best practices, as well as general guidance on measures that state-chartered banks can take to avoid engaging in such acts or practices.

Although the majority of insured banks adhere to a high level of professional conduct, banks must remain vigilant against possible unfair or deceptive acts or practices both to protect consumers and to minimize their own risks.

## Coordination of Enforcement Efforts

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce"[4] and applies to all persons engaged in commerce, including banks. The agencies each have affirmed their authority under section 8 of the Federal Deposit Insurance Act to take appropriate action when unfair or deceptive acts or practices are discovered.[5]

A number of regulators have authority to combat unfair or deceptive acts or practices. For example, the Federal Trade Commission has broad authority to enforce the requirements of section 5 of the FTC Act against many non-bank entities.[6] In addition, state authorities have primary responsibility for enforcing state statutes against unfair or deceptive acts or practices. The agencies intend to work with these other regulators as appropriate in investigating and responding to allegations of unfair or deceptive acts or practices that involve state banks and other entities supervised by the agencies.

## Standards for Determining What Is Unfair or Deceptive

The FTC Act prohibits unfair or deceptive acts or practices. Congress drafted this provision broadly in order to provide sufficient flexibility in the law to address changes in the market and unfair or deceptive practices that may emerge.[7]

An act or practice may be found to be *unfair* where it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."[8] A representation, omission, or practice is *deceptive* if it is likely to mislead a consumer acting reasonably under the circumstances and is likely to affect a consumer's conduct or decision regarding a product or service.

The standards for unfairness and deception are independent of each other. While a specific act or practice may be both unfair and deceptive, an act or practice is prohibited by the FTC Act if it is *either* unfair *or* deceptive. Whether an act or practice is unfair or deceptive will in each instance depend upon a careful analysis of the facts and circumstances. In analyzing a particular act or practice, the agencies will be guided by the body of law and official interpretations for defining unfair or deceptive acts or practices developed by the courts and the FTC. The agencies will also consider factually similar cases brought by the

3. 15 USC 45.
4. 15 USC 45(a).
5. 12 USC 1818(b)(1), (e)(1), and (i)(2). See letter from Chairman Alan Greenspan to the Hon. John J. LaFalce (May 30, 2002) and "Unfair or Deceptive Acts or Practices: Applicability of the Federal Trade Commission Act," FIL 57-2002 (May 30, 2002).
6. 15 USC 45(a)(2) and Gramm–Leach–Bliley Act, section 133, published in notes to 15 USC 41.
7. See FTC Policy Statement on Unfairness (December 17, 1980) and FTC Policy Statement on Deception (October 14, 1983).
8. This standard was first issued as a policy by the FTC and later codified into the FTC Act as 15 USC 45(n).

FTC and other regulators to ensure that these standards are applied consistently.

## Unfair Acts or Practices

### Assessing Whether an Act or Practice Is Unfair

An act or practice is unfair where it (1) causes or is likely to cause substantial injury to consumers, (2) cannot be reasonably avoided by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition. Public policy may also be considered in the analysis of whether a particular act or practice is unfair. Each of these elements is discussed further below.

- *The act or practice must cause or be likely to cause substantial injury to consumers*—To be unfair, an act or practice must cause or be likely to cause substantial injury to consumers. Substantial injury usually involves monetary harm. An act or practice that causes a small amount of harm to a large number of people may be deemed to cause substantial injury. An injury may be substantial if it raises a significant risk of concrete harm. Trivial or merely speculative harms are typically insufficient for a finding of substantial injury. Emotional impact and other more subjective types of harm will not ordinarily make a practice unfair.
- *Consumers must not reasonably be able to avoid the injury*—A practice is not considered unfair if consumers may reasonably avoid injury. Consumers cannot reasonably avoid injury from an act or practice if it interferes with their ability to effectively make decisions. Withholding material price information until after the consumer has committed to purchase the product or service would be an example of preventing a consumer from making an informed decision. A practice may also be unfair where consumers are subject to undue influence or are coerced into purchasing unwanted products or services.

  The agencies will not second-guess the wisdom of particular consumer decisions. Instead, the agencies will consider whether a bank's behavior unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision making.
- *The injury must not be outweighed by countervailing benefits to consumers or to competition*—To be unfair, the act or practice must be injurious in its net effects—that is, the injury must not be outweighed by any offsetting consumer or competitive benefits that are also produced by the act or practice. Offsetting benefits may include lower prices or a wider availability of products and services.

