BC

FILED
7/18/2025 LJ
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Meyer v Gannett

United States District Court for the Northern District of Illinois

ANN MEYER

Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media)

Defendant

Case No. 1-24-cv-09529
Judge Jorge L. Alonso

Ms. Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (work)
847-271-0177 (cellphone)

Ms. Julie C. Ratliff, associate
jratliff@taftlaw.com
Direct dial: 312-537-4011

Mr. Andrew Murphy, associate
hjackson@taftlaw.com
Direct dial: 312-836-4145

Ms. Heather Jackson, partner
hjackson@taftlaw.com
Direct dial: 312-836-4172

Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601-4208
Tel: 312-527-4000

RESPONSE TO MOTION TO DISMISS Part II: Discriminatory Counts

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth this Part II Response to the DEFENDANT's Motion to Dismiss and asserts **Counts of Discrimination,** as the DEFENDANT's attorneys have requested, and other information about disability law as it pertains to employment at one of the nation's largest publicly traded news media companies.

**1** The DEFENDANT's request for "counts" might sound simple, except for the fact the discrimination occurred on a daily basis, including during the PLAINTIFF's off hours and it continues today while the PLAINTIFF isn't employed by the DEFENDANT company.

**2** To fully understand the extent of the discrimination, it helps to understand the reason Congress passed the Americans with Disabilities Act and the Amended Act in 2008/2009. Without intending to be repetitive, the PLAINTIFF feels it's worth a paragraph or two to refresh the DEFENDANT's attorneys on what the Americans with Disabilities Act is all about and why it is stronger today than ever -- because the attorneys haven't demonstrated they understand it.

**3** The Americans with Disabilities Act exists and was strengthened in the Amended Act and in a recent U.S. Supreme Court case to ensure those people with disabilities aren't disadvantaged so they can lead a life as close to normal as possible. It provides for access. Without this law, people with disabilities would have no recourse when they faced exclusion, segregation, denials of reasonable accommodations, retaliation, harassment, interference, coercion, intimidation, threats and other forms of discrimination. It means people with disabilities shouldn't be blocked, as the DEFENDANT's attorneys are trying to do and as they did in 2022. The ADA also works with other laws, including the Lily Ledbetter Fair Pay Act and the Age Discrimination in Employment Act.

**4** Another way of thinking about how or why the ADA applies in this case, please keep in mind the PLAINTIFF can't do some jobs she otherwise would be qualified for. She spent considerable time in 2022 and 2023 getting a substitute teacher's license and received a five-year license from the state of Illinois. However, when she spent a month in a kindergarten classroom, she became very ill with a respiratory illness that lasted for months. Her doctors advised her not to try this line of work again, as her body is prone to infections. She has considerable education experience in her background and otherwise might be a good candidate for a job in education. Why didn't the PLAINTIFF know of the issue before she went through all the steps to become licensed and get hired? She worked remotely for about 30 years. She previously had worked with children in the schools but for limited periods of time, not seven hours a day five days per week. Here's another example: Her speaking skills aren't as strong as her written skills as she has a small language disability, so she's not likely to get an on-camera job in broadcast news. This eliminates another area of work she might otherwise have pursued.

**5** Instead of considering the jobs she can't do, the ADA provides for accommodations for jobs she can do. The PLAINTIFF has worked remotely for most of her career as a journalist. To prevent the PLAINTIFF from becoming economically disadvantaged, the DEFENDANT should have allowed her to work remotely.

**6** During Covid, while the PLAINTIFF worked for a newspaper in Michigan's Upper Peninsula and Wisconsin, she took a pay cut to do so being rejected from a Regional Executive Editor role at the same company. She went through three rounds of interviews, including a partial-day interview in person in Wisconsin, where she met about 14 people, 13 of which were white men. Every editor she would be supervising was a white male. During 2020, the PLAINTIFF had interviewed for at least three positions in Chicago she was well qualified for, including a return to a lecturer position at the University of Illinois-Chicago, an editor role at Tribune Publishing

and an adjunct role at Northwestern University, yet she didn't receive any offers due to Covid and various furloughs. One employer told her they were concerned about her health being an issue. She also likely was denied employment based on the condition of newsrooms throughout the country and her history of allergies, asthma, sinus issues and lack of smell rather than considering the fact her performance and her attendance were excellent and with due care, she is able to work in a newsroom, another office or remotely. She ended up working for Census2020 in two states but returned from Iowa with a sinus infection and needed emergency sinus surgery in November 2020 for the same condition that had been an issue in Savannah.

The ADA is an ideal law for this case, which also involves anti-trust issues as the PLAINTIFF is the owner of an LLC company. She had largely put this business on hold while she worked in Savannah, though she took several online courses and produced works that weren't for the Savannah Morning News. She was an hourly employee. Many business owners also are employed. This isn't a new concept. Large publicly traded companies aren't supposed to block small businesses, per the Sherman Act.

**7** The ADA also is ideal because the news media also has been provided access through interpretations of the First Amendment and the traditional media's important and foundational role in this nation's democratic form of government. The traditional news media isn't just another business; nor should it ever be considered a part of the tech industry, because it must be able – and allowed -- to criticize the tech industry if it's in the public's interest to do so.

**8** The traditional news media, of which the PLAINTIFF is a member, is known as the Fourth Estate. It is called this because it forms what's often referred to as the fourth leg of a table, with the other three legs being the branches of our government. It provides the balance to keep this table from becoming wobbly, as some might assert it is today because the press has become weakened. The traditional news media provides a check on the three branches of government – as well as on corporations, nonprofits, etc. – which is necessary to keep our system operating as it was intended. Journalism helps to fight corruption by exposing it. It also is an influencer of change. This important role shouldn't be overlooked in this case, because it explains why the PLAINTIFF is so annoyed about the disrespectful, discriminatory way she was treated and about what she — and many others — say are the DEFENDANT company's mistakes.

**9** The DEFENDANT's attorneys seem to be representing Gannett, the employer, which isn't an envious position to be in. The DEFENDANT's attorneys resemble the DEFENDANT employer in that its people are talking to one another – they're sending contradictory messages. They're also not listening to the PLAINTIFF's reasonable suggestions, in her opinion. This is another form of blocking access, which the ADA prohibits.

**10** The PLAINTIFF, in representing herself, also is representing the interests of many journalists and shareholders who thought they were joining or buying a stake in a traditional newspaper company, not a poorly performing tech company (as plenty of other tech companies exist), but one that understood the news media's important role. On the face of it, a news media company should understand the laws of this nation and abide by them. (A news company really shouldn't ever act as if it is above the law or try to abuse its authority -- because it would be so profoundly hypocritical to do so as to raise an allegation of fraud, per the Federal Trade Act, Section 5.)

**11** Representing shareholders is a natural position for the PLAINTIFF, a journalist with 40 years of experience who is highly knowledgeable about the news industry and who also is a business owner dating back to 1988 and the owner of published works dating back to 1978. She understands the news business because she has served it as a supplier and consultant for decades. The PLAINTIFF became a shareholder of DEFENDANT corporation in November 2023, just weeks before she was offered a full-time, hourly, nonexempt position with the DEFENDANT employer. She doesn't think this is a coincidence; she thinks it is another example of invasion of privacy. How would the DEFENDANT corporation know she bought shares? She didn't tell the hiring managers.

**12** The PLAINTIFF believes in holding the DEFENDANT accountable, because she believes in order to succeed it needs to correct problems that have led to its decline. As one of the nation's largest news organizations, with reportedly about 250 news outlets, the DEFENDANT's success or failure also determines that of the news industry overall to a certain extent.

**13** As a journalist and as a supplier to news organizations, the PLAINTIFF is concerned about what's occurred as the DEFENDANT company has become smaller and has de-emphasized its core print product – the newspaper — despite the fact print is where the money is. This isn't about technology coming in and making news more efficient, because it's really not working for the company and for the public. Fewer people are reading local – and possibly national news – on a regularly. This doesn't mean a nation of people in the dark is what we should be aiming for.

**14** The DEFENDANT's attorneys are welcome to take the PLAINTIFF's offer to help guide the company back to success as long as the PLAINTIFF is paid and receives the credit for any suggestions she makes as part of this litigation. She is not giving her ideas to the DEFENDANT's attorneys, and they are not to take the PLAINTIFF's intellectual property without her permission, despite the fact this is what the DEFENDANT company allegedly has done for years. The DEFENDANT company apparently understands copyright and IP on some level or they wouldn't have expressed such a keen interest in taking her copyright in the agreement they presented to the PLAINTIFF in 2023. If the DEFENDANT's attorneys are doing

their job well, they should be recommending Gannett's people work with the PLAINTIFF to prevent the counts of discrimination from continuing to accrue.