  Costs that would be incurred for remedies or measures to prevent the injury are also taken into account in determining whether an act or practice is unfair. These costs may include the costs to the bank in taking preventive measures and the costs to society as a whole of any increased burden and similar matters.
- *Public policy may be considered*—Public policy, as established by statute, regulation, or judicial decisions, may be considered with all other evidence in determining whether an act or practice is unfair. For example, the fact that a particular lending practice violates a state law or a banking regulation may be considered as evidence in determining whether the act or practice is unfair. Conversely, the fact that a particular practice is affirmatively allowed by statute may be considered as evidence that the practice is not unfair. Public policy considerations by themselves, however, will not serve as the primary basis for determining that an act or practice is unfair.

## Deceptive Acts and Practices

### Assessing Whether an Act or Practice Is Deceptive

A three-part test is used to determine whether a representation, omission, or practice is "deceptive." First, the representation, omission, or practice must mislead or be likely to mislead the consumer. Second, the consumer's interpretation of the representation, omission, or practice must be reasonable under the circumstances. Lastly, the misleading representation, omission, or practice must be material. Each of these elements is discussed below in greater detail.

- *There must be a representation, omission, or practice that misleads or is likely to mislead the consumer*—An act or practice may be found to be deceptive if there is a representation, omission, or practice that misleads or is likely to mislead the consumer. Deception is not limited to situations in which a consumer has already been misled. Instead, an act or practice may be found to be deceptive if it is likely to mislead consumers. A representation may be in the form of express or implied claims or promises and may be written or oral. Omission of information may be deceptive if disclosure of the omitted information is necessary to prevent a consumer from being misled.

  In determining whether an individual statement, representation, or omission is misleading, the statement, representation, or omission will not be evaluated in isolation. The agencies will evaluate it in the context of the entire adver-

tisement, transaction, or course of dealing to determine whether it constitutes deception. Acts or practices that have the potential to be deceptive include making misleading cost or price claims; using bait-and-switch techniques; offering to provide a product or service that is not in fact available; omitting material limitations or conditions from an offer; selling a product unfit for the purposes for which it is sold; and failing to provide promised services.

- *The act or practice must be considered from the perspective of the reasonable consumer*—In determining whether an act or practice is misleading, the consumer's interpretation of or reaction to the representation, omission, or practice must be reasonable under the circumstances. The test is whether the consumer's expectations or interpretation are reasonable in light of the claims made. When representations or marketing practices are targeted to a specific audience, such as the elderly or the financially unsophisticated, the standard is based upon the effects of the act or practice on a reasonable member of that group.

  If a representation conveys two or more meanings to reasonable consumers and one meaning is misleading, the representation may be deceptive. Moreover, a consumer's interpretation or reaction may indicate that an act or practice is deceptive under the circumstances, even if the consumer's interpretation is not shared by a majority of the consumers in the relevant class, so long as a significant minority of such consumers is misled.

  In evaluating whether a representation, omission, or practice is deceptive, the agencies will look at the entire advertisement, transaction, or course of dealing to determine how a reasonable consumer would respond. Written disclosures may be insufficient to correct a misleading statement or representation, particularly where the consumer is directed away from qualifying limitations in the text or is counseled that reading the disclosures is unnecessary. Likewise, oral disclosures or fine print may be insufficient to cure a misleading headline or prominent written representation.

- *The representation, omission, or practice must be material*—A representation, omission, or practice is material if it is likely to affect a consumer's decision regarding a product or service. In general, information about costs, benefits, or restrictions on the use or availability of a product or service is material. When express claims are made with respect to a financial product or service, the claims will be presumed to be material. Similarly, the materiality of an implied claim will be presumed when it is demonstrated that the institution intended that the consumer draw certain conclusions based upon the claim.

  Claims made with the knowledge that they are false will also be presumed to be material. Omissions will be presumed to be material when the financial institution knew or should have known that the consumer needed the omitted information to evaluate the product or service.

## Relationship to Other Laws

Acts or practices that are unfair or deceptive within the meaning of section 5 of the FTC Act may also violate other federal or state statutes. On the other hand, there may be circumstances in which an act or practice violates section 5 of the FTC Act even though the institution is in technical compliance with other applicable laws, such as consumer protection and fair lending laws. Banks should be mindful of both possibilities. The following laws warrant particular attention in this regard.