## Courtroom antics: Retaliatory for bringing an employment complaint?

**15** Employees at most companies today are trained to speak up with concerns about the workplace to reduce the risk of litigation. Per the Sarbanes Oxley Act of 2002, employees of a publicly traded company should not be retaliated against for speaking up. The ADA also provides for access and prohibits retaliation. Do the DEFENDANT's attorneys realize this? Employers have to allow employees to speak and to be listened to, and so does the law firm representing the DEFENDANT. Many hours are devoted to new-hire webinars and training so employees, including managers, know the rules, such as what harassment looks like so it can be avoided. They also often are trained to include others who are different from them. Despite going through the act of providing training, the DEFENDANT hasn't been winning at the labor game. Its headcount is drastically smaller than it was just five years ago. Compensation hasn't kept up with inflation at many outlets, and the employer has lost a lot of experienced journalists, resulting in weaker products. Reductions in headcount only exacerbate other employment issues, such as discrimination. The DEFENDANT company needs to generate more revenue.

**16** It's one thing to acknowledge an employment issue and another to resolve it. The DEFENDANT company's standard procedure of stonewalling employees who have concerns doesn't resolve the issues and doesn't prevent the issues from coming back. The coercion a DEFENDANT's attorney used in March 2025 is prohibited by the Americans with Disabilities Act. It's reminiscent of the DEFENDANT employer's coercion, which the PLAINTIFF has faced over and over, including in 2023. These coersive acts are illegal. The DEFENDANT's legal counsel from Taft Law also used a form of coercion and retaliation in the courtroom in 2022 when it refused to negotiate or settle the case, preferring instead to criticize the format of a document created by PLAINTIFF, a person with multiple disabilities who has faced discrimination for years on many fronts and who has become economically disadvantaged because of this discrimination. The DEFENDANT's attorneys and their tactics seem intent on distracting the court from the primary issue in need of addressing. This is discriminatory.

**17** After the PLAINTIFF redid the Complaint in November 2022, the DEFENDANT's attorney complained again, saying she didn't like the numbering system the PLAINTIFF used. Perhaps she thinks this is what the editors at the DEFENDANT company do; they don't. The PLAINTIFF's work wasn't an issue, and the DEFENDANT employer hasn't said it was. Further, the PLAINTIFF reminds the opposing party the United States has outlawed slavery. She

hasn't been paid for her time or her work product in this case, despite providing valuable information to the DEFENDANT's leaders if they care to know about it. In late 2022, Judge Coleman dismissed the Complaint without prejudice so the PLAINTIFF employee/small business owner could bring it back. Contrary to the DEFENDANT attorney's defaming accusation the PLAINTIFF didn't file complaint on time, this is false. The PLAINTIFF is attaching dated documents to this brief.

**18** The PLAINTIFF employee/small business owner hasn't found the right attorney as the case became more complicated – and perhaps also more clearly malicious – in 2023, when the PLAINTIFF received an offer with an agreement that shined a light on the DEFENDANT public company's motivation to acquire the PLAINTIFF's business without paying for it. This is the extreme opposite of what the ADA allows; in fact, it's what the ADA tries to prevent, economic disadvantage among people with disabilities.

**19** The economic disadvantage the PLAINTIFF has suffered continues to the present: Not only was the PLAINTIFF's furniture and belongings damaged, stolen or lost in the moves to and from Georgia, the PLAINTIFF's businesses were impaired. She hasn't been able to reopen her real-estate rental business since October 2022, due to her poor economic situation, where she has more debt than the amount of revenue she is generating.

**20** Seven years after the PLAINTIFF rented the townhouse unit to go to work for the DEFENDANT, she has been economically disadvantaged to the point where the townhouse now needs extensive repairs and PLAINTIFF doesn't have the funds available, in part due to the discrimination she has faced from the DEFENDANT, one of the nation's largest news companies.

**21** Similarly, the equipment she used for her journalism company also was damaged, lost and stolen, and she doesn't have the funds to replace it. This is contributing to ongoing financial hardship.

# Counting the Counts of Discrimination

**22** **2025**

**23** October 2024 to March 2025: The DEFENDANT is **blocked** from settling this dispute, in several **counts of exclusion and retaliation**, when DEFENDANT's habit of **stonewalling** continues, as it fails to show for **three** Status Hearings. PLAINTIFF contacts Investor Relations for addresses and sends certified letters to DEFENDANT's registered agent, its Chief Legal Officer as well as to attorneys at Taft Law in Chicago. **Three counts.**

**24** Other counts of blocking were described above, along with a count of coercion. **Three counts.**

**25** The PLAINTIFF also applied for a couple of other positions and extended an offer to help as an independent journalist, working through her business in 2024. **At least two counts.**

**26** Invasions of privacy (see other section below around p. 26). How many? Counts are to be determined.

**27 2024**

**28** PLAINTIFF is excluded from accessing clips on Proquest, though they had appeared in this database in 2020. PLAINTIFF produced about 340 articles and projects while she worked for the Savannah Morning News, which appeared on Proquest.

**29** PLAINTIFF also is excluded from accessing online some of the articles, photos and videos she produced while working for the DEFENDANT as they have been taken down or her name removed for them. In general, this isn't allowed in the profession of journalism. These exclusions and retaliatory actions following the PLAINTIFF's second complaint to the EEOC have impaired her job search and damaged her reputation. **Number of counts to be determined.**

**30** Summer 2024: PLAINTIFF is excluded from working for DEFENDANT company through PLAINTIFF's business, when she contacted an editor she had interviewed with previously and offered to help cover Milwaukee during a news event. She received a rejection. She also applied for several full-time positions. However, she also realized if the DEFENDANT employer was going to continue to coerce her to sign an agreement she isn't comfortable signing, she is wasting her time in sending in more applications. While PLAINTIFF reopened her journalism/media-services business in 2024, she isn't making ends meet yet as fees being paid for stories aren't at the level they were when she worked full-time through her business previously, when she earned between 50 cents and $1 a word or from $50 to $100 an hour working through her business. The DEFENDANT's poor financial performance has impacted the entire news market, as because of its size it sets market rates and rates haven't increased. The DEFENDANT shouldn't be allowed to block PLAINTIFF in working through her business and in employees, as this would be a violation of anti-trust laws, such as the Sherman Act, which prohibits monopolies. **Counts: Several**

**31** For counts of discriminatory exclusion, please see section below on job applications during 2024.

**32 2023**

**33** Dec. 18, 2023 **discriminatory counts** against the PLAINTIFF include:

**34** PLAINTIFF was coerced and retaliated against when she was told she must sign an unlawful employment agreement that also would have involved a hostile takeover of her company, in a violation of the ADA prohibitions against coercion and exclusion and in a violation of the Sherman and Clayton Acts regarding anti-trust behavior. How many other applicants were presented with this agreement to sign as a condition of hourly employment? PLAINTIFF contents this is likely an example of unequal treatment (segregation) along with retaliation and coercion. **Three counts.**

**35** PLAINTIFF asserts the employment agreement was blatantly discriminatory and would have caused further economic discrimination, which the ADA prohibits, because the agreement would have allowed the DEFENDANT to steal her business – everything she had created or would later create – in exchange for hiring her for an hourly position paying $24 an hour. She was earning $29.50 working plus overtime for the Census Bureau in 2020 and she was earning $60,000 as a journalist in 2023. Do other journalists offered positions paying $24 an hour have to give property to the DEFENDANT employer in exchange for a job paying below market? If not, she was discriminated against. This is a violation of the Equal Pay Act and the ADA (compensation clause and fairness). **Two counts.**

**36** The PLAINTIFF's business apparently had some value or the DEFENDANT wouldn't have been interested in it. Why would the DEFENDANT care about it; why the DEFENDANT have mentioned it at all? The PLAINTIFF is the sole owner of her company. She holds the rights to published articles that were "fixed" in a common law form of copyright as early as 1978. She worked as a volunteer journalist from 1978 to 1985 at least part of the time and owns the rights to works published during this period. She worked through her business from 1988, often as an outsourced editor, newsletter editor, reporter, columnist, writer and photographer, and continues to work in the business currently. The attempted theft of thousands of articles is discriminatory. **Counts to be determined.**

**37** PLAINTIFF was excluded from employment in a discriminatory act when the job offer was rescinded. This is a **failure to rehire**, as the PLAINTIFF had received a job offer. The job offer also indicates the PLAINTIFF was considered employable and a top candidate for an education reporter position in a mid-size market four years after she experienced a health issue in a contaminated newsroom owned by the same company. While this was just one count of failure to rehire, it represented the culmination of three years of sending out dozens of applications. **One count at $100,000.**

**38** PLAINTIFF was denied **reasonable accommodations**, in a violation of the ADA, such as being exempted from having to sign the form and being allowed to recuse herself from any meeting

where the company's proprietary information was revealed. Why would a publicly traded company want to tell a protected news reporter confidential information that it wanted kept a secret? **One count.**

**39** PLAINTIFF was excluded from continuing a discussion with an HR manager named Joann when the HR manager interrupted the PLAINTIFF and said she would rescind the offer, instead of negotiating. PLAINTIFF was further excluded from any further negotiations as the DEFENDANT apparently didn't understand or didn't care that what it did was a violation of the ADA. **Two counts of segregation and exclusion.**

**40** PLAINTIFF suspects she was retaliated against for pointing out an employment agreement she was told she must sign was unlawful. She told this to the HR manager and to the hiring manager. The company hasn't hired the PLAINTIFF since this time -- either through freelance/contract work or employment. This discriminatory exclusion is ongoing. **Two counts of retaliation/whistleblower.**

**41** PLAINTIFF was retaliated against for protecting her small business' interests when the DEFENDANT's regional executive editor turned down the PLAINTIFF's verbal offer to do the job offered through her business, instead of as a full-time employee. To box out a small business and also not hire the person after having made a determination she should be presented with a job offer is a triple-whammy of discrimination. Three counts at $100,000 each.