### Truth in Lending and Truth in Savings Acts

Pursuant to the Truth in Lending Act (TILA), creditors must "clearly and conspicuously" disclose the costs and terms of credit.[9] The Truth in Savings Act (TISA) requires depository institutions to provide interest and fee disclosures for deposit accounts so that consumers can compare deposit products.[10] TISA also provides that advertisements must not be misleading or inaccurate and must not misrepresent an institution's deposit contract. An act or practice that does not comply with these provisions of TILA or TISA may also violate the FTC Act. On the other hand, a transaction that is in technical compliance with TILA or TISA may nevertheless violate the FTC Act. For example, consumers could be misled by advertisements of "guaranteed" or "lifetime" interest rates when the creditor or depository institution intends to change the rates, whether or not the disclosures satisfy the technical requirements of TILA or TISA.

### Equal Credit Opportunity and Fair Housing Acts

The Equal Credit Opportunity Act (ECOA) prohibits discrimination against persons in any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to contract), the fact that an applicant's income derives from any public assistance program, and the fact

9. 15 USC 1632(a).
10. 12 USC 4301 et seq.

that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Similarly, the Fair Housing Act (FHA) prohibits creditors involved in residential real estate transactions from discriminating against any person on the basis of race, color, religion, sex, handicap, familial status, or national origin. Unfair or deceptive practices that target or have a disparate impact on consumers who are members of these protected classes may violate the ECOA or the FHA, as well as the FTC Act.

### Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act prohibits unfair, deceptive, and abusive practices related to the collection of consumer debts. Although this statute does not by its terms apply to banks that collect their own debts, failure to adhere to the standards set by this act may support a claim of unfair or deceptive practices in violation of the FTC Act. Moreover, banks that either affirmatively or through lack of oversight permit a third-party debt collector acting on their behalf to engage in deception, harassment, or threats in the collection of monies due may be exposed to liability for approving or assisting in an unfair or deceptive act or practice.

## Managing Risks Related to Unfair or Deceptive Acts or Practices

Since the release of the FDIC's statement and the Board's letter on unfair and deceptive practices in May 2002, bankers have asked for guidance on strategies for managing risk in this area. This section outlines guidance on best practices to address some areas with the greatest potential for unfair or deceptive acts and practices, including advertising and solicitation, servicing and collections, and the management and monitoring of employees and third-party service providers. Banks should also monitor compliance with their own policies in these areas and should have procedures for receiving and addressing consumer complaints and monitoring activities performed by third parties on behalf of the bank.

To avoid engaging in unfair or deceptive activity, the agencies encourage use of the following practices, which have already been adopted by many institutions:

- Review all promotional materials, marketing scripts, and customer agreements and disclosures to ensure that they fairly and adequately describe the terms, benefits, and material limitations of the product or service being offered, including any related or optional products or services, and that they do not misrepresent such terms either affirmatively or by omission. Ensure that these materials do not use fine print, separate statements, or inconspicuous disclosures to correct potentially misleading headlines, and ensure that there is a reasonable factual basis for all representations made.
- Draw the attention of customers to key terms, including limitations and conditions, that are important in enabling the customer to make an informed decision regarding whether the product or service meets the customer's needs.
- Clearly disclose all material limitations or conditions on the terms or availability of products or services, such as a limitation that applies a special interest rate only to balance transfers; the expiration date for terms that apply only during an introductory period; material prerequisites for obtaining particular products, services, or terms (for example, minimum transaction amounts, introductory or other fees, or other qualifications); or conditions for canceling a service without charge when the service is offered on a free trial basis.
- Inform consumers in a clear and timely manner about any fees, penalties, or other charges (including charges for any force-placed products) that have been imposed, and the reasons for their imposition.
- Clearly inform customers of contract provisions that permit a change in the terms and conditions of an agreement.
- When using terms such as "preapproved" or "guaranteed," clearly disclose any limitations, conditions, or restrictions on the offer.
- Clearly inform consumers when the account terms approved by the bank for the consumer are less favorable than the advertised terms or terms previously disclosed.
- Tailor advertisements, promotional materials, disclosures, and scripts to take account of the sophistication and experience of the target audience. Do not make claims, representations, or statements that mislead members of the target audience about the cost, value, availability, cost savings, benefits, or terms of the product or service.
- Avoid advertising that a particular service will be provided in connection with an account if the bank does not intend, or is not able, to provide the service to account holders.
- Clearly disclose when optional products and services—such as insurance, travel services, credit protection, and consumer report update services that are offered simultaneously with credit—are not required to obtain credit or considered in decisions to grant credit.