**42** PLAINTIFF was injured and excluded when, upon calling hiring manager after a job offer was rescinded and offering to work through her business, he not only said "No," he also said, "this is about negotiations." Was the DEFENDANT trying to take over the PLAINTIFF's business? Was it trying to get itself out of possible IP infringement by acquiring her company? Was the hiring manager aware the PLAINTIFF's offer for a nonexempt hourly position didn't necessarily mean she would be prevented from working through her business on her off hours? Why wasn't she allowed to work in an hourly position? Likely because it was more important for the DEFENDANT to acquire her IP and continuing spying on her to gather more IP– yet the DEFENDANT preferred not to state this explicitly, as it's illegal and discriminatory. The DEFENDANT's decision not to follow up led to considerable financial hardship for the PLAINTIFF and should be a separate count of discrimination, which is ongoing. **Two counts for lack of access and segregation/treated differently.**

**43** PLAINTIFF's **real estate rental** business also was impaired by the DEFENDANT's decision to rescind the job offer she received verbally on Dec. 13 as she likely would have relocated to be closer to the territory if the DEFENDANT had lived up to its verbal offer and not attempted to steal her business without discussing it. Treble damages. **Three counts $100,000 each.**

**44** The 2023 exclusions put back in PLAINTIFF's face the horrendous discrimination and exclusion she faced in 2019 and 2020 when her health suffered and she was told to pack up her belongings, put them in storage and go home, due to the newsroom environment. Who else did she say this to? This is a count of segregation/exclusion/failure to provide a reasonable accommodation.

**45** **2021 and 2022**

**46** At some point in 2021 or 2022, for retaliatory reasons the PLAINTIFF doesn't understand, Gannett took down photos and videos the PLAINTIFF produced for the public's information and benefit, depriving the public of this content. After news is published, it continues to have historical value. Libraries keep news archives from local and national publications because they remain of scholarly interest to historians and researchers in a variety of academic disciplines, such as social studies, business and law. It's rare for a legitimate news organization to take down previously published content and replace elements, such as photos and videos, because it violates the public trust. During this period, PLAINTIFF continued to apply for other positions with the company. Sabotaging her work would be a way to reduce her chances from being rehired, as this company doesn't hire for experience possible because it doesn't want to pay people what they're worth. This is another example of how the DEFENDANT went to great lengths to exclude and retaliate against the PLAINTIFF. **Multiple counts of retaliation/harassment/sabotage.**

**47** In a disheartening discovery, Many of the PLAINTIFF's videos on YouTube also were tampered with in apparent sabotage. Repairing them at this late date would require substantial time and effort. Multiple counts of **retaliation/harassment/sabotage.**

**48** 2020: While recovering from a respiratory illness and a fractured/bruised sternum, PLAINTIFF felt blocked from two different businesses – one being the real estate rental business she said was a condition of her employment and the other the journalism business she had worked through since 1988. While recovering and on unpaid leave, the PLAINTIFF updated her own website, SmallBizChicago.com, with new articles and photos, only to have it hacked with typos inserted into the posts. The hacking continued to the point where she had to take it down because it was damaging her reputation while she pursued other opportunities. The PLAINTIFF doesn't know who hacked the site, but it's clear her photos and videos were taken down in an act of retaliation, providing fewer work samples for her to show as she looked for work and destroying the public trust. **Multiple counts of retaliation and ongoing blocking and exclusion/treble damages.**

**49** 2020: Both businesses were damaged by the obstacles the plaintiff faced. The rental property needed several large repairs, but PLAINTIFF couldn't afford to make them during Covid, due to supply and labor shortages in 2020. Five years later, the PLAINTIFF still hasn't been able to afford tuckpointing, a new roof, counter replacement, flooring, some new windows and landscaping. As a result her property is somewhat diminished from where it was in 2018 when she left Evanston for Savannah. She lost a lot of kitchen and household items and some furniture was permanently damaged. She is estimating the work needed on her townhouse to in excess of $70,000.

**50** PLAINTIFF intended to purchase a rental property to generate income lost from living in her townhouse, but hasn't been able to do so because she can't afford properties near her and won't qualify for a loan in other locations. This is permanent damage to a profitable business. If she had been allowed to keep her position, the PLAINTIFF could have purchased another rental property or moved from her townhouse and rented it out for supplemental income to pay off debt and return funds taken out early from retirement accounts, due to the hardship she faced. Ongoing count of blocking from business pursuit due to economic hardship.

**51** March 31, 2020: When PLAINTIFF's job was terminated on March 31, she faced one count of Wrongful Termination and one of failure to provide reasonable accommodations.

**52** This action also include **eight counts** of discriminatory exclusion in violation of the ADA, including:

- exclusion from pension benefits;
- exclusion from life insurance benefit;
- exclusion from paid employer health care benefits;
- exclusion from paid holidays;
- exclusion from vacation days;
- exclusion from comp time, personal days and other paid time off;
- exclusion from employer's disability insurance and workman's comp.
- exclusion from employer-portion of payroll taxes and FICA.

4

**53** In this case, PLAINTIFF also was excluded from working for DEFENDANT through her business; as the HR Director wanted her to be a disabled veteran so she wouldn't have to pay property taxes. The HR director didn't involve PLAINTIFF in discussing this; the PLAINTIFF wasn't interested in becoming disabled and she wasn't a veteran. **Count of segregation.**

**54** 2020: The PLAINTIFF was excluded from disability insurance benefits. The HR Director instructed the PLAINTIFF to use the employee benefit of disability insurance and not to mention newsroom chemicals on her application; just to use the car accident. The insurance company

**denies the claim**, saying it is a workman's compensation case. However, the PLAINTIFF was denied workman's compensation as the in-taker didn't understand how PLAINTIFF's chronic respiratory health condition was involved. **One count** of discriminatory lack of access.

**55** March 31, 2020: PLAINTIFF received termination letter, as FMLA leave has expired. This count is related to **failure to provide a reasonable accommodation and discriminatory exclusion.**

**56** March 19, 2020: HR director told the PLAINTIFF she must work from the newsroom at least part of the time and asked PLAINTIFF for how long she will be able to be in the newsroom. PLAINTIFF said she didn't know because she didn't know if the conditions have improved; she repeats that she is cleared for remote work. The HR director said it won't work out if PLAINTIFF can't say how many minutes per day she will be in the newsroom. This is a blatant failure to provide reasonable accommodations and discriminatory exclusion.

**57** **March 19, 2020:** PLAINTIFF's recollection is HR Director tells PLAINTIFF to re-apply for Disability Insurance through the Standard Insurance Company, which she does. She faxes form with her doctor's signature on March 19, 2020. This claim is denied, in another **exclusion.**

**58** **Count:** March 16, 2020: After seeing cardiologist on March 9, PLAINTIFF had a cardio stress test on March 16, and was told she was cleared to return to full-time work remote from the newsroom, as this is during the COVID-19 shutdown and Illinois as a stay-at-home order in place. PLAINTIFF calls HR director and tells her she has been OKed to return to work. HR director requests to see this in writing, despite her primary care already giving her OK.