# Exhibit 5

Gannett and the Chicago market

**Chicago is hugely under-represented in USA Today's front-page stories**

Despite the name "USA Today," Gannett and USA Today have largely excluded the Chicago market from their coverage, with the exception of sports and occasional references inserted into national stories that are primarily focused on other geographic areas. The PLAINTIFF went through back issues of USA Today from 2023, when she subscribed to the print newspaper and saved the issues. Given the company's financial challenges, it would seem to behoove it to consider expanding in the Chicago market. Why hasn't it? The PLAINTIFF wonders if it's penchant for "investigating" journalists, such as herself, and using information to guide its story selection and headline writing is part of the reason Gannett has avoided covering Chicago, where privacy laws prohibit eavesdropping and other forms of privacy invasion.

With the new Pope being from Dolton, Illinois, USA Today has carried more stories about the Chicago area in 2025. While the PLAINTIFF was compiling this list of front-page USA Today headlines from 2023, to show the lack of stories specifically about Chicago, USA Today published these two stories about Chicago:

'Incredibly blessed': Anonymous players claim $349 Mega Millions jackpot in Illinois

Encinas, Amaris. **USA Today (Online); Arlington**. 30 Apr 2025.

...jackpot of $80 million, will take place on May 2. USA TODAY reached out to...
...digital lottery courier of the USA TODAY Network, in these U.S. states and...
...of the USA TODAY Network. Gannett may earn revenue for audience referrals to...

- The Tylenol murders claimed 7 lives and remain unsolved. New documentary unpacks cold case

  Robledo, Anthony USA Today (Online) **Arlington**. 30 Apr 2025.

Other than coverage of the Pope's home in Dolton and major-sports coverage that includes Chicago teams, USA Today rarely covers anything going on in Chicago, yet it purports to be a national newspaper. This could be a potential violation of the Federal Trade Act Section 5, which prohibits companies from misrepresenting products or deceiving consumers.

The following are the Page 1 headlines from the print version of USA Today for several consecutive months for which the PLAINTIFF had access to the newspapers on a daily basis.

August 2023

Aug 1, 2023:

- K-9 cops in a corner Legalized marijuana Minnesota, Olmsted County
- ND governor knows the long-shot game
- Special counsel's cards are held close: Jack Smith's pattern: Go dark and stay there

Aug 2, 2023

Excluding the Chicago market

- Antibiotic resistance at point of crisis – MRSA staphylococcus aureus, Washington, DC
- Far bigger Trump charges possible by Josh Meyer
- GOP has leveraged state high courts, Zach Boyden-Holmes/photo

Aug. 3, 2023

- **More than an indictment – a stress test** Susan Page
- Takeaways : Criminal acts 'fueled by lies'; Six keys to the prosecutor's case against Trump
- Tree of Life mass killer faces death sentence; Pittsburgh gunman turned synagogue into 'hunting ground'
- Incandescent lightbulb ban takes effect after 16 years

Aug. 4-6, 2023

- Darrelle Revis finds home in Hall of Fame
- Rick Springfield opens up on album
- Missing, still: Alexis Patterson: Theories to consider
- Trump in Legal Peril
- Some demonstrators show up to support; others say 'lock him up' Washington
- Alleged conspirators pose threat if they flip Washingotn
- Washington courthouse has been the site of multiple historic trials

Aug. 7, 2023

- Sweden humbles USA, again, at World Cup
- LA Plan has gotten thousands off streets
- Defending champs early exit indicative of sport's growth By Nancy Armour soccer
- Both parties want child tax credit restored

Aug. 8, 2023

- Trump's GOP rivals treading lightly
- Journalists in exile
- Common scents may build a better brain

Aug. 9, 2023

- 5 ways 1st debate boosts, breaks campaigns
- Military's review for extremists falls short
- Many international players have US ties
- Opportunities for training, leagues draw elite athletes