**59** Feb. 24, 2020: PLAINTIFF's primary care physician in Wilmette provides a signed Fitness for Duty Certification form stating: "patient is still being treated for a allergic rhinitis/nasal polyps/sinus infection/asthma that was exacerbated by previous working environment. Recommendation at this time would be for patient to work remotely while her specialists care" for her. The HR director rejects this and asks when her next doctor's appointment is. This is another example of discriminatory over-reach and abuse of position authority on the part of the HR director, in the PLAINTIFF's opinion, as the PLAINTifF could have worked remotely. PLAINTIFF is on an unpaid leave and not eligible for unemployment, incurring a financial hardship with no income coming in. She is being excluded from a paycheck, a violation of the ADA and the 13th Amendment prohibition of slavery, as she is still negotiating with the DEFENDANAT. Every day that goes by is another count of ADA discrimination per lack of compensation and exclusion from working.

**60** Feb. 19, 2020: The PLAINTIFF has appointment with Ear/Nose/Throat doctor, who sees polyps in nasal passage and sinuses. He recommends she see a cardiologist as her condition could

contribute to a cardiac issue. He said she may work remotely. PLAINTIFF continues to be **excluded** from returning to work and from being paid. The PLAINTIFF was denied compensation when DEFENDANT employer denied her request to work at least some hours per week during her recovery from a health issue that started in the newsroom with an exposure to chemicals she couldn't tolerate. Every day from this date on should be a count of exclusion: 250 work days x 5 years = 1,250 plus 5 months = 1,375 counts

**61** Early February 2020: Covid-19 is declared. PLAINTIFF regains possession of her townhouse on Feb. 1, and starts what will be months of cleaning. She does not move her furniture from Savannah until the beginning of June, as she continues to negotiate a return. **Continued segregation and exclusion** resulting in financial hardship from cost of storage, which editor instructed.

**62** January 2020: Hardship and economic disadvantage to PLAINTIFF continues as PLAINTIFF, injured and without income, stays with friends and relatives for several weeks, then rents a room by the week in Oak Park as she learns it's going to be several more weeks before her late tenant's relatives can clean out the tenant's belongings and repair damages to townhouse.

**63** January 2020: PLAINTIFF was hit two other times in January, including once as a pedestrian crossing in a crosswalk in Oak Park and another when she was driving a rental minivan on a thoroughfare and a car on a side street disregarded a stop sign and proceeded into the intersection before her car had cleared it, hitting a back corner of the vehicle's fender. The PLAINTIFF believes these "accidents" were related to the comment the HR Director made about her becoming a disabled veteran in six months. They also are evidence of **invasion of privacy**; how would the perpetrators know her precise whereabouts if privacy hadn't been invaded? **These are three counts of invasion of privacy.**

**64** Early 2020: The PLAINTIFF was excluded from working for Gannett at a time when all employees were told they should be working remotely and not in the newsrooms. This is a violation of the ADA and the Amended Act. The PLAINTIFF recalls Chief Executive Officer Michael Reed and another key executive of Gannett stating during a virtual staff meeting in early 2020, "No one should be working in the newsroom," due to COVID-19. The PLAINTIFF was allowed to participate in this virtual meeting, but wasn't invited to other virtual meetings or to work remotely. When the PLAINTIFF's work email address was shut down, she was excluded from other staff meetings and from returning emails from colleagues and sources. Several counts of discrimination and exclusions.

**65** January 2020: PLAINTIFF also applied for a night editor role posted online as she could have performed this remotely, but this was denied. **One count.**

**66** Dec. 26, 2019: The PLAINTIFF is seriously injured and her minivan is totaled when it was rolled in a high-impact crash in Evanston, Illinois that she believes was an extreme form of **harassment** and a **retaliatory** act. Every airbag except the front driver's side deployed, as the vehicle was hit on the side, flipped and rolled. She suffered a fractured or badly bruised sternum. Fortunately, the PLAINTIFF had her seatbelt fastened. Her primary care physician at the time said she may have suffered from a concussion when the car flipped over and her head touched the ceiling. This wasn't an ordinary accident; the car was hit at a high speed from a vehicle that blew a red light and made no attempt to slow down while crossing an intersection where PLAINTIFF had the green light and was proceeding within the speed limit. It was perfectly timed.

**67** December 2019: PLAINTIFF asked to work remotely and continue writing for the paper or editing. This request for a reasonable accommodation was denied. The PLAINTIFF received her regular paid hours in December to move to her home in Illinois and interview for other positions at the company. She was told to apply for positions at other newsrooms and she would be recommended. However, the PLAINTIFF feels she was **wrongfully excluded** from working as the education reporter, the role she was hired for and had performed admirably for about 17 months. Ongoing counts of discriminatory exclusion.

**68** December 2019: After 10 days in Illinois, PLAINTIFF's health improved and she returned to Savannah **on Dec. 13**, but immediately felt a tightness in her chest in the newsroom. Editor tells her to pack up her belongings and put them in a storage pod. Several other employees also weren't feeling well, many were working remotely. This feels like discrimination and possible retaliation, but she did as she was told to do. **Retaliation and harassment counts.**

**69** Subsequent to being told to apply for a transfer, DEFENDANT told the PLAINTIFF not to speak with Executive Editor Susan Catron and only to work with HR Director Frankie Fort. This reduced the likelihood the PLAINTIFF would return to her position or be invited to write for the publication. This resulted in further **exclusions** and **economic disadvantage**. **Several counts of discrimination.**

**70** Upon contacting the human resources department about an FMLA leave, the DEFENDANT is told to apply for jobs in other newsrooms and was given the names of a couple of HR managers. This is right when the merger was completed, and people were uncertain what was coming down the pike.

**71** November/December 2019: PLAINTIFF returns to Evanston and learns her tenant has died and it will be several months before her tenant's relatives can clean out her stuff.

**72** The HR Director tells her to go to the urgent care facility. The editor tells her to pack up her Richmond Hill apartment and put her belonging in a pod for storage and return home to Chicago. She opted to rent a storage locker in Savannah instead of a pod. She assumed she would continue to work for the company. She didn't know Covid-19 would soon be declared. Her doctors in Illinois, whom she had visited in November, didn't want her returning to the newsroom, and neither did the editor, as it was contaminated with a chemical she was allergic to or couldn't tolerate given her respiratory and nasal/sinus conditions. **Multiple counts of exclusion.**

**73** November 2019: Chemicals in the newsroom also are a violation of (a) the Environmental Protection Agency's General Duty Clean Air Act Section 112(r)(1), which "makes the owners/operators of facilities with regulated hazardous substances responsible for managing chemicals safely." https://www.epa.gov/rmp/general-duty-clause-fact-sheet# OSHA's General Duty Clause. Public Law 91-596 84 STAT. 1590 of 1970, amended in 2004, SEC 5, Duties (a), states: Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this Act. https://www.osha.gov/laws-regs/oshact/completeoshact. The PLAINTIFF isn't certain over what period of time this exposure occurred, because of her disabilities, including lack of sense of smell. Whatever contaminants worked their way into the PLAINTIFF's physical body remained there, and her allergist told her in February2020, "You were poisoned.

**74** Nov. 25, 2019: PLAINTIFF and others in the newsroom are told to clear out because a chemical the HR director referred to as "meth" was being sprayed in it. **Count of harassment**

**75** PLAINTIFF suspects the use of chemicals was aimed at getting older workers out of the newsroom following news of the merger in the summer of 2019. **ADEA count.**

**76** During a virtual meeting in November 2019, the CEO announces the company plans to launch a small business hub. Given the amount of time PLAINTIFF spent in this specialized area of journalism and the fact she wasn't invited to participate, this feels like segregation and exclusion. **Two counts.**

**77** Fall 2019: PLAINTIFF She is accused of being a "nigger lover" by a white male candidate. **Count of discrimination.**

**78** On Nov. 12, editor attempted to exclude PLAINTIFF from covering an important aspect of this breaking-news story by telling her not to go to Pembroke to get the election results, despite the fact the officials in Richmond Hill weren't releasing the results. **Count of discrimination.**

**79** Fall 2019: Editor said "Go Home" or "Go Home, Ann" in the newsroom on a regular, if not daily, basis in the fall of 2019, from September to November 23. This occurred at all hours, including as early as 10 a.m. and also later in the day. She did not say it directly to the PLAINTIFF but rather while walking through the newsroom as if to no one in particular or from her office, a few feet from where the PLAINTIFF sat. Despite this, the editor gave the PLAINTIFF a strong performance review and had no complaints about the PLAINTIFF's work or her productivity. **Multiple counts of harassment.**

**80** Oct. 23, 2019: While covering a school district event at a convention center in Savannah, the PLAINTIFF notices a similar white mist in the atmosphere at the conference. She hadn't been feeling well and decided to leave the event and do some other reporting. She felt better in the fresh air. **Count of harassment/OSHA violation.**

**81** October 2019: A strange chemical mist/spray is being used in the newsroom in several locations, including the editor's office, which the PLAINTIFF sat outside of and another work station not far from hers. PLAINTIFF didn't know what it was. After several days, she noticed more of the other reporters weren't coming in to the office. She also had a large number of out-of-office stories to cover. Then HR director started telling people to clear out of the newsroom. Another reporter is bringing a portable air purifier to the newsroom and carrying it around with her, complaining the air didn't seem to be good. PLAINTIFF also wasn't feeling well. The DEFENDANT employers shouldn't have allowed this chemical use to occur. HR director and editor were aware of it, as were others. To subject someone with a respiratory disability to this and then to forbid them from working remotely when other people are is discrimination. **Multiple counts of harassment.**.