Excluding the Chicago market

Aug. 11-13, 2023

- National treasure, then ruin: 'It was that quick'
- Family flees hometown through walls of flame; Lahaina, Hawaii
- Historic church is gone, but strength lies in our people; island of Maui
- Schools all over lack bus drivers
- Summertime cases tick upward

Aug. 14, 2023

- Survivors link arms as they wait for help
- Scope of disaster in Maui makes food, shelter hard to find
- Migrant families severed in Texas
- Hunter Biden investigation deepens

Aug. 15, 2023

- In Georgia, shadow of 2020 still looms large
- New danger directly tied to 'forever chemicals'
- At 12, fleeing Taliban was just the beginning (12-year-old Mohammad Halim Shams quietly said goodbye to his sleeping parents)

Aug. 16, 2023

- Georgia indictment lands hard on Trump
- Trauma haunts survivors in Maui
- **TV trial, tape pose distinctive perils for Trump's future Susan Page**
- **Trump faces 91 charges across four indictments**
- **New case dramatically widens the net**
- Use of law meant for Mafia bosses raises the stakes

Aug. 17, 2023

- Pardon power could be put to test
- Firefighters in Maui are now homeless themselves: As flames advanced, many faced an agonizing choice
- Pig kidney works in brain-dead man a month by Karen Weintraub, Doctors hope transplant case is a breakthrough

Aug. 18-20, 2023

- US women's soccer needs fixes -fast With Paris Olympics weeks away.
- Suvivors vow to hold on to homes Kahului, awaii Tammy Kaililaau's home of 20 years burned to the ground

Excluding the Chicago market

- Will this man become Biden's border ally? Guatemalan candidate aims to turn tide on flight to US
- 2024 rivals turn memes into merch by Savannah Kuchar photo from S.C.

Aug. 21, 2023

- **Spain beats England to win 1st World Cup**
- **Social media algorithms push racism, studies say**
- **Major tropical storm churns toward the US – Baja, Calif**
- Southwest prepares for 'catastrophic and life-threatening flooding' to come Diamond Bar, California
- Back to school? Make health kit
- Who were 'fake' electors? Inside Trump's bid to overturn 2020 election

Aug. 22, 2023

- Sticker shock at gas pump; prices hit 10-month high
- Yankees heading for their worst season this century
- Jethro Tull's Anderson talks bank's longevity
- Support remains steadfast for Trump
- Have US consumers hit gratuities tipping point? Columbus, Dispatch
- How the GOP candidates will try to score debate points
- Hilary is down but not out in Southern California

Aug. 23, 2023

- Coffee shops short on diversity
- Extreme heat leaves deadly trail: No matter what age or profession, weather can affect lives of healthy, vulnerable, Washington state and Louisiana, University of Texas at Austin
- Republican rivals get ready for the big stage

Aug. 24, 2023

- When there's a picket line, what are workers' rights?
- Top superhero films from Avengers to Superman
- Sha'Carri Richardson a force on, off track
- A race like no other is off and running: Susan Page
- **Wastewater disease surveillance is a rising public health tool and Wisconsin leads the way – Milwaukee**
- **Sewage testing cheap, reliable, expanding**
- Pride flag shooting follows sad precedent

Excluding the Chicago market

Aug. 25-27, 2023

- Tim McGraw stays firm in his beliefs
- Dream speech still reverberates
- Ohtani's torn UCL clouds his future
- Eyes on Trump, co-defendants: Georgia Election Case
- Life of the party is the no-show Susan Page
- Rivals hope Milwaukee was their moment

Aug. 28, 2023

- Meadows to argue for moving charges: Face-off with Ga. DA expected Monday
- Cross-island aid flows: Hawaii is one family
- Most exciting day of my entire life; March on Washington recollection by Grace Hauck and Marc Ramirez

Aug. 29, 2023

- Companies are hiring more workers who are autistic
- Steve Miller recounts 60s rock scene
- Chance for a career reset
- Trump's trial is set to begin on March 4
- Catastrophic surge could wallop Florida
- Post-pandemic alternatives for education thrive

Aug. 30, 2023

- Powerful Idalia: it's not to mess around with
- Racist attacks spread unease
- Conservatives secure pop culture successes