**82** Fall 2019: HR Director walked through the newsroom and behind PLAINTIFF's desk saying "Editor," "Editor," without inviting any real discussion. She also mentioned the current editor was supposed to be finding her replacement. No one said anything. Perhaps no one knew what to do with these random remarks; no email went out or any real announcement**. Count of segregation**

**83** Summer/Fall 2019: Strange comments continue to be made in the newsroom, with some that seem to be related to personal information about PLAINTIFF. Editor would call out "Britney," and "Britney, Avery." There was a woman named Britney on staff, but not an Avery. The PLAINTIFF happens to know people with these names. The Editor also said out of the blue and repeatedly, "Drop it," a familiar phrase to the PLAINTIFF. She asked, "Who said, 'We're poor?'" This is comment made in the PLAINTIFF's dining room over a decade earlier. While other people may have said the same thing, when all of the random comments are put together,

and considering the Background Investigation document the PLAINTIFF was required to sign, it began to feel like harassment and stalking. She also was asked in the newsroom about her religion, whether she was a Boy Scout and other personal information. This is discriminatory harassment and possible privacy invasion. The PLAINTIFF doesn't know how many "counts" of this occurred; it depends on how you define a count. **Multiple counts of harassment.**

**84** At one point, the HR director approached the PLAINTIFF as she was writing a story on deadline and asked for her auto insurance card. After making a photocopy of it, the HR director brought it back to her and said, "In six months, you'll be a disabled veteran." The PLAINTIFF didn't give much thought to this remark, as strange comments were made in the newsroom on a regular basis. However, after the car accident in December 2019, she recalled it. In hindsight, this was discrimination as there were no grounds for this comment or any action related to it. This was not a dialogue, as the HR director who reportedly was a military veteran had a command-and-control approach. The PLAINTIFF was excluded from any kind of discussion or negotiation related to this. The PLAINTIFF is not a military veteran, nor did she say she was. **Count of defamation and exclusion.**

**85** Summer 2019: PLAINTIFF is excluded from promotion to Senior Education Reporter role. Position wasn't filled.. **Count of equal pay discrimination.**

**86** Summer 2019: PLAINTIFF is excluded from at least two opportunities at Gannett in Wisconsin, which PLAINTIFF was highly qualified for. **Two counts of discrimination/unfair treatment.**

**87** April 2018: The PLAINTIFF was coerced to sign a Background Investigation document she had serious concerns about, particularly regarding how it gave third-parties permission to interview sources, neighbors, friends, family, acquaintances and anyone the PLAINTIFF came in contact with. This coercion was discriminatory, as she had the experience and knowledge to foresee the risk of invasion of privacy. The ADA prohibits coercion. This issue also may have led the DEFENDANT to retaliate against the PLAINTIFF, as it put interest in invasions above its mission of covering the news accurately and objectively. **Count of coercion and multiple counts of invasion of privacy.**

**88** Shortly after she was hired in 2018, it became obvious the PLAINTIFF wasn't being invited to participate staff meetings and many other discussions that occurred without her, as they were held when she was covering school board meetings or behind closed doors. Excluded from at least four staffing meetings. **Multiple counts of exclusions**.

**89** 2018: Excluded from doing a health care story on sexual assault by doctors; this story won a Pulitzer Prize for the Los Angeles Times in 2019. The PLAINTIFF received a tip from a caller

in 2018 and discussed it with the editor, who turned down the story idea, saying the hospital wouldn't cooperate with its requests for documents

## Discriminatory exclusions from other opportunities

**1** This section is in chronological order and is not a complete list of the PLAINTIFF's applications to Gannett and Gatehouse Media. These are the ones for which she has correspondence for. The following represent a small number of the many Gatehouse/Gannett posted job openings the PLAINTIFF applied for, starting in 2019 when her respiratory condition became an issue in the Southern tropical climate conducive to molds and other allergens.

**2** The PLAINTIFF also applied for countless positions at other DEFENDANT newsrooms. She served in several temporary capacities in 2020, 2021-2002 and 2023. She restarted a website in April 2020 that she had launched years earlier but put on hold in 2018 and 2019, but the site was hacked over and over in 2020, and it was expensive to repair it. She restarted her business again after recovering from a prolonged respiratory illness that began in the fall of 2023. She currently is working through the business (Ann Meyer Communication/L3C Chicago L3C LLC), serving as a reporter for a newspaper in northeast Wisconsin in a remote capacity.

**3** While Gannett has refused to hire the PLAINTIFF in any capacity in Wisconsin, where the company has owned several major newspapers, including the Milwaukee, Green Bay and Appleton newspapers, the PLAINTIFF has served as a reporter for two other Wisconsin newspaper companies since 2021, producing over 600 news stories.

**4** Job applications from 2019 to 2023 in chronological order:

**5** PLAINTIFF applied for dozens, likely over 100 jobs at Gatehouse and Gannett in 2019, 2020 and 2021. She was working through her business in 2016 when she reached out to a company director of Gannett with an interest in partnering through her company, as this is the way she has worked for decades through her media services company. As a result, the DEFENDANT was aware of the PLAINTIFF's small business, yet has refused to work with her, which she regards as an anti-trust issue.

**6** May 18, 2019: Jim Nelson at Milwaukee Journal Sentinel tells PLAINTIFF to contact Mr. Zizzo, who refers her to Jim Fitzhenry.

**7** June 2, 2019: Fitzhenry invites PLAINTIFF to a phone interview June 6, 2019. It seemed to go well.

**8** June 5, 2019: Corporate recruiter Nick Capaz sends PLAINTIFF "screening questions" as a preliminary step to interviewing for a position. He sends her an invite to interview for two possible positions, a News Content Coach role in Appleton, WI, and a Living & Storytelling Editor role with several newspaper groups in Wisconsin.

**9** June 10, 2019: PLAINTIFF interviews with Mark Treinen, who is still an editor in Wisconsin. Others on the call include Jim, Mark, Larry and Robert.

**10** July 20, 2019: PLAINTIFF applies for Senior Education Reporter role in Savannah, which would bring her wages up to a more competitive level, as she was underpaid when she was hired.

**11** Aug. 1, 2019: PLAINTIFF contacts Mark Trienen to follow up on positions she interviewed for in Wisconsin. He replies Jim Fitzhenry filled one of the positions with an internal candidate but said, "I'm going to forward your email to Jim for consideration of any other openings or future openings."

**12** Aug. 2019: Fitzhenry tells PLAINTIFF to contact Peter Bhatia, editor of Detroit Free Press and Great Lakes regional editor for USA Today Network. On Aug. 11, 2019, PLAINTIFF contacts Bhatia by email and asks if anyone will be at SPJ. He tells her to seek out Gannett's recruiters there.

**13** Sept. 2019, Society of Professional Journalists annual conference is held in San Antonio, Texas. PLAINTIFF attends and talks to recruiters in person, and some people from Gannett.

**14** PLAINTIFF meets with Mizell Stewart III, Gannett's Vice President of News Performance, Talent and Partnerships, and he tells her Gannett doesn't hire for experience. This is a count of blatant age discrimination and also exclusion, a violation of the ADA.

**15** Dec. 6, 2019: Meets with George Stanley, editor of the Milwaukee Journal Sentinel, in Milwaukee and tells him she had an issue where due to a local leader's tight grip, the editor felt it would be better if she transferred to another newsroom. Stanley said he has heard they are going to be moving out of the historic building and the company plans to sell the real estate. He said he isn't hiring but will keep her resume on file.  PLAINTIFF is on an FMLA leave but feels well enough to drive to Milwaukee, as she needs to work. Why the DEFENDANT didn't allow her to cover Chicago for the national company isn't clear.

**16** Dec. 9, 2019: PLAINTIFF sends email to State Journal-Register editor Jon Styf in Springfield, Illinois and is told Mr. Styl is no longer at the newspaper but is invited to visit for an interview with the new editor. Dec. 9 or 10: Meets with Letia (sp?) Richardson, editor of the Springfield,

Illinois paper. Newsroom is largely empty, and Richardson also said she didn't have a current opening but would keep PLAINTIFF's resume on file.