Aug. 31, 2023

- Idalia sweeps Georgia after pounding Florida
- Court has gone silent on ethics
- More medical care isn't from doctors, but jury still out on how it's working
- Hearts are broken, as Maui counts its dead

September 2023

Sept. 1-4, 2023

Excluding the Chicago market

- American Annihilation, murder by a loved one
- College game day rituals celebrated
- A treasure worth bingeing One Piece
- How a clown fetish went unchecked
- 2022 hate crimes up 10% over prior year
- Talk of UFOs zooms into the mainstream: reports exposed secret monitoring program

Sept. 5, 2023

- Skies Clear for Burning Man Exodus -- Black Rock City, Nevada
- Fears of federal shut down -- Washington
- Maui fire victims plea: Don't forget about us -- Hawaii
- Flamingo frenzy in birding world – Eastern USA

Sept. 6, 2023

- Unlikely voters solidly behind Trump -- New Hampshire
- Shelter dog: A devotion 'meant to be' -- John Carlisle, Detroit Free Press
- Judges rule against Ala again over Black voter—Alabama

Sept 7, 2023

- Divide over climate change goes deeper than politics
- Russian missile kills 17 civilians
- More state lawmakers fighting to protect Confederate statues
- Dat downgrades new Covid variant's severity

Sept 8-10, 2023

- Follow the ammo from US to Ukraine
- Covid could be a factor in 2024
- There's no clock on your kidney

Sept. 11, 2023

- Michigan State coach accused of sex misconduct by activist
- Quake survivors: Please save us
- Still awaiting justice: Washington

Sept. 12

Excluding the Chicago market

- Remembering Sept. 11, 2001
- Attacks leave legacy of national distrust
- Schools reinstate resource officers
- US sets record for billion-dollar weather disasters

Sept. 13, 2023

- GOP will launch Biden inquiry
- Leave no one behind
- Breast cancer content creators have beef with social media rules

Sept. 14, 2023

- Economy weighing Americans down Washington
- With killer captured, nightmare finally over
- Trouble on the river

Sept. 15-17, 2023

- When the dead don't stay buried
- Biden's agenda failing to click
- NASA releases report about UFOs

Sept. 18, 2023

- Latest DACA court ruling leaves Dreamers in doubt
- Justices weigh 1st cases on Jan. 6
- Gay, bisexual men may now donate blood again
- Making good on 2-decade-old promise

Sept. 19, 2023

- Keep your brain in shape Extra puzzles in Life
- Ge to know labor union leading autoworker strike
- A star's name: Leslie Jones opens up in memoir
- Cowboys off to strong start but will it last?
- Iran frees 5 Americans in prisoner exchange
- Strides made in treating cancer Washington
- Student loans may threaten pets Making sense of the new SAVE repayment program

Sept. 20, 2023

- Prisoner exchange stirs up debate Washington
- Biden at UN warns world can't abandon Ukraine
- Modern monogamy: Seasonal chapters

Sept. 21, 2023

- Garland defends DOJ as GOP alleges unequal investigations
- VA hotline botched cry for help, report says
- Study: Smoke from wildfires worsening air quality CALIF
- NYC's migrant crisis loom over Biden at UN

Sept. 22, 2023

- Zelenskyy tries to rally for additional US Aid
- Senate OKs top military nominee
- US Latinos face language shaming

Sept. 25, 2023

- High court could alter interaction on internet
- Stuck half-mile below surface, fearing death
- Return to Earth: NASA recovers asteroid sample

Sept. 26, 2023

- Sexual assault survivors too often can't find care
- Writers, studios agree on contract
- Concerned moms shape 2024 race

Sept. 28, 2023

- Late Night 5 back in business – talk show
- Student debt grew for decades, then gone overnight
- For 804,000, a burden lifts via 'golden email'
- Year of the supermoon riding off into the sunset

Sept. 29 – October 1, 2023

- Disasters have lingering effect on kids' education
- GOP's inquiry could backfire
- El Nino confounds winter forecast

Oct. 2, 2023

- Homebuyers being outbid in droves by investors
- **Nicks a Barbie doll; They helped her have my soul**
- **Ryder Cup stays home after win by Team Europe**
- How Congress averted government shutdown; Hours earlier it seemed all but certain lawmakers wouldn't pass bill in time
- Does deal provide glimmer of hope for future of US? Susan Page, Washington
- DFR's death led to pivotal research; Karen Weintraub, cardiovascular disease
- Massive national alert test this week