**17** Dec. 13: While on the FMLA leave, PLAINTIFF is feeling well enough to return to Savannah. She drives from Springfield and arrives on Dec. 13. She returns to the newsroom on Monday, Dec. 16 and almost immediately feels ill. Instead of discussing a reasonable accommodation, the HR Director tells her to go to urgent care and then apply for disability and Editor tells her to pack up her belongings and put them in a pod for storage and go home.

**18** Jan-Feb, 2020: PLAINTIFF is recovering from car accident and is between homes as her townhouse is occupied. PLAINTIFF doesn't have access to any applications submitted in 2020 as she did them at public libraries.

**19** March 10, 2020: PLAINTIFF applies for a Reporter III role in Springfield and is not hired.

**20** April 2020: PLAINTIFF continues to apply for positions at Gatehouse/Gannett. Due to the merger, there are technical issues with the platforms. PLAINTIFF was blocked from the career site on numerous occasions. With no one answering the phone lines at headquarters, she contacted investor relations and was provided access to the Career site.

**21** PLAINTIFF doesn't have a completed list of the roles she applied for; DEFENDANT may have this information. PLAINTIFF was continuing to negotiate for her right to work remotely until March 31, 2020 when she received a termination letter. Her belongings remained in a Savannah storage locker until the end of May.

**22** July 15, 2020: PLAINTIFF applied for Business Reporter position at IndyStar in Indianapolis, a position she is highly qualified for as she has covered business for over 20 years.

**23** July 23, 2020: PLAINTIFF applied for Milwaukee suburbs reporter role at Milwaukee Journal Sentinel.

**24** July 2020: Plantiff makes contact with Lee Horwich at USA Today about covering the Chicago area. She was referred from a reporter in Chicago.

**25** Late July 2020; PLAINTIFF starts working for Census2020, which was delayed from May due to Covid. After several weeks in Chicago suburbs, she is transferred to Iowa for full-time work. She exceeds expectations and is

**26** Aug. 2, 2020: PLAINTIFF applies for open courts reporter position at Des Moines Register. Correspondence with editor Carol Hunter is ongoing for the months of August and September and into October, when PLAINTIFF is working for the Census Bureau in Des Moines.

**27** Aug. 2, 2020: PLAINTIFF applies for job at Nashville paper.

**28** Aug. 23, 2020: While working for the Census Bureau in Des Moines, Iowa, PLAINTIFF contacts Carol Hunter, editor of the Des Moines Register and says she is in town and would like

to meet with her. Hunter replies and says she is on vacation. On Sept. 14, Hunter offers to set up a Zoom interview. This doesn't occur. Sept. 14, PLAINTIFF's email bounces back with automatic reply Hunter is out of the office until Aug. 31.

**29** Nov. 17, 2020: PLAINTIFF applies for a Culture, Diversity and Inclusion Trends reporter role at the State Journal-Register in Springfield.

**30** Jan. 4, 2021: PLAINTIFF applies for Visual Journalist position at Milwaukee Journal Sentinel.

**31** Jan. 7, 2021: PLAINTIFF applies for Statewide Georgia Reporter role at August Chronicle.

**32** Jan. 7, 2021: PLAINTIFF applies for Government and Business Watchdog Reporter role at State Journal Register in Springfield.

**33** Sept. 22, 2022: PLAINTIFF applies for virtual Part-Time Digital Editor III.

**34** Nov. 10, 2022: PLAINTIFF applies for Digital Editor III, Wisconsin Statewide Health, Science & Environmental Editor in Milwaukee.

**35** Dec. 13, 2023: Applies for Investigative Reporter role in Cincinnati.

**36** Feb. 5, 2022: Applies for National News Editor, a virtual role at USA Today.

**37** Jan. 12, 2023: Applies for Executive Editor role at Milwaukee Journal Sentinel.

**38** 2023 (no date): Applies for Commentary Editor virtual at USA Today.

**39** Jan. 10, 2024: Applies for Trending Business/Breaking News Reporter role at Milwaukee Journal Sentinel.

**40** Feb. 5, 2024: Applies for National News Editor virtual at USA Today.

**41** Feb. 20, 2024: Applies for Executive Producer role at USA Today.

**42** March 22, 2024: Applies for Money Reporter/National News Reporter III role at USA Today. Pay is listed at $72,000 to $161,000 per year.

**43** May 29, 2024: Applies for National News Editor virtual role. Was this role ever filled?

**44** June 26, 2024: Reaches out to Jim Fitzhenry in Wisconsin/Oshkosh about unnamed role.

## Privacy violations are a form of discrimination; these are ongoing

**45** **Occurrences: 2,649 days and counting.**

**46** Most privacy violations are a form of exclusion, as the PLAINTIFF is a victim and isn't being included in the discussions aside from the invasions, which fail to provide attribution, a tenet of professional journalism.

**47** Trying to come up with an exact number of privacy-invasion/discrimination counts is a tall order and it might reach into the thousands, as the PLAINTIFF doubts many days have gone by without an example of invasion of privacy showing up in a Gannett newspaper somewhere. The

mere act of counting these invasions is injurious to the Plaintiff, as it is despicable for any major public company to pick on any single person, let alone a business owner, in this way. The Plaintiff can't begin to describe how draining the process of going through newspapers and jotting down examples is. She has suffered extreme fatigue in recent weeks because of this.

**48** Regarding the best way to settle this case, there are multiple ways to skin the cat or get to the damages the Plaintiff/business owner/shareholder/customer believes she is owed. Trying to come up with an exact number of counts is a tall order and might reach into the thousands, as the Plaintiff doubts many days have gone by without an example of invasion of privacy showing up in a Gannett newspaper somewhere. The mere act of counting these invasions is injurious to the Plaintiff, as it is despicable for any major public company to pick on a sole proprietor in this way. The Plaintiff can't begin to describe how draining the process of going through newspapers and jotting down examples is. Professor Nita Farahany explains this below.

**49** "The Battle for Your Brain," a 2023 book by Nita Farahany, a professor of law and philosophy at Duke University, published by St. Martin's Press, described the risks neurotechnology poses to privacy: "When it comes to privacy protections in general, trying to restrict the flow of information is both impossible and potentially limits the insights we can gain to address **the leading causes of disability and human suffering**. Instead, we should focus on securing rights and remedies against the *misuse* of information. If people have the right to decide how their brain data is shared, and more importantly, have legal redress if it is misused (say, to discriminate against them in an employment setting or in health care or education) that will go a long way toward building trust. Neurotechnology has unprecedented power to either empower or oppress us." Farahany is the director of the Duke Institute for Science and Society.

**50** This kind of privacy invasion unfortunately is occurring at other employers as well, Farahany writes, such as financial services firms and transportation companies. Many people are concerned about it. PLAINTIFF doesn't know if this is the same technology the DEFENDANT company is using, but somehow it is gaining access to her words, writings and even her thoughts.

**51** The Plaintiff acknowledges some of the invasions seemed inexplicable, as how could this company know what she was thinking before she had the chance to write down her thoughts? She passed many of them off as coincidences until she read Farahany's book, which describes the science of neurotechnology being used for what the PLAINTIFF considers privacy invasions many employers are frightfully using today.

**52** The book describes the neurotechnology used in the workplace as a form of employee surveillance, where employers tap employees' brain waves and emotions to gain insights and

guard against potential problems, such as insider trading. Surveillance is "legally required in the financial industry to prevent insider trading. But it can also be used to control employees, to discriminate against them, and to chill workers' ability to unionize." P. 59.

**53** "Governments must enact laws and regulations that explicitly spell out employees' rights. This should begin with the following three-part test in international human rights law for determining whether a relative right like mental privacy can be limited: (1) legality, (2) necessity, and (3) proportionality. In other words, the human right to mental privacy would prohibit unauthorized access to employees' neural data without an explicit law justifying doing so, based on a compelling societal interest in so doing, in a manner that is narrowly tailored to balance the interests of the employee with those of society. "P. 59

**54** **Biometric privacy laws**

**55** Illinois has a particularly strict biometric privacy law, where for each instance, employers can incur a fine. (White Castle case is discussed in Part I.) The Plaintiff/employee/business owner isn't aware of case law pertaining specifically to exploitative brain wave tapping, but it would be covered by Illinois' privacy laws, which also prohibit eavesdropping.

**56** As Farahany writes, "Only when there is a bona fide need – a necessity – for employers to access employee brain data –such as to monitor fatigue in a commercial driver, or attention in an air traffic controller – should employers ask to do so. Even then, they should be limited to collecting data for the specific purpose it serves, and employers should be prohibited from mining brain data for other insights about the employee to ensure that the impact on employee privacy is proportional to the societal benefit it affords.'