Oct. 3, 2023

- Opioid case divides even grieving moms
- Test for virus in newborns gets push
- Supreme Court will decide on OxyContin maker's settlement
- Kids' report card after Covid is mixed

Oct. 4, 2023

- Hard-liners revolt against McCarthy
- Debate leaves GOP voters sour on Christie USA Today/Boston Globe/Suffold University poll
- Finding workarounds to teach Black history **by Debra Barfield** Berry
- Study: Same-sex behavior common in animals **Study by Spanish researchers; Joan Roughgarden, Stanford University**

Oct. 5, 2023

- San Francisco honors Feinstein's life, legacy
- 75,000 Kaiser workers strike; Kaiser Permanente health care workers strike in Washington and several states
- Haley overtakes DeSantis in NH
- World's amphibians risk being 'climate captives'

Oct. 6-8, 2023

- Lack of oversight endangers patients
- MLB playoffs
- Exorcist: Believer a spirited sequel
- Game on for GOP's speaker scramble
- Unwavering support for Ukraine in doubt
- Schools face mental health crisis

Oct. 9, 2023

- Toll rises as Israel is plunged into war
- GOP braces for what could be a wild week – Susan Page
- Several Americans reportedly killed in surprise attack (ZAKA) by John Bacon, Josh Meyers, Francesca Chambers
- For nation's most hazardous waste, end of the road is often Michigan

Oct. 10, 2023

- Israel orders siege as conflict escalates – At least 9 Americans among dead; airstrikes pound Gaza
- USA Today town halls to spotlight 6 candidates – New Hampshire
- Low-tech website helped fuel book bans – Florida
- On the winter wish list: Donated coats – with pullquote

Oct. 11, 2023

- US Jews, Palestinians endure 'shared pain' – Montebello, NY
- Communities are always worried about safety – Manhattan, NY, Berkeley, Calif, photo caption Milwaukee
- Irania link to attack would light new fuse -- Washington
- Police trials drawing spotlight
- Bird flu may have met its match – genetic 'editing' could grow resistant chickens -- UK research
- Republicans race to find new speaker – Washington

Oct. 12, 2023

- **"No one deserves this' (I've said this very phrase) Cindy and Igal Flash; Lfar Aza in caption**
- Pa court makeup could tilt outcome – Washington dateline about Pennsylvania
- US citizens scramble to get out of war zone
- Queen of the fat bears Bear 128 Grazer topped 32 Chunk to become Fat Bear Week champion at Katmai National Park and Preserve in Alaska

Oct. 13-15, 2023

- Hamas feeds terror digitally ; The attacks came by land, sea, air- and online. Atlantic council – East Coast
- Diabetes Dilemma – doesn't give locations of people mentioned
- **Broad relief unlikely in 'Plan B' for student debt – Biden and Supreme Court**
- Saturday's eclipse is a preview of showstopper coming in April no location

Oct. 16, 2023

- Israel says it killed Hamas raid leader
- Linda Thomas-Greenfield's brand of 'gumbo diplomacy' has caried her all the way to the United Nations
- Most brides stick with tradition on last names – no location
- America's global voice – Washington /

Oct. 17, 2023

- Biden 'considering' solidarity trip to Israel
- **Hate for Muslims cited in slaying – Chicago boy's stabbing launches federal inquiry photo provided by Cair Chicago; story by Bart Jansen, Thao Nguyen and Christopher Cann**
- Jordan has nomination but will he garner votes By Ken Tran Washington
- Strained cities try 'tiny home' villages -- California

Oct. 18, 2023

- Biden heads to Israel as war's toll widens
- Rough start for Jordan's attempt
- Millenials, Gen Z aim for new type of success
- Ivory-billed woodpecker gets stay

Oct. 19, 2023

- Biden assure Israel it doesn't stand alone
- Jordan looks to win over holdouts
- Americans running low on pandemic stimulus cash

Oct. 20, 2023

- 21 years later, an injection of hope
- New tack to move on fails in House
- Palestinian Americans report rising hostility
- Inflation taking hold of health insurance
- Chicken allowed home to roost