**57** The Plaintiff can think of no "need" that would explain or justify the Defendant/employer's egregious behavior if this is what it was doing. Georgia has a fair amount of technology innovation, so it wouldn't surprise the PLAINTIFF if some form of remote biometric technology was involved.. The Plaintiff is no longer an employee and should not be subjected to the continued invasions of privacy. She doesn't understand exactly how this is occurring, but the invasions of privacy have appeared in Gannett' news products.

**58** Farahany states "neurotechnology should be a tool of empowerment, not a means of control; any law authorizing the use of neurotechnology in the workplace should require employers to provide clear notice in their employee handbook and company polices about how they intend to use the neural data collected, as well as any insights they glean from it." p. 60.

**59** After the Plaintiff made it clear she wasn't willing to sign another agreement allowing the company or a subcontractor to invade her privacy, she suspects the Defendant became concerned

about the invasions and wanted her out of the company, because the editor started to repeatedly tell her to "Go home."

**60** PLAINTIFF hasn't been paid by DEFENDANT since Dec. 31, 2019, yet **the invasion of privacy continues.** Since signing the form and returning it in mid-April, 2018, this includes 365 days x 7 years and about three months or 94 days to July 15 = 2,555 + 94 days = **2,649 days and counting.**

**61** These ongoing invasions have had a chilling effect on PLAINTIFF's normal conversation and relationships with people, as she doesn't want their personal information picked up and published in the news. This also affects DEFENDANT's story selection and leads to questionable news judgment.

**62** Instead of feeling included, the use of surveillance and other surreptitious means of obtaining personal information about her has the effect of leaving the Plaintiff out of the discussion, as she doesn't want to be recorded without permission. This is the standard she is accustomed to as an Illinois resident. Besides the violation of her human rights, this is a form of exclusion, a violation of the ADA. The PLAINTIFF wonders if Illinois' strong privacy laws provide one explanation for the DEFENDANT's almost nonexistent coverage of Chicago. See attached Exhibit showing lack of Chicago stories in USA Today.

**63** The invasion of privacy is a discriminatory act, as it takes away the PLAINTIFF's civil right to lead a normal life. No one wants to be stalked. Cyber stalking is a growing issue; it also poses a risk to the DEFENDANT's digital-first strategy. While the following examples show how PLAINTIFF's personal life ends up in the headlines and story selection of USA Today, the PLAINTIFF also has observed other Gannett newspapers following her daily life and using aspects of it in headlines and stories, including those in Wisconsin. The newspaper the PLAINTIFF worked for in Savannah was careful to avoid doing this.

## Examples of recent coincidences follow:

**64** PLAINTIFF had a doctor's visit Thursday, July 10, when the doctor asked who in her family had a history of diabetes. When PLAINTIFF went online later, she saw this headline on USA Today: "See the first Barbie with Type 1 diabetes." A coincidence?

**65** PLAINTIFF was working on a story about a "dri-tri," a triathlon without swimming, and several stories had headlines about dry, try, or fry, such as one on national French fry day.

**66** On July 11, PLAINTIFF commented that her shorts being dirty and asked, How did I get that spot? USA Today has a story with the following headline: "Yes, retired Ndamukong Suh was dirty. He's also a Hall of Famer." A coincidence?

**67** On Tuesday, July 8, a physical therapist told the PLAINTIFF to use a neck pillow. On July 10, USA Today posted a story with about Amazon Prime Day and a sale on travel pillows. A coincidence?

**68** On July 10 or 11, PLAINTIFF opened an electric-company bill and commented on how high it was, as the weather had been warm. I also had told the physical therapist and a few other people, I had bought a fan to try to keep my AC bills down. USA Today published a story with the following headline: Should you turn off your AC when you're not at home. A coincidence?

**69** In June, at dinner with a friend, we talked about an older car she wasn't driving much because it needed some work. Soon after, USA Today published a four-page pull-out section on whether to repair an older car or buy a new/used car. A coincidence?

**70** June 1, 2025: PLAINTIFF attends a Celebration of Life event June 1 at Brookfield Zoo. Event room is located behind the carousel, or merry go round. On June 3, 2025: USA Today publishes a front- page photo of a large carousel similar to the one at the zoo.

**71** Other stories/headlines the same day have references to death or to other recollections from the event:

a. Volunteers scan desert for remains of migrants
b. At US-Mexico border, it's an open graveyard
c. Living room vs bedroom Where kids hang out can speak to family dynamics

**72** June 2 stories in USA Today also are related to caregiving; PLAINTIFF's friend was a caregiver to her mother for years:

a. Costs, stresses of caregiving explored in USA Today series By Madeline Mitchell

**73** At the event, PLAINTIFF tells another friend she is looking for work but it's not easy as most employers favor younger workers. These stories are published in USA Today June 2:

a. AI, tariffs shake up job market for grads
b. Recent college graduates unemployment rate is now above the national rate
c. The woman who died was devoutly Catholic and at times she seemed to favor her son.

**74** These stories also were published in early June, 2025:

a. "Mother tours USA to inspire with account of saintly son" By Eduardo Cuevas Every mother thinks her son is a saint, but Antonia Salzano's is about to become a real one.

**75** PLAINTIFF also has observed USA Today headlines are being picked up by AI. For example, this is a USA Today headline: "Severity of pneumonia depends on the cause and source of illness." The following text is from an AI overview from Microsoft edge/bing search: "Yes, the severity of pneumonia can depend on the cause and source of the illness. Different pathogens like bacteria, viruses, or fungi can cause pneumonia." https://www.google.com/search?q=USA+Today+%2B+Severity+of+pneumonia+depends+on+the+cause+and+source+of+illness&sca_esv=a89d269aec3ce157&ei=Y74_aJP-DuuwkvQPsJzRuQo&ved=0ahUKEwjTu9e26taNAxVrmIQIHTBONKcQ4dUDCBA&uact=5&oq=

**76** More "coincidences" continue in May, such as this one:

a. May 17, 2025: PLAINTIFF receives a text about a relative's background working in coal mines. Within days, news about coal and coal mines starts showing up in USA Today, such as this story from May 23, that references someone with asthma, which the PLAINTIFF also suffers from. "Before leaving her East Texas home, Paulette Goree checks her air monitor. If the hue is green on the connected phone app, she steps outside to tend to her backyard garden where she grows tomatoes, squash and peppers. If it is red, she stays inside. Over the years, she has watched respiratory illnesses strike her family one by one. Her sister died of chronic obstructive pulmonary disease. Her father battled the same lung disease. Her husband has it now. Goree has asthma.  Goree, 72, lives in Beckville, a town of fewer than 800 people, just miles from the Martin Lake coal plant, a 2.4-gigawatt facility that has loomed over the region since the late 1970s."

**77** Other times the discrimination takes the form of mimicking the PLAINTIFF's work, such as a photo that appeared in USA Today that was reminiscent of one the PLAINTIFF shot for a back-to-school education story of a family sitting on the steps on Aug. 3, 2019 in Savannah, Georgia. When the PLAINTIFF sees content that resembles work she has created it feels as if the DEFENDANT is mocking or taunting her publishes a similar, distinct image or story excluding the PLAINTIFF from working for the DEFENDANT in any capacity.

Similarly, the PLAINTIFF heard newsroom chatter that also seemed to be reminiscent of dialogue from PLAINTIFF's personal life in an earlier year, such as the following:

1 Upon arriving at the newsroom, the PLAINTIFF quickly caught on to the fact the editor and some others were listening to the hearsay chatter, which could be heard in the newsroom aloud. The editor walked through the newsroom saying things like, "Said, Said; She said," with no other commentary to

give it context. After a while, the "saids" seemed to be correlated with whether people finished their work as promised. Some of the editor's remarks seemed to be about the PLAINTIFF's personal information, though it was mixed up and often not accurate. The PLAINTIFF heard the editor make comments about home schooling repeatedly and thought it was odd; it took months before PLAINTIFF caught on to it being a reference to her elementary school, which was Holmes School. "Drop it" was also a common saying. It might have related to a phrase from the PLAINTIFF's past involving playing ball – or perhaps not. The editor also called out "Brittney, Brittney" and an employee named Brittney worked in the newsroom, but then the editor added "Avery" to it, which could be related to a couple the PLAINTIFF was acquainted with. The editor asked questions out loud in the newsroom, such as: "Who said, 'We're poor?'" or "Who said, 'drop it?'" picking up pieces of conversations from the PLAINTIFF's personal life in Illinois. It was distracting at first; then it became annoying and personally so. The PLAINTIFF didn't respond to it.

2 Often, the DEFENDANTS used a hidden language or a form of double-speak also known as "the Conversation" to taunt, provoke or exclude the PLAINTIFF. It felt like she was being punished and bullied. While she some of understood it, she could not speak this double-speak form of English.