Oct. 23, 2023

- Speaker election wearing on nation
- In Israel-Hamas war, one man may be key link
- College LGBTQ+ centers vanishing: Texas and Florida

Oct.24, 2023

- No funeral cars, no ambulances

- Biden, Trump locked in a tie
- Former Morehouse students' debts erased

Oct. 25, 2023

- Child care providers look over a fiscal cliff; Missoula, Montana
- Muslims, Jews in US forge bonds
- Lupus and coma can't stop student

Oct. 26, 2023

- GOP crowns Johnson speaker
- Kidnapped from Israel flyers expose a painfully deep divide – New York
- Campaign aims to build public trust in election -- Washington
- Mom warns of elopement dangers—Michigan

Oct. 27, 2023

- Lewiston residents cope with massacre -- Maine
- Nation's pharmacy chains in revolt
- For new House speaker, the answer wasn't magic

Oct. 30, 2023

- Two days in lockdown amplified town's fear
- Calls for cease-fire in Gaza increase
- During manhunt in Maine, residents denied time to mourn
- San Diego ranked as most expensive US city

Oct 31, 2023

- Israel prepares to do battle tunnel to tunnel
- Ohio vote will send a strong signal on abortion
- Eerie repute doesn't fly
- Growing presence of police robots has some concerned -- Texas

Nov. 1, 2023

- Sickle cell gets a chance at a cure
- "I have to take action' With loved ones held in Gaza, the fight to bring them home becomes all-consuming, Brooklyn, NY
- NYC family's resolve overcomes anguish by Joey Garrison
- Warnings precede Maine shooting by Will Carless , Maine

Nov. 2, 2023

- Economy looms large for voters – Rye, NH
- Made in America is key to Biden's aid proposal
- Birds to be renamed to shun racism Human names will be dropped in US, Canada

Nov. 3, 2023

- Drugs were found on Hamas fighters; About Captagon
- Climate change predictions too low?
- State contests will echo into 2024: Ohio, Virginia, Mississippi, Kentucky, Louisiana

Nov. 6, 2023

- When Libs of TikTok posts, threats increasingly follow by Will Carless
- 3 justices to watch in blockbuster guns case
- Millions rely on untested wells (Iowa)

Nov. 7, 2023

- Trump lets loose political spectical—Aysha Bagchi, David Jackson, Bart Jansen NY
- Statewide contests ae a 'stress test' for 2024; Washington, Kentucky, Virginia, Mississippi, Ohio
- Spinal implant shows new promise – by Karen Weintraub; on Marc Gauthier, Bourdeaux, France

Nov. 8, 2023

- States take the lead on key issues, Louisville, Ky
- What's at stake in next GOP debate?
- Justices wrestle with gun ban for abusers; Court poised to uphold law, weighs effect on other challenges
- Muslims in US fear another Trump-style 'travel ban'
- **More than half of female homicide victims were slain by a male intimate partner; 96% of the victims in murder-suicides involving a gun are female**

Nov. 9, 2023

- Democrats ride wave on abortion rights
- For Israelis, Palestinians in US, war is top of mind
- Panel mulls who should get student relief
- Jewish US citizen head overseas to fight Hamas
- **American fled Gaza, brought harrowing tales home to Texas** (taxes accountant)

Nov. 10-12, 2023

- **How to avoid scams when donating this Veterans Day**
- Stronger jabs land not only on Trump
- Migrant sea route brings new levels of suffering
- Billionaire Bunker: Bezos part of new land rush to Florida area rich in history

Nov. 13, 2023

- Hard test for Biden as APEC gathers
- In this new frontier, options are limitless
- Winter snowpack critical for West

Nov. 15, 2023

- Military targets sexual assaults
- It's 'a terrifying time' to be Jewish for many Washington
- Leukemia, homelessness then college degree at 18
- Justices adopt ethics code

Nov. 16, 2023

- House dodges government shutdown by Ken Tran and Riley Beggin –Washington
- It's Leonid meteor time! Here's how to see them at their best
- Health clinics 'treating both ends of the leash' - - Pittsburgh

Nov. 17-18, 2023

- With new ethics report, tide turns against Santos – by Ken Tran
- Avoid traffic headaches during holiday week
- Senate OKS plan, sidesteps shutdown
- Mascot gives last bear hug (Panda photo) – Smithsonian National Zoo