3 The reporter who sat directly across from the PLAINTIFF said "miss you" over and over while looking at his computer, which was situated directly behind the PLAINTIFF's workstation. He didn't seem to be speaking to anyone in particular. He left the company in late 2019 after a 40-year run. An editor died suddenly, another went out on a prolonged medical leave, returned and found a job in his home state. Two other reporters were in serious car accidents.

4 The PLAINTIFF tried to ignore these isolated phrases, but occasionally they were so personal as to be distracting and injurious. A few weeks after the PLAINTIFF arrived in Georgia, when she had Illinois plates on her car, she was pulled over on a highway for no apparent reason. It was a speed trap, with a police officer on a bridge holding a radar gun and several police cars on the side of the road pulling over cars. She wasn't exceeding the speed limit, but the officer gave her a ticket for violating a move over rule, saying she wasn't supposed to merge to the right lane, despite her reduced speed, when a police car was on the shoulder. She told the editor, who seemed to delight in the fact the PLAINTIFF had received a ticket. The editor walked into the newsroom saying, "Busted for traffic" or something that made it sound like a drug crime, in such a way as to be defaming.

5 After the PLAINTIFF worked for the Savannah Morning News for about a year, the editor started saying, "Go home. Go home, Ann," on a regular basis for no apparent reason and without saying it directly to the PLAINTIFF but instead saying it out loud in the newsroom. Other reporters caught on and started saying "malice." It became counterproductive.

## Corporate espionage as invasion of privacy

**78** Ordinarily the PLAINTIFF would pass off some of the similarities she noticed to coincidences. However, with the knowledge and understanding of the DEFENDANT's keen interest in collecting personal information on certain people, calling them coincidences becomes implausible. There were too many coincidences for them all to be coincidences.

**79** USA Today's health care news hub launched in 2022 is a similar concept to one the PLAINTIFF conceived.

**80** A companywide opioid project in 2019 followed a class project at DePaul University in 2017 the PLAINTIFF participated in. Was it a coincidence Gatehouse chose this topic or was it because it had been following the PLAINTIFF when she was involved in the opioid projects at DePaul?

**81** Was it a coincidence staff meetings were scheduled on day s when the PLAINTIFF was going to be out of the office, covering a school board meetings, for example so that any similarities to PLAINTIFF's business discussed in the meetings wouldn't be known by the PLAINTIFF? She also was excluded from other closed-door meetings other reporters were invited to.

**82** Was it a coincidence people in the company for many years seemed to know details about the PLAINTIFF's personal life?

**83** PLAINTIFF suspects the invasion of privacy pre-dates her employment, as she encountered many coincidences when she started working at a DEFENDANT newsroom, such as projects that borrowed strategies from business plans and proposals she had created in 2009-2012 in the Chicago area. The editor of the Savannah Morning News visited the Knight Center for Innovation in Journalism for a conference in 2018 or 2019, and PLAINTIFF wonders if she gained access to PLAINTIFF's grant/contest submissions. PLAINTIFF doesn't know how DEFENDANT learned of these concepts. It also could have been by accessing her laptop, which was tampered with in 2018.

**84** The DEFENDANT company also discussed using editorial strategies similar if not identical to those in a business plan she created in 2009. To take ideas from the PLAINTIFF while she is economically disadvantaged – her was at about the poverty line last year except for early withdrawals of retirement income and credit card lines of credit that kept her afloat.

**85** In 2019, the PLAINTIFF was excluded from participating in Beacon magazine, a print publication the Savannah Morning News publisher and editor launched in early 2019, which may have drawn from strategies she came up with earlier. It seemed odd she wouldn't be asked to help with it, given her years of magazine experience. The publication was published in print and also posted online. The publisher and the editor both left the company in 2020.

**86** The DEFENDANT sued Google in 2022 and 2023, and the PLAINTIFF notes while she didn't agree with the tactic for remedies the litigation took, she had provided information about Google's use of news content in a Google form she was asked to complete in 2018 or 2019, before her laptop was tampered with and the case broken where the cord is to be plugged in. For years, the PLAINTIFF had talked about how Google ended up with Performics' pay-per-click invention, which was partly funded by the news business (Tribune Ventures). Google's search engine was driven by news content, especially in its early years, yet the news industry hadn't claimed a royalty. She felt Google's use of news content without compensation, combined with the amount of advertising revenue it was generating at the expense of the news industry, was a violation. When asked to complete a form on how Google could help the news industry, she suggested a clawback of revenue and a royalty going forward. She completed the Google survey at her Georgia apartment from her laptop, which later would be broken when her apartment was accessed without permission. In 2020, several attorneys general sued Google. The U.S. Department of Justice also sued Google for its monopolistic practices in 2022. Gannett also filed lawsuits against Google after it terminated the PLAINTIFF. In a June 2023 USA Today article, Gannett said that in the previous year, "Google made upwards of $30 billion in revenue from the sale of ad space on publishers' websites, which was six times the digital advertising revenue of all U.S. news publications, combined." Not only did the PLAINTIFF receive no credit for her suggestion to pursue revenue from Google, but she was excluded from the DEFENDANT company before it pursued revenue and it provided no opportunity for continued dialogue. This is discrimination.

**87** Other documents related to PLAINTIFF's business also went missing from the PLAINTIFF's Georgia apartment, including contracts from previous publications where she had served as an outsourced editor.

**88** PLAINTIFF was excluded from use of the laptop she brought down to Georgia when it was tampered with and broken.

**89** The DEFENDANT seems to have used her writing style to such an extent it can be difficult to tell the difference. This is proprietary to the PLAINTIFF's business. The PLAINTIFF understands this is not a Copyright case being heard in a Copyright Court and doesn't expect this to be fully considered, outside of the allegations pertaining to the way she and her business were injured by the ongoing invasion of privacy. Other companies don't see the need to hire her if so much of her intellectual property has been stolen by media companies.

**90** In 2018 and 2019, the PLAINTIFF wondered if the Background Investigation document she was coerced to sign when she was hired was being used to gain information about her business

passively. She had serious concerns about the agreement, particularly regarding how it gave third-parties permission to interview sources, neighbors, friends, family, acquaintances and anyone the PLAINTIFF came in contact with.

**91** PLAINTIFF alleges the invasion of privacy also included surveillance of keystroking in the newsroom and continued after she left the company. The PLAINTIFF continues to notice times when her computer is tapped, as typos are inserted and on several occasions the cursor has jumped around without her touching the mouse. To the extent the DEFENDANT was monitoring the PLAINTIFF's writing or editing style, this would be **cyber espionage**. To the extent the DEFENDANT used the intellectual property, it would be theft and possible infringement. The Plaintiff was employed in an hourly nonexempt position and her business wasn't included in the hire.

**92** The Plaintiff's hard drives were stolen in December 2019, including one that was a mirror-replica back up of a desktop computer she had used for over 10 years. This backup, which had her name emblazoned on it, was professionally performed and cost $3,000. The PLAINTIFF's hard copies of newspapers containing her work also were stolen in 2020. She seeks access to digital versions of the newspaper on microfiche if available.

**93** The Plaintiff has lost countless computer files related to this case. She doesn't think it is random.

**Remedies and Relief**

**94** The PLAINTIFF is seeking monetary remedies and injunctions against invasions of privacy and against obstructions of her small business. The Americans with Disabilities Act, which states the courts may assess civil penalties for ADA violations against the entity in amounts "not exceeding $50,000 for a first violation and not exceeding $100,000 for any subsequent violation." The ADA also provides for immediate relief. The Biometric Information Privacy Act provides for remedies, and Rogers v. BNSF Ry. Co., No. 1:19-cv-03083, asserts a reasonable remedy for a privacy violation is $5,000 per occurrence.

**95** WHEREFORE, PLAINTIFF respectfully requests the court grant immediate relief from the Wrongful Termination and Failure to Hire in the form of a partial settlement as she currently isn't generating sufficient income to keep up with her bills and make much-needed repairs to her townhome;

**96** The PLAINTIFF seeks equitable, compensatory, declaratory and punitive relief from the Defendant's discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA), as well as the Clayton Act, the Sherman Act, and other laws involved.

**97** THE PLAINTIFF seeks an injunction from privacy invasions the DEFENDANT and associated third-party companies are involved with.

**98** The PLAINTIFF seeks an injunction from the DEFENDANT's continued obstruction of the PLAINTIFF's right to work of a professional, paid journalist independently and freely as the U.S. Constitution provides for.

Respectfully submitted,
Ann Meyer
*Pro Se*
Evanston, IL 847-271-0177

July 17, 2